UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNIFER ROOT BANNON, as the Special Personal Representative of the Estate of Juston Root, <br><br> Plaintiff, <br><br> v. <br><br> BOSTON POLICE OFFICERS DAVID GODIN, JOSEPH McMENAMY, LEROY FERNANDES, BRENDA FIGUEROA, and COREY THOMAS; <br><br> MASSACHUSETTS STATE TROOPER PAUL CONNEELY; and <br><br> THE CITY OF BOSTON, MASSACHUSETTS; <br><br> Defendants. | Civil Action No. _____ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1.      On February 7, 2020, five Boston Police Officers—David Godin, Joseph McMenamy, Leroy Fernandes, Brenda Figueroa and Corey Thomas—and one Massachusetts State Trooper—Paul Conneely—(together, the "Individual Defendants") shot and killed Juston Root while he was on the ground, unarmed, seriously injured, and desperately struggling to breathe.  Mr. Root did not flee.  He did not point or brandish a weapon of any kind.  He made no threatening or overt act toward the Individual Defendants or anyone else.  In sum, he undeniably posed no immediate threat to harm anyone.  But within seconds of charging toward a bleeding and helpless Mr. Root, the Individual Defendants, without warning, collectively fired at least 31 rounds into him in a span of approximately three seconds.  The Individual Defendants undeniably used unnecessary, gratuitous, and disproportionate force in effecting the seizure of Mr. Root in violation of his constitutional rights.

2.      An indication of the Individual Defendants' callous disregard for Mr. Root's life can be found in video footage recorded immediately after the shooting.  That footage demonstrates that not only did these officers fail to render aid to Mr. Root following the shooting, but some of them spent those moments congratulating each other, boasting, and discussing how to cover up their actions.  Their statements included the following: "Yeah, I killed that motherf**ker," "I emptied my magazine on him," "Just shut your f**kin' mouth," "You got a [union] rep coming?" "I won't talk," "I gotta get out of here."

3.      Based upon this conduct, and as described in greater detail below, the Estate of Juston Root (the "Estate") has brought the present action against the Individual Defendants and the City of Boston under 42 U.S.C. § 1983 for their violation of Mr. Root's rights under the Fourth and Fourteenth Amendments of the United States Constitution, the Massachusetts Declaration of Rights, and Massachusetts common law.  By this action, the Estate seeks to shed light on precisely

what transpired on February 7, 2020, to hold the defendants accountable for their wrongful conduct, and to ensure that appropriate remedial measures are taken by the Boston Police Department and the City of Boston to prevent similar tragic killings in the future.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1367.  This action arises under the Constitution and laws of the United States, and this Court has supplemental jurisdiction over the state law claims.  Specifically, Plaintiff seeks damages for violations of Mr. Root's rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, the Massachusetts Declaration of Rights, and Massachusetts law.

5.      This Court has personal jurisdiction over Defendants because they all reside within the Commonwealth of Massachusetts.

6.      Venue is proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in Massachusetts.

## PARTIES

7.      Plaintiff Jennifer Root Bannon ("Plaintiff") is Juston Root's sister.  She is the duly-appointed Special Personal Administrator of Mr. Root's estate.  *See In the Matter of Juston Root*, No. 20P0332EA (Suffolk Cnty. Probate & Family Ct. Feb. 21, 2020).  The hearing to appoint Plaintiff as the permanent Personal Representative of Mr. Root's estate has been postponed due to the Covid-19 pandemic.  Plaintiff resides in Norfolk County, Massachusetts.

8.      Defendant City of Boston ("City") is a Massachusetts municipality located in Suffolk County and organized under the laws of Massachusetts.  Its city hall is located at 1 City Hall Square, Boston, Massachusetts 02201.  The City oversees and operates the Boston Police Department ("BPD").  The City promulgated and otherwise adopted under the color of state law

rules, practices, procedures, policies, and other customs to be followed by its law enforcement officers.

9.      Defendant David Godin ("Defendant Officer Godin"), whose true address is unknown to Plaintiff, is a duly appointed officer, ID number 103757, of the BPD.  At all relevant times, Defendant Officer Godin was employed by the BPD and was acting within the scope of his employment and under the color of state law.  This action is brought against him in his individual capacity.  On information and belief, Defendant Officer Godin is a Massachusetts resident.

10.     Defendant Joseph McMenamy ("Defendant Officer McMenamy"), whose true address is unknown to Plaintiff, is a duly appointed officer, ID number 144501, of the BPD.  At all relevant times, Defendant Officer McMenamy was employed by the BPD and was acting within the scope of his employment and under the color of state law.  This action is brought against him in his individual capacity.  On information and belief, Defendant Officer McMenamy is a Massachusetts resident.

11.     Defendant Leroy Fernandes ("Defendant Officer Fernandes"), whose true address is unknown to Plaintiff, is a duly appointed officer, ID number 113407, of the BPD.  At all relevant times, Defendant Officer Fernandes was employed by the BPD and was acting within the scope of his employment and under the color of state law.  This action is brought against him in his individual capacity.  On information and belief, Defendant Officer Fernandes is a Massachusetts resident.

12.     Defendant Brenda Figueroa ("Defendant Officer Figueroa"), whose true address is unknown to Plaintiff, is a duly appointed officer, ID number 148264, of the BPD.  At all relevant times, Defendant Officer Figueroa was employed by the BPD and was acting within the scope of her employment and under the color of state law.  This action is brought against her in her

individual capacity.  On information and belief, Defendant Officer Figueroa is a Massachusetts resident.

13.     Defendant Corey Thomas ("Defendant Officer Thomas"), whose true address is unknown to Plaintiff, is a duly appointed officer, ID number 153159, of the BPD.  At all relevant times, Defendant Officer Thomas was employed by the BPD and was acting within the scope of his employment and under the color of state law.  This action is brought against him in his individual capacity.  On information and belief, Defendant Officer Thomas is a Massachusetts resident.

14.     Defendant Paul Conneely ("Defendant Trooper Conneely"), whose true address is unknown to Plaintiff, is a duly appointed trooper, ID number 3094, of the Massachusetts State Police ("State Police").  At all relevant times, Defendant Trooper Conneely was acting within the scope of his employment and under the color of state law.  This action is brought against him in his individual capacity.  On information and belief, Defendant Trooper Conneely is a Massachusetts resident.

## FACTS

### A.     Background

15.     Mr. Root was born in 1979 and was raised in Boston, Brookline, and Ashland, Massachusetts.  In February 2020, he resided at 13 Catbird Court, Mattapan, Massachusetts.

16.     When he was 20 years old, he was diagnosed with both bipolar disorder and schizoaffective disorder, two chronic mental health conditions.  Since approximately 2010, Mr. Root was treated for his psychiatric illness at the Massachusetts Mental Health Center located at 75 Fenwood Road, adjacent to Brigham & Women's Hospital ("BWH") in Boston.

17.     Among the problems caused by Mr. Root's psychiatric disability were delusions that he was a law enforcement officer.  In fact, Mr. Root had previous interactions with the BPD

arising from such delusions.  As a result, the BPD knew about Mr. Root's mental health struggles, that he previously had been hospitalized, and that he sometimes carried a clear plastic paintball pistol and/or a BB gun pistol.  On March 26, 2019, Mr. Root drove into the parking lot of the District B-13 BPD station and flagged down BPD officers to report that a local grocery store was illegally putting pesticides and other substances in its meat.  According to the BPD incident report, Mr. Root claimed he worked, or formerly worked, for the CIA, DEA, and NASA.  BPD officers ran Mr. Root's license plate—which was the same plate that was on his car on February 7, 2020 (MA 8SL846)—and learned the vehicle was registered to Juston Root.  As a result of a frisk of Mr. Root and search of his car, the BPD learned that Mr. Root possessed a clear plastic paintball pistol and a BB gun pistol.  Because of this incident, Mr. Root was FOIed, meaning that the information the BPD learned as a result of this incident was added to the BPD's Field Interrogation and Observation database.

**B.      BPD Officers Shot Mr. Root Near 75 Fenwood Road.**

18.      On the morning of February 7, 2020, Mr. Root drove his light gray Chevrolet Volt with Massachusetts license plate number 8SL846 from his residence in Mattapan to Fenwood Road in Boston.  He drove past the Massachusetts Mental Health Center at 75 Fenwood Road and double parked his car in front of 65 Fenwood Road.  This location is one block from the main entrance to BWH located at 75 Francis Street, Boston.

19.      Upon information and belief, around this time, the BPD was called with a report of a person with a gun near BWH.

20.      According to Defendant Officer McMenamy, who heard a BPD dispatch report of the incident over his radio, calls for people displaying guns is "very common . . . in that area."  He did not respond to the call.

5

21.     Ultimately, two other BPD officers, Defendant Officer Godin and Officer Michael St. Peter (BPD ID number 108891), arrived on the scene in separate, marked BPD cruisers.

22.     Defendant Officer Godin drove to the Fenwood Road area and parked his cruiser in front of 65 Fenwood Road, at the intersection of Fenwood Road and Vining Street, and in very close proximity to Mr. Root's vehicle.  As Defendant Officer Godin was exiting his vehicle, Mr. Root was walking down the Vining Street sidewalk away from Francis Street and toward Fenwood Road.  As Defendant Officer Godin turned the corner on the sidewalk from Fenwood Road onto Vining Street he encountered Mr. Root.  Upon seeing Mr. Root, and while Mr. Root was facing away from him, Defendant Officer Godin drew his firearm:



23.     When Mr. Root turned around and saw Defendant Officer Godin's gun pointing in his direction, Mr. Root removed from his waistband an uncharged, unloaded, clear plastic paintball pistol.  Defendant Officer Godin fired at Mr. Root and then stumbled backward and fell onto the sidewalk and into the intersection.  According to Defendant Officer Godin, he got to his feet and again attempted to fire at Mr. Root, but his firearm jammed.

24.     Upon information and belief, Defendant Officer Godin's BPD-issued firearm is a Glock 22 with the serial number VYN765.  In violation of BPD policy, the firearm Defendant Officer Godin used on February 7 was not his BPD-assigned Glock 22, but instead was a firearm on which he had not been qualified.  According to Defendant Officer Godin, he does not know how he came to be without his BPD-issued firearm.

25.     During an interview conducted as part of the Norfolk County District Attorney's Office's investigation into the events of February 7, Defendant Officer Godin could not remember the make or caliber of his firearm.  At one point he said it was a Glock 22; when asked the caliber, he said .45 but was corrected by an investigating officer, who informed him it was a .40 caliber; he then agreed it was a .40 caliber and stated, without being asked, that it was a .40 caliber Smith; and finally, an interviewing officer again corrected him and explained that his BPD-issued firearm was not a Smith but a Glock 22 .40 caliber.

26.     Moments before Defendant Officer Godin parked his cruiser in front of 65 Fenwood Road,  Officer St. Peter arrived and parked his cruiser in the middle of the intersection of Fenwood Road and Vining Street. According to Officer St. Peter, he exited his cruiser, stood by the hood on the driver's side, heard shots fired, and fired at Mr. Root.  Officer St. Peter also stated that he saw Mr. Root fall and grimace and that he believed that Mr. Root "was mortally wounded" and would "succumb to his injuries at some point there."  At no point during his

interactions with the BPD officers that morning were paintballs or anything else fired from Mr. Root's uncharged, unloaded, clear plastic paintball pistol.

27.    Surveillance video footage shows that while Defendant Officer Godin was getting to his feet and Officer St. Peter was standing next to his cruiser, Mr. Root limped back to his Chevrolet Volt, got into it, and drove away:



28.     Defendant Officer Godin and Officer St. Peter then got into their respective cruisers and began to pursue Mr. Root westbound on Route 9 (Huntington Avenue) toward Brookline.

29.     Over the radio in his cruiser, Defendant Officer Godin informed dispatch, "I've shot him.  I know I shot him."

30.     Upon information and belief, Mr. Root was not the only person whom BPD shot at BWH that morning.  A valet standing near the entrance to BWH at 75 Francis Street was struck in the head by a bullet shot by either Defendant Officer Godin or Officer St. Peter as they fired at Mr. Root.

31.     The Suffolk County District Attorney's Office confirmed the valet was shot by BPD and is investigating Defendant Officer Godin's and Officer St. Peter's conduct on the morning of February 7.  That investigation is ongoing.

**C.     The Individual Defendants Fatally Shot Mr. Root on Route 9 in Chestnut Hill.**

32.     As Defendant Officer Godin and Officer St. Peter chased Mr. Root westbound on Route 9, other BPD cruisers joined the pursuit.  Among the BPD officers who joined the pursuit were Defendant Officers Figueroa, Thomas, McMenamy, and Fernandes.

33.     Defendant Officers Thomas and Fernandes were together in the same cruiser.

34.     According to Defendant Officer Godin, during the pursuit, he was able to fix the jam in the firearm he was carrying.

35.     According to the Norfolk County District Attorney's Office, "[n]ear the beginning of the pursuit, a BPD cruiser struck [Mr. Root's] vehicle in an unsuccessful attempt to disable or stop it."  Defendant Officer McMenamy was the officer who "tried to pit maneuver [Mr. Root] on the . . . driver's side of his car."  A PIT ("Pursuit Intervention Technique") maneuver is a technique whereby an officer deliberately strikes or makes contact with a vehicle being pursued to bring it to a stop.  On video footage taken on February 7, Defendant Officer McMenamy is recorded

saying, "I rammed him on Huntington.  Like everybody was kinda following him, so I came in, and I just, boom," while making a "T" with his hands.

36.     Using a police vehicle to deliberately strike a pursued vehicle violates BPD Rules and Procedures.  *See* BPD Rule 301, § 7.6.7 (eff. Apr. 29, 2013), *available at* https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/t/52af5f16e4b0dbce9d22a7dd/1387224854494/Rule+301.pdf ("Vehicle Contact: Officers shall not use their police vehicle to deliberately make contact with a pursued vehicle.").

37.     The extent to which Mr. Root's vehicle was damaged and made less operable by Defendant Officer McMenamy's reckless behavior is uncertain.  Similarly uncertain is the extent to which Mr. Root suffered further injury as a result of that collision.  After Defendant Officer McMenamy struck Mr. Root's car, Mr. Root put his Chevrolet Volt back in motion and continued driving westbound on Route 9 into Brookline, with six to seven BPD cruisers still in pursuit.

38.     In addition to prohibiting PIT maneuvers, BPD Rules and Procedures relating to Pursuit Driving require that supervisors be engaged to control and coordinate the pursuit and to provide supervision, support, and guidance to pursuing officers during and after the pursuit.  *See* BPD Rule 301, §§ 7.2 and 7.5.  As evidenced by, among other things, Defendant Officer McMenamy's PIT maneuver, BPD failed to maintain proper supervision over the pursuit.

39.     Massachusetts State Police cruisers also joined the pursuit.  Among the State Police troopers who joined was Defendant Trooper Conneely (State Police cruiser number 1195).  Defendant Trooper Conneely was on patrol on Route 9 near the Brookline-Newton line when he learned that shots had been fired in the vicinity of BWH and that BPD officers were pursuing a suspect in a vehicle traveling westbound on Route 9.  He headed eastbound on Route 9 in the direction of BWH.  He stopped his cruiser in a cut-out in the median of Route 9 and planned to put

out stop sticks, a tire deflation device, to stop the suspect's vehicle.  Before Defendant Trooper Conneely could put out the stop sticks, Mr. Root, in the identified vehicle, passed him.  Defendant Trooper Conneely then fell in behind several BPD cruisers in pursuit westbound on Route 9.

40.     During the drive westbound on Route 9 from BWH, Mr. Root was bleeding profusely from a gunshot wound he sustained on Vining Street.  A Fallon Ambulance report prepared later that day reflected that Mr. Root had lost approximately 2,000 cc of blood (almost half of the total amount of an average-sized adult) while in his car.

41.     The following photos show the blood pooled on, and soaked into, the driver's seat and surrounding area of Mr. Root's vehicle.  Also shown is the uncharged, unloaded, clear plastic paintball pistol that had been carried by Mr. Root on Vining Street:









42.     Approximately 6 minutes after being shot in Boston and leaving 65 Fenwood Road,
Mr. Root's Chevrolet Volt collided with another vehicle at the intersection of Route 9 and
Hammond Street in the Chestnut Hill neighborhood of Brookline.  His car continued through the
intersection and came to a stop in the right-hand lane of Route 9 near the entrance to a shopping
center parking lot.  Mr. Root's car was severely damaged.  By the time the vehicle came to a stop,
three of its tires had fallen off:





43.     Defendant Trooper Conneely saw the collision and observed Mr. Root's car travel through the intersection, collide with another car, and come to a stop on the opposite side of the intersection.

44.     Seconds after coming to a stop, Mr. Root opened the driver's door and began to exit his vehicle.  As he was getting out of his car, he fell, got up, stumbled around the front of the

car, and limped onto the nearby sidewalk.  There, his legs buckled, and he fell onto his back.  He continued to lie on his back for a moment but eventually managed to get himself back on his feet.

45.     At the time Mr. Root's vehicle came to a stop, a female, former Emergency Medical Technician (the "EMT") was sitting in her car in the adjacent shopping center parking lot.  The EMT saw Mr. Root's car strike the curb and come to a stop.  She observed him get out of his car and then fall onto the sidewalk.  As she later explained to law enforcement investigators, when she saw Mr. Root fall and struggle to get back up, she "realized something was really wrong," and she went running toward him to administer aid.

46.     Mr. Root staggered from the sidewalk into an adjoining mulched area with trees and shrubbery.

47.     As the EMT further explained to law enforcement investigators, when she reached Mr. Root in the mulched area, he "had fallen again and was trying to stand back up again, but he was very, very wobbly."  He was clutching his chest, and she thought he was having a heart attack. As she was "standing over him," she saw that "he was covered in blood."  He was not talking or groaning, and the former EMT described him as having "lights on, no one home."

48.     The EMT was trying to render aid to Mr. Root, who in her opinion appeared unable to communicate.  As she put her hand on his left shoulder to assist him, she heard a police officer ordering her to run away.  Reluctantly, she did so.  As she described it to law enforcement, she heard "screaming, 'Run, run, run, go,' and [she] turned around, and there was what seemed like at least a dozen officers . . . with their weapons drawn, pistols, and it looked like . . . or handguns . . . shotguns."  The following stills from a video captured on a bystander's cell phone show the EMT approaching Mr. Root to help him as he fell to the ground:



Former EMT who tried to help Mr. Root

Mr. Root



Former EMT who tried to help Mr. Root

Mr. Root flat on the ground

49.     Defendant Officer McMenamy was the first officer to arrive at the scene.  As he entered the mulched area, he observed the EMT next to Mr. Root and touching his shoulder. He yelled at her to get away.

50.     Defendant Officer Godin arrived within seconds of Defendant Officer McMenamy. Defendant Officer Godin pulled his cruiser up past Mr. Root's car and saw Mr. Root lying on the ground.   As he later described it to law enforcement investigators, he observed Mr. Root "staggering up on that . . . mulch area. . . . [N]ot even staggering, almost like crawling."  He also saw the EMT trying to help Mr. Root.

51.     As the EMT began to run away, Defendant Officer McMenamy walked toward Mr. Root, and, while standing directly over him as he was crouched on the ground and while in a

position to observe Mr. Root's significantly impaired condition, Defendant Officer McMenamy
"put [his] foot up like [at a] 90-degree angle and kicked [Mr. Root] down to the ground."
Defendant Officer McMenamy then stepped back and was joined by Defendant Officer Godin,
Defendant Trooper Conneely, Defendant Officer Figueroa, Defendant Officer Fernandes, and
Defendant Officer Thomas, who formed a loose line a few feet from Mr. Root.

52.    As the Individual Defendants charged into the mulched area they collectively,
simultaneously, and unintelligibly began screaming a series of commands such as "Stay down,"
"Get down," and "Let me see your hands."

53.    A bystander who was in the parking lot reported to law enforcement that "there
were multiple cops yellin' different things."

54.    Another bystander stated he could not "hear exactly what [the police were]
screaming, because . . . everybody was screaming."

55.    Defendant Officer Godin admitted that he and the other officers yelled conflicting
and confusing commands.  As he described it to law enforcement investigators: "[Mr. Root] was
in like a, it was in front of like a shoppin' plaza or a side mall or whatever, but he was up on the
curb like a grassy, it was like all muddy, and he was layin' there . . . . He laid there, um, and . . .
I'm just yellin' at him to lay on the ground with your hands out.  Get on the ground 'cause he's in
like a seated position, um, actually he was leaning to his right-hand side on a, like a seated position,
and we continue to tell him to lay on the ground hands out . . . [E]verybody was yellin', everybody
. . . it was so loud and there was so many, all of us just yellin' commands."

56.    Although the officers were screaming incomprehensibly to get down and stay
down, Mr. Root was already down on the ground.  Moreover, as the Individual Defendants plainly
observed from a few feet away, Mr. Root was in no condition to comprehend, let alone respond

to, the cacophony of orders being simultaneously shouted.  He was helpless and incapacitated as a result the tremendous loss of blood from the gunshot wound he had suffered a few minutes earlier on Vining Street—a serious wound that both Individual Defendant Godin and Officer St. Peter had radioed to all that they believed Mr. Root had sustained.  Finally, as each of the Individual Defendants acknowledged in post-event statements to law enforcement investigators, at no time in Chestnut Hill did any of them see Mr. Root point or brandish a gun or any other type of weapon at them or anyone else.

57.    Regardless, in a matter of a few seconds—after Defendant Officer McMenamy had kicked Mr. Root fully to the ground and after the officers collectively and simultaneously shouted a host of incomprehensible commands—without warning, the Individual Defendants opened fire from a few feet away and shot Mr. Root at least 31 times.  All 31 shots were fired within approximately three seconds.

58.    At the time the 31 shots were precipitously fired, Mr. Root posed no immediate threat, and many alternatives short of the use of lethal force remained available to the Individual Defendants.  Clearly a more measured approach was called for.

59.    No one, including none of the Individual Defendants, took control of the scene before Mr. Root was shot.  No one suggested that officers take cover or triangulate as they approached Mr. Root lying in the mulch.  No one attempted to assess Mr. Root's physical or mental condition.  No one attempted to engage Mr. Root in a conversation.  No one attempted to take a measured approach and de-escalate the situation.  There was no one in charge.  It was chaos. Tactically, it was a disaster.

60.    Instead, without any threatening action having been taken by Mr. Root, within less than ten seconds of the EMT leaving his side, and with what can only be described as a callous

disregard for Mr. Root's life, the Individual Defendants collectively fired dozens of shots into Mr. Root. A total of 31 shell casings—all of which were matched to their firearms—were found at the scene.

61.     Mr. Root's body was riddled with bullets and covered in blood.

62.     A witness informed law enforcement investigators that  the shooting "sounded like the 4th of July."  The witness "highly doubt[ed]" that Mr. Root was moving after the shooting— or that anyone could have moved after being shot like that—because "[t]here was a lot of shots fired."

63.     After the shooting, Defendant Trooper Conneely and Defendant Officer Figueroa handcuffed Mr. Root.  A BB gun pistol, which Mr. Root sometimes carried in a left shoulder holster, was reportedly found in the mulch under his body.

64.     Video footage captured law enforcement officers' conversations and conduct after the shooting.

65.     While Mr. Root was still lying in the mulch, Defendant Trooper Conneely walked over to Defendant Officer McMenamy and asked if he had fired shots.  Defendant Officer McMenamy confirmed that he had.  The two shook hands in a congratulatory manner.  Defendant Trooper Conneely reached out to shake another BPD officer's hand while asking if that officer had shot too; when that officer said he had not, Defendant Trooper Conneely withdrew his hand.

66.     Defendant Trooper Conneely then told Defendant Officer McMenamy, "Just shut your f**kin' mouth," and asked him, "You got a [union] rep coming?"  Defendant Officer McMenamy responded, "Yeah, I don't know.  I won't talk."

67.     Defendant Officer Godin told other officers, "I gotta get out of here."  When an officer later asked Defendant Officer Godin if he was alright, he responded, "Yeah, I killed that mother**ker."

68.     Defendant Officer Godin also told a supervising officer at the scene moments after the shooting, "I emptied my magazine on him."

69.     While walking around the scene after the shooting, Defendant Officer Figueroa asked another officer, "Did you shoot?  I shot too.  We're good."  A male BPD officer in a gray hooded sweatshirt responded, "Don't say nothing to nobody."

70.     None of the Individual Defendants attempted to administer aid or tried to revive Mr. Root.  When one officer asked if someone wanted to check for Mr. Root's pulse, another responded, "Don't think he has one."  A few minutes went by before officers began tending to him.

71.     The entire pursuit from its inception on Fenwood Road to where Mr. Root got out of his car on Route 9 lasted approximately 6 minutes.  During that time, BPD Officers, including Defendant Officer Godin, communicated over radio about the status of the pursuit.  None of the officers and no BPD supervisor, however, formulated or communicated a plan for the pursuit itself or any confrontation with  Mr. Root following the pursuit.

72.     The Individual Defendants and other officers involved in the pursuit and the shooting were acting independently and without regard for how each other was approaching the pursuit, Mr. Root's apprehension, or the shooting.  The Individual Defendants were unaware of which officers arrived on the scene on Route 9, were unaware of where other officers were standing, and were unaware of who shot at Mr. Root.  For example, Defendant Trooper Conneely

admitted that other than an officer to his left, he had "no idea" if other officers around him were shooting too.

## D.    Mr. Root's Fatal Injuries

73.    Mr. Root was taken to the hospital by ambulance.

74.    He was pronounced dead at Beth Israel Deaconess Medical Center.

75.    The Massachusetts Office of the Chief Medical Examiner ("Medical Examiner") performed on autopsy on Mr. Root's body.  The Medical Examiner's summary autopsy report reflects that there was a total of 50 gunshot wounds or bullet holes in Mr. Root's body, 26 of which were deemed entry wounds and 22 of which were wounds to his torso.  He also had 6 bullet holes in his right leg, 5 in his left leg, 8 in his left arm and elbow, a through-and-through hole in a right finger, a through-and-through hole in his left thumb, and a graze wound on the left side of his chest.  Mr. Root suffered brain hemorrhaging due to a projectile that hit his vertebrae, resulting in a sudden rush of blood from his aorta to his brain.

76.    The Medical Examiner determined that the cause and manner of Mr. Root's death were homicide by multiple gunshots from law enforcement.

## E.    Defendant Officers Godin, McMenamy, Thomas, and Fernandes Did Not Have Their Body Cameras Turned On During the Shooting.

77.    All BPD police officers, including the five BPD officer-Defendants in this case, are assigned BPD-issued body worn cameras ("BWCs").  By rule, BPD requires its officers to wear their BWCs when on duty and performing any patrol function.  *See* BPD Rule 405 (eff. May 31, 2019), *available at* https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/t/5db05d41e4661c456ab6b870/1571839297911/SO19-015.pdf.  BPD Rule 405 also requires BPD officers to activate their BWCs during "[a]ll dispatched calls for service involving contact with civilians"; "[i]ncidents of Pursuit Driving"; "[a]ny contact that becomes adversarial, including a

Use of Force incident, when the officer has not already activated the [BWC]"; and "[a]ny other civilian contact or official duty that the officer reasonably believes should be recorded to enhance policing transparency, increase public trust and police-community relations, or preserve factual representations of officer-civilian interactions, provided that recording" complies with other sections of the BPD body camera policy. *Id*. at § 2.2.

78.     All five of the BPD Officer Defendants had been issued BWCs.  Contrary to BPD Rule 405, only Defendant Officer Figueroa activated her BWC before the shooting.  Although she did not activate her BWC at the outset of the pursuit, she did while she was pulling up to the area where Mr. Root got out of his car on Route 9.  Defendant Officer Figueroa, however, wore her BWC in such a way that her camera was largely covered when she approached and shot Mr. Root.  She turned her camera off approximately 5 minutes after the shooting.

79.     Both Defendant Officers McMenamy and Thomas were wearing a BWC during the shooting, but neither activated it until *after* the shooting.

80.     Defendant Officers Godin and Fernandes reported to law enforcement investigators after the shooting that they were not wearing their issued BWCs at the time of the shooting.

## COUNT 1:  42 U.S.C. § 1983
### EXCESSIVE USE OF FORCE IN VIOLATION OF JUSTON ROOT'S FOURTH AMENDMENT RIGHTS
### (Against the Individual Defendants)

81.     Plaintiff realleges and reincorporates herein Paragraphs 1 – 80.

82.     The Fourth Amendment to the United States Constitution guarantees the right of the people to be secure in their persons against unreasonable seizures.  That right includes the right to be free from the use of excessive and/or deadly force during the seizure of a person.

83.     On Route 9 in Chestnut Hill, the Individual Defendants, acting under color of law, intentionally restrained Mr. Root's freedom of movement and ability to walk away by pointing

22

their firearms at Mr. Root and issuing verbal commands.   Their conduct constituted a seizure within the meaning of the Fourth Amendment.

84.   The Individual Defendants' shooting of Mr. Root, while acting under color of law, was intentional.   The Individual Defendants:

      a.   drew their firearms,

      b.   pointed their firearms at Mr. Root,

      c.   placed their fingers on the triggers of their firearms,

      d.   fired their firearms by intentionally applying pressure to the triggers, and

      e.   intended to shoot Mr. Root and cause him severe physical injury or death.

85.   As a result of the Individual Defendants' actions, Mr. Root was seized within the meaning of the Fourth Amendment.

86.   When the Individual Defendants shot Mr. Root, he was in their custody and control.

87.   Moments before the shooting, the EMT was able to readily recognize that Mr. Root was seriously injured and needed immediate medical attention, so she tried to help him.   He had fallen on the sidewalk, had staggered into the mulch area, was unable to get up, was severely injured, was covered in blood, was non-communicative, was grasping his chest, and appeared to be having a heart attack.

88.   At the time of the shooting, Mr. Root was defenseless and unarmed.   He did not flee; he did not resist in any way; and he did not pose an immediate or future threat of harm to the Individual Defendants or anyone else.   As a result, the Individual Defendants had no reasonable justification for the use of deadly force.

89.   The Individual Defendants' intentional use of deadly force was unreasonable, excessive, unjustified, and constitutes a seizure under the Fourth Amendment.

90.     The Individual Defendants violated Mr. Root's constitutionally protected right under the Fourth Amendment to be free from unreasonable seizures of his person.

91.     As a direct and proximate result of the Individual Defendants' intentional conduct, Mr. Root was subjected to excessive force during a seizure and was killed.

92.     An objectively reasonable law enforcement officer would have understood, at the moment that the shots were fired, that employing deadly force against Mr. Root under the circumstances presented would contravene clearly established case law and general Fourth Amendment principles and statements of law.

93.     The Individual Defendants' intentional and excessive use of deadly force was such an obvious and/or apparent violation of the Fourth Amendment's prohibition against unreasonable seizures that a reasonable officer would not have required prior case law to be on notice that his or her conduct was unlawful or unconstitutional.

94.     A reasonable officer in the Individual Defendants' position would, or should, have understood that his or her conduct violated Mr. Root's right to be free from the excessive use of deadly force.

95.     Plaintiff is therefore entitled to damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## COUNT 2:  MASS. G.L. c. 12, §§ 11H & 11I
### EXCESSIVE USE OF FORCE
### (Against the Individual Defendants)

96.     Plaintiff realleges and reincorporates herein Paragraphs 1 – 95.

97.     During the shooting in Chestnut Hill, the Individual Defendants, by means of threats, intimidation, and coercion, intentionally and unlawfully used excessive deadly force against Mr. Root, and thereby interfered with Mr. Root's right to be free from unreasonable

seizures secured by Article XIV of the Massachusetts Declaration of Rights and by the Fourth Amendment to the United States Constitution.

98.     Mr. Root was killed as a result of the Individual Defendants' use of threats, intimidation, and coercion to interfere with his rights.

99.     Plaintiff is therefore entitled to damages and attorneys' fees pursuant to G.L. c. 12, §§ 11H and 11I.

**COUNT 3:  42 U.S.C. § 1983**
**DEPRIVATION OF DUE PROCESS IN VIOLATION OF JUSTON ROOT'S**
**FOURTEENTH AMENDMENT RIGHTS**
**(Against the Individual Defendants)**

100.     Plaintiff realleges and reincorporates herein Paragraphs 1 – 99.

101.     The Fourteenth Amendment protects a person from the deprivation of life, liberty, and property without due process of law.

102.     The Individual Defendants' conduct described above was committed under color of law and reflected reckless or callous indifference to Mr. Root's clearly established rights, in violation of Mr. Root's Fourteenth Amendment right to life.

103.     As a direct and proximate result of the Individual Defendants' reckless or callous indifference, Mr. Root was deprived of his life without due process of law.

104.     The Individual Defendants' violation of Mr. Root's Fourteenth Amendment rights through their reckless and callous conduct was clearly established under existing case law or general Fourteenth Amendment principles and statements of law such that it was apparent to the Individual Defendants that their conduct was unlawful and unconstitutional.

105.     The Individual Defendants' violation of Mr. Root's Fourteenth Amendment rights through their reckless and callous conduct was such an obvious and/or apparent violation of the Fourteenth Amendment's general prohibition of the deprivation of life without due process of law

that a reasonable officer would not have required prior case law to be on notice that his or her conduct was unlawful and unconstitutional.

106.   A reasonable officer in the Individual Defendants' position would, or should, have understood that his or her conduct violated Mr. Root's right to life without due process of law.

107.   Plaintiff is therefore entitled to damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## COUNT 4:  MASS. G.L. c. 12, §§ 11H & 11I
### DUE PROCESS
### (Against the Individual Defendants)

108.   Plaintiff realleges and reincorporates herein Paragraphs 1 – 107.

109.   During the shooting in Chestnut Hill, the Individual Defendants, by means of threats, intimidation, and coercion, intentionally and unlawfully used deadly force against Mr. Root, and thereby interfered with Mr. Root's right to life secured by Article XII of the Massachusetts Declaration of Rights and by the Fourteenth Amendment to the United States Constitution.

110.   Mr. Root was killed as a result of the Individual Defendants' use of threats, intimidation, and coercion to interfere with his rights.

111.   Plaintiff is therefore entitled to damages and attorneys' fees pursuant to G.L. c. 12, §§ 11H and 11I.

## COUNT 5:  42 U.S.C. § 1983
### EXCESSIVE USE OF FORCE IN VIOLATION OF JUSTON ROOT'S FOURTH AMENDMENT RIGHTS
### (Against Officer Joseph McMenamy)

112.   Plaintiff realleges and reincorporates herein Paragraphs 1 – 111.

113.   During the vehicle pursuit of Mr. Root's car, Defendant Officer McMenamy, acting under color of law, intentionally restrained Mr. Root's freedom of movement and used excessive

force against Mr. Root by engaging in a PIT maneuver and colliding with Mr. Root's vehicle.  Mr. Root was thereby seized within the meaning of the Fourth Amendment.

114.    A PIT maneuver is an unreasonable and dangerous technique by which an officer uses his moving vehicle to to stop a suspect's moving vehicle.

115.    Defendant Officer McMenamy intentionally performed a PIT maneuver by using his BPD cruiser to stop Mr. Root's vehicle.

116.    The BPD recognizes that a PIT maneuver is unreasonably dangerous.  The BPD's policies and procedures expressly prohibit the use of PIT maneuvers.

117.    When Defendant Officer McMenamy first approached the scene of the ultimate shooting, he observed the EMT attempting to render aid to Mr. Root.  He ordered the EMT to get away from Mr. Root.  Mr. Root was defenseless, was not armed, offered no resistance, did not attempt to flee, and posed no immediate threat of harm to the Individual Defendants or anyone else.  He was severely injured, bleeding profusely, non-verbal, and appeared to be having a heart attack.  He appeared to the EMT to not understand what was happening—as she stated to investigators: "it appeared that the lights were on, but no one was home."

118.    As the EMT obeyed Defendant Officer McMenamy's order to get away, Defendant Officer McMenamy approached Mr. Root—who was crouched on  the ground—and intentionally kicked him to the ground, exacerbating his already seriously impaired condition.

119.    Defendant Officer McMenamy's intentional uses of force in executing the PIT maneuver and in kicking Mr. Root were both excessive and unjustified.

120.    Defendant Officer McMenamy violated Mr. Root's right under the Fourth Amendment to be free from unreasonable seizures of his person.

121.    As a direct and proximate cause of Defendant Officer McMenamy's intentional conduct, Mr. Root was subjected to excessive force during seizures.

122.    Defendant Officer McMenamy's violations of Mr. Root's Fourth Amendment right through his use of excessive force were clearly established under existing case law or general Fourth Amendment principles and statements of law such that it was apparent to Defendant Officer McMenamy that his conduct was unlawful and unconstitutional.

123.    Defendant Officer McMenamy's intentional and excessive uses of force were such obvious and/or apparent violations of the Fourth Amendment's prohibition against unreasonable seizures that a reasonable officer would not have required prior case law to be on notice that his conduct was unlawful or unconstitutional.

124.    A reasonable officer in Defendant Officer McMenamy's position would or should have understood that his conduct violated Mr. Root's right to be free from the excessive use of force.

125.    Plaintiff is therefore entitled to damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## COUNT 6:  MASS. G.L. c. 12, §§ 11H & 11I
### EXCESSIVE USE OF FORCE
### (Against Officer Joseph McMenamy)

126.    Plaintiff realleges and reincorporates herein Paragraphs 1 – 125.

127.    When Defendant Officer McMenamy performed a PIT maneuver during the vehicle pursuit, Defendant Officer McMenamy, by means of threats, intimidation, and coercion, intentionally and unlawfully used excessive force against Mr. Root, and thereby interfered with Mr. Root's right to be free from unreasonable seizures secured by Article XIV of the Massachusetts Declaration of Rights and by the Fourth Amendment to the United States Constitution.

128.     When Defendant Officer McMenamy kicked Mr. Root, Defendant Officer
McMenamy, by means of threats, intimidation, and coercion, intentionally and unlawfully used
excessive force against Mr. Root, and thereby interfered with Mr. Root's right to be free from
unreasonable seizures secured by Article XIV of the Massachusetts Declaration of Rights and by
the Fourth Amendment to the United States Constitution.

129.     Plaintiff is therefore entitled to damages and attorneys' fees pursuant to G.L. c. 12,
§§ 11H and 11I.

**COUNT 7:  42 U.S.C. § 1983**
**NEGLIGENT TRAINING AND SUPERVISION**
**(Against the City of Boston)**

130.     Plaintiff realleges and reincorporates herein Paragraphs 1 – 129.

131.     The City of Boston, through its agents, servants, and employees in the BPD, had
the duty and responsibility for the training and supervision of its police officers regarding the
appropriate use of force during a seizure and the appropriate methods and practices to avoid the
use of deadly force upon a seized person, including those who do not pose an immediate risk of
serious harm to others.

132.     On or before February 7, 2020, the City of Boston's policymakers knew or should
have known that their police officers had in the past, and would in the future, be faced with
situations similar to the circumstances and facts alleged above where police officers might be in a
position to consider the use of deadly force on a suspect such as Mr. Root that (a) did not pose any
immediate danger to police officers or others, (b) did not have a firearm, (c) was severely injured
and covered in blood, and (d) lying on the ground.

133.     The City of Boston, under color of law, failed to provide adequate training to its
officers regarding procedures and methods to avoid the infliction of deadly force on a seized person
who was already seriously injured, was defenseless, was not armed, did not resist the police, did

not attempt to flee, and posed no immediate or future threat of harm.  The procedures and methods as to which the City of Boston failed to provide adequate training include, but are not limited to, the following:

    a.    the proper and reasonable procedures for conducting a vehicle pursuit;

    b.    the proper and reasonable procedures to ensure that a supervisor is in charge and properly coordinates, manages and oversees a pursuit;

    c.    the proper and reasonable procedures for identifying and assessing a scene prior to restraining and making physical contact with a suspect;

    d.    the proper and reasonable procedures for the safe and proper restraint of a suspect without causing him great bodily injury or death;

    e.    the proper and reasonable procedures to be followed when approaching a suspect they believe to be armed;

    f.    the proper and reasonable procedures for taking control of an arrest scene involving multiple law enforcement officers and ensuring that one officer serves as the primary officer or supervisor;

    g.    the proper and reasonable procedures to be followed with respect to the use of less than lethal force;

    h.    the proper and reasonable procedures to be followed with respect to the use of lethal force;

    i.    the proper and reasonable procedures for de-escalation prior to the use of lethal force including, without limitation,  the need to assess the suspect's physical and mental condition;

j.     the proper and reasonable procedures to be followed by an officer in preparing to fire his or her weapon;

k.     the proper and reasonable procedures to be followed to avoid contagious fire;

l.     the proper and reasonable procedures to be followed to ensure that medical assistance is provided to a suspect following the use of lethal force; and

m.     the proper and reasonable procedures to be followed with respect to the use of issued body worn cameras, including, without limitation, when they should be worn, activated, and de-activated.

134.   Proper training in one or more of the procedures listed in the above paragraph would have prevented the shooting of Mr. Root in Chestnut Hill and could, and should, have been implemented by the City of Boston.  The BPD Individual Defendants could, and should, have been trained in those procedures.

135.   Mr. Root's death was caused by the City of Boston's policy or custom of inadequate training and supervision of its police officers, including the BPD Individual Defendants, the City of Boston's failure to provide adequate policies and procedures, and/or the City of Boston's failure to ensure compliance with its existing policies and procedures.

136.   The City of Boston's custom of inadequate training and supervision of its police officers amounts to deliberate indifference to clearly established constitutional rights of others, including Mr. Root, to be free from the use of excessive force and the deprivation of life without due process of law.

137.     The reckless or negligent manner in which the City of Boston trained and supervised its officers, failed to provide necessary policies and procedures, and/or failed to enforce existing policies and procedures, created a high risk of death to others, including Mr. Root.

138.     Policymakers for the City of Boston knew to a moral certainty that their police officers, including the BPD Individual Defendants, would be required to encounter and seize individuals, including individuals that are physically or mentally impaired.

139.     The inadequacy of the City of Boston's policies and procedures, its compliance protocols, its training, and its supervision were so obvious and likely or probable to result in the violation of constitutional rights that the City of Boston's policymakers acted with deliberate indifference to the need to protect civilians.  The City of Boston's policymakers acquiesced in and implicitly authorized the use of excessive force during a seizure.

140.     The City of Boston had knowledge of an obvious risk to the constitutional rights of persons with whom the police would come into contact, and the City of Boston failed to act despite the obvious risk.

141.     The above-alleged constitutional violations by the BPD Individual Defendants were proximately caused by the City of Boston's deliberate indifference to the training and supervision of those officers and by the City of Boston's decisions, policies, and procedures with respect to the use of force and avoiding deadly force during the seizure of a person.

142.     Plaintiff is therefore entitled to damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

### COUNT 8:  ASSAULT AND BATTERY (MASSACHUSETTS COMMON LAW)
#### (Against the Individual Defendants)

143.     Plaintiff realleges and reincorporates herein Paragraphs 1 – 142.

144.   The Individual Defendants intentionally and unjustifiably used deadly physical force against Mr. Root during the shooting in Chestnut Hill.

145.   That use of deadly physical force was unreasonable, offensive, unconsented to by Mr. Root, and resulted in the death of Mr. Root.

146.   Plaintiff is therefore entitled to damages under Massachusetts common law.

### COUNT 9:  WRONGFUL DEATH (MASS. G.L. c. 229, § 2)
### (Against the Individual Defendants)

147.   Plaintiff realleges and reincorporates herein Paragraphs 1 – 146.

148.   The Individual Defendants' shooting of Mr. Root in Chestnut Hill was intentional, willful, wanton, and/or reckless.

149.   Moments before the shooting, the EMT recognized Mr. Root was seriously injured and needed immediate medical attention, so she tried to help him.  Among other things, he was covered in blood, had fallen on the sidewalk, was unable to communicate, and appeared to be having a heart attack.

150.   At the time of the shooting, Mr. Root was defenseless, was unarmed, offered no resistance, did not attempt to flee, and posed no immediate or future threat of harm to the Individual Defendants or anyone else.  He was severely injured, bleeding profusely, non-verbal, and appeared to be having a heart attack.  It appeared that the lights were on, but no one was home.

151.   The Individual Defendants had intentionally seized Mr. Root, and despite his incapacitation, the Individual Defendants all opened fire on him.

152.   Mr. Root's death was a direct and proximate result of the Individual Defendants' unjustified conduct.

### CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Enter judgment in Plaintiff's favor in such amount as will fully compensate the

Estate for its losses to the greatest extent allowed by law;

2.    order such punitive damages as are allowed by law;

3.    order payment of interest, costs, and attorneys' fees as allowed by law; and

4.    order such further relief as this Court deems fair and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands that the present case be tried before a jury.

Dated:  August 10, 2020                    Respectfully submitted,

PLAINTIFF JENNIFER ROOT BANNON,
Special Administrator of the Estate of Juston
Root,

By her attorneys,

*/s/ Mark A. Berthiaume*
Mark A. Berthiaume (BBO # 041715)
Gary R. Greenberg (BBO # 209420)
Alison T. Holdway (BBO # 690569)
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Tel.: 617-310-6000
Fax:  617-310-6001
berthiaumem@gtlaw.com
greenbergg@gtlaw.com
holdwaya@gtlaw.com