UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNIFER ROOT BANNON, as the Special Personal Representative of the Estate of Juston Root, <br><br> Plaintiff, <br><br> v. <br><br> BOSTON POLICE OFFICERS DAVID GODIN, JOSEPH McMENAMY, LEROY FERNANDES, BRENDA FIGUEROA, and COREY THOMAS; <br><br> MASSACHUSETTS STATE TROOPER PAUL CONNEELY; and <br><br> THE CITY OF BOSTON, MASSACHUSETTS; <br><br> Defendants. | Civil Action No. 1:20-cv-11501-RGS <br><br><br> **HEARING REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR AN EVIDENTIARY HEARING AND SANCTIONS**

This case is about police officers shooting and killing an unarmed civilian, Juston Root. Defendant David Godin, a Boston Police ("BPD") officer who shot and killed Mr. Root, has repeatedly claimed—including in his interrogatory answers signed under the penalties of perjury— that he was not wearing a body worn camera ("BWC") on the day of the shooting and that his BWC was in his duty bag. But video footage from a fellow BPD officer's BWC undeniably shows that Defendant Officer Godin *was* wearing a BWC and, moments after the fatal shooting, removed the BWC from his chest and tossed it into a cruiser. In other words, Defendant Officer Godin lied, apparently to conceal the fact that he was wearing his BWC at the time of the fatal shooting.

Defendant City of Boston (the "City") was obligated to collect BWCs from all BPD officers involved in two shootings and a vehicle pursuit that happened on February 7, upload all

1

footage, and preserve that footage.  BWC footage of the fatal shooting is the best and most compelling evidence of what occurred at the time of the shooting.  It captures police commands allegedly given to Mr. Root, Mr. Root's response, and the police opening fire on him.  Despite BPD policies governing the collection of BWC equipment after police fire their firearms and kill a civilian, the City has not produced any video footage from Officer Godin's BWC, any documents concerning BPD's process for collecting Defendant Officer Godin's BWC, whether the City investigated whether Officer Godin wore his BWC, or the nature and extent of the footage contained on Officer Godin's BWC on February 7, 2020.  Nor has the City answered Plaintiff's interrogatories related to Officer Godin's or all other responding BPD officers' activation (or lack of activation) of BWCs on February 7.  If the City failed to fulfill its obligations to collect, review, and preserve BWC footage—particularly from Defendant Officer Godin's BWC—then any footage that may have been recorded was likely deleted.

Pursuant to Federal Rules of Civil Procedure 26(g)(3) and 37(c)(1) and the Court's inherent powers to protect the administration of justice, Plaintiff Jennifer Root Bannon ("Plaintiff") requests an evidentiary hearing to evaluate, among other things:  (1) whether the City undertook any investigation into whether its offers were wearing, or had activated, BWCs on the day of the shooting; (2)  the BPD's process for storing and saving BWC footage; (3)  whether Defendant Officer Godin's BWC was collected, the extent to which it recorded video or audio footage on the day of the shooting, and whether that footage has been deleted; (4) if footage has been deleted, determine when and by whom; and (5)  whether Defendant Officer Godin and/or BPD supervisors complied with and enforced BPD rules governing his use of (or failure to use) his BWC.

Plaintiff also moves for sanctions against Defendant Officer Godin and the City in the form of default judgment against both.  In the alternative, Plaintiff seeks as sanctions adverse inference

instructions to the jury that Defendant Officer Godin had activated his BWC on February 7, that his BWC recorded both shootings, and that the footage would show that Defendant Officer Godin's use of deadly force in Chestnut Hill was unreasonable.  Plaintiff also seeks an award of her expenses, including attorneys' fees, in filing this motion and conducting an evidentiary hearing.

## BPD'S BWC POLICY

BPD Rule 405 governs the use of BWCs and required BPD officers, including Defendant Officer Godin, to activate their BWCs during the events of February 7.  *See* **Exhibit 1**.  During each shift, a BPD officer must "[a]ffix his/her BWC properly upon his/her uniform in a manner consistent with training," "[p]osition and adjust the BWC to record events," and "[a]ctivate the BWC and record as outlined in [Rule 405 § 2.2]."  BPD Rule 405, § 3.1 subsections 2.a, 2.b., and 2.d.  Under Section 2.2, BPD officers must activate their BWCs during many types of encounters with civilians, including:   "Investigative person stops: consensual, or articulable reasonable suspicion stops . . . , or stops supported by probable cause"; "All dispatched calls for service involving contact with civilians"; "Initial responses by patrol officers, including on-site detentions, investigations pursuant to an arrest, arrest, and initial suspect interviews on-scene"; "Incidents of Pursuit Driving"; "Any contact that becomes adversarial, including a Use of Force incident, when the officer has not already activated the BWC"; and "Any other civilian contact or official duty that the officer reasonably believes should be recorded to enhance policing transparency, increase public trust and police-community relations, or preserve factual representations of officer-civilian interactions . . . "  *Id*. at § 2.2.  BPD officers must "continue recording until the event has concluded" and, "[t]o the extent possible, prior to deactivating a BWC, . . . state the reason for doing so."  *Id*. at § 2.8.  There can be little question that the BPD officers' confrontation with Mr. Root at Brigham & Women's Hospital ("BWH"), the pursuit down Route 9, and the fatal shooting in Chestnut Hill are types of civilian encounters that requires a BPD officer to activate his BWC.

"If an officer fails to activate the BWC, fails to record the entire contact, or interrupts the recording, the officer shall document in the incident report that a recording failure occurred." *Id.*; *see also id.* at § 3.1 subsection 2.g.  An officer who does not create an incident report must "submit BWC Special Notification Form to his/her Duty Supervisor to document that a recording failure occurred by the end of the shift or as soon as practical." *Id.* at § 2.2.  Then "[t]he Duty Supervisor shall submit the officer's Form through his/her chain of command to his/her Bureau Chief." *Id.*

At the end of each shift, the officer must place his BWC on his assigned docking station, which will charge the BWC's battery and "transfer video data to the storage system." *Id.* at § 3.2. The officer must also categorize the recorded footage based on the nature of the police activity in the footage. *See id.* at § 3.2.1.

After "an Officer Involved Death, Officer Involved Shooting, or Other Use of Deadly Force," the patrol supervisor "shall collect all BWC equipment" belonging to officers involved in, or who witnessed the incident. *Id.* at § 6.3.  BPD personnel must "transport the [BWC] to the involved officer's assigned district or the Homicide Unit for upload into the system." *Id.*  An officer who used deadly force, as well as supervisors and other officers at the scene, "shall not view any video before the Homicide Unit or Firearm Discharge Investigation Team ('FDIT') views the footage and uploads it into the system." *Id.* at § 6.2.

Duty supervisors must ensure that BPD officers follow Rule 405, and commanding officers or their designees must "review BWC activity logs and reports to ensure officers remain in compliance with Department policy and training." *Id.* at § 5.1.

BWC footage related to a death investigation or use of deadly force shall be retained indefinitely. *Id.* at § 9.2.

## FACTUAL BACKGROUND[1]

**1.      Police Shot Killed Mr. Root on February 7, 2020.**

On the morning of February 7, 2020, Mr. Root drove to the area around BWH in Boston. The BPD was called to the area with a report of a person with a gun.  Defendant Officer Godin and BPD Officer Michael St. Peter arrived in separate cruisers at the intersection of Fenwood Road and Vining Street near where Mr. Root had gotten out of his car.  Defendant Officer Godin exited his cruiser as Mr. Root walked on the sidewalk away from the intersection.  Defendant Officer Godin—now on foot—turned the corner, encountered Mr. Root, and drew his firearm.  When Mr. Root turned around and saw Defendant Officer Godin's gun pointing in his direction, he removed from his waistband an uncharged, unloaded, clear plastic paintball gun.  Defendant Officer Godin fired at Mr. Root and stumbled backward, falling onto the sidewalk and into the intersection. Defendant Officer Godin got up and tried to fire again at Mr. Root, but his firearm jammed.  During this series of events, Officer St. Peter, who had parked his cruiser in the middle of the intersection of Fenwood Road and Vining Street, also fired at Mr. Root.

Mr. Root was hit with at least one bullet fired by Defendant Officer Godin or Officer St. Peter.  After being shot, Mr. Root limped back to this car and drove away.  Defendant Officer Godin and Officer St. Peter got in their respective cruisers and followed Mr. Root.  Other BPD cruisers and Massachusetts State Police joined the pursuit.  During the pursuit, Defendant Officer Godin fixed the jam in the firearm he was carrying.

Mr. Root drove westbound on Huntington Avenue in Boston, which becomes Route 9 in Brookline.  He was bleeding profusely due to the gunshot wound(s) he sustained near BWH.  At the intersection of Route 9 and Hammond Street in Chestnut Hill, Mr. Root's car collided with

---

[1] The Factual Background section includes only those facts that are relevant to the present motion.

another vehicle. His car traveled through the intersection and stopped on Route 9 at or near the entrance to a shopping center parking lot. Mr. Root's car was heavily damaged, two wheels had fallen off, and a third tire was partially hanging off. He got out of the car, stumbled around the front of it, and limped onto a nearby sidewalk, where he fell to the ground and lay on his back. He managed to get back on his feet and then stumbled toward a mulched area near the entrance to the shopping center parking lot.

Defendant Officer Godin and other officers arrived at the entrance to the parking lot. They got out of their cruisers and approached Mr. Root, who was on the ground, covered in blood, and non-verbal. A former EMT who had been sitting in her car in the parking lot ran to help Mr. Root and was trying to administer aid to him. Officers arrived and yelled at her to run away, which she did. Officers were simultaneously yelling confusing commands at Mr. Root. Given his condition and the fact that the commands made little sense given the circumstances, he could not have comprehended or responded to the commands. Within a matter of seconds, Defendant Officer Godin, four other BPD officers, and a Massachusetts state trooper[2] opened fire without warning and shot Mr. Root at least 31 times. Mr. Root died from the shooting.

## 2. Defendant Officer Godin Told Police Investigators that He Was Not Wearing a BWC on February 7, 2020 and that His BWC Was in His Duty Bag.

The Norfolk County District Attorney's Office opened a criminal investigation into Mr. Root's death. As part of that investigation, on February 12, 2020—five days after the shooting— a State Police lieutenant and a BPD detective sergeant interviewed Defendant Officer Godin. *See* **Exhibit 2** (transcript of interview with relevant portions are highlighted in yellow). During the interview, Defendant Officer Godin told the investigators that though he is assigned a BWC, it was

---

[2] The four other BPD officers (Joseph McMenamy, Leroy Fernandes, Brenda Figueroa, and Corey Thomas) and the state trooper (Paul Conneely) are defendants in this case.

not affixed to his body on February 7.  *See id*. at COB 2629.  Instead, Defendant Officer Godin

claimed that the BWC was left "[i]n [his] duty bag."  *Id*. at COB 2630.  When an investigator

asked if there was a reason why he was not wearing the BWC, Defendant Officer Godin replied,

"I didn't put, I just didn't have it on. . . . I don't keep it on my body unless I get out for a call."  *Id*.

The investigators did not ask any follow up questions about Defendant Officer Godin's BWC.

In addition, the BPD's final Firearm Discharge Investigation Team ("FDIT") report on its

officers' intentional firearm discharges on February 7 states that "Police Officer David Godin was

not wearing his Body Worn Camera at the time of discharge.  The BWC was inside of his assigned

Department-vehicle."  **Exhibit 3** at ROOT_0002296.

3.     **In His Interrogatory Answers, Defendant Officer Godin Claimed He Was Not Wearing a BWC on February 7, 2020, the BWC Was in His Duty Bag, and He Did Not Activate a BWC "At Any Time."**

Two of Plaintiff's interrogatories to Defendant Officer Godin relate to whether he wore or

activated a BWC on February 7, 2020.  *See* **Exhibit 4**.  First, Interrogatory No. 2 asked:

> Describe in detail Your use or activation of a BWC before, during, or after the Vehicle Pursuit and Chestnut Hill Shooting, including, without limitation, whether You failed to wear or activate a BWC; if You failed to wear or activate a BWC, Your reason for that failure; and, if You did activate a BWC, why You did so when You did.

*Id*. at p. 2.  Defendant Officer Godin answered Interrogatory No. 2 as follows:

> I was not wearing my BWC during either the vehicle pursuit or the Chestnut Hill shooting, and did not activate it at any time.  At the time I heard the call about the man with the gun at the Brigham, my camera was not yet affixed to my body; it was still in my duty bag. The call was not assigned to me.  But given that I was just around the corner, and given the nature of the call, I responded to the scene quickly and soon thereafter became engaged with both the security guard and the suspect.  The suspect pointed a firearm at me and fired. Thereafter, I was more concerned with apprehending the suspect who I believed just fired at me than with taking my camera out of my bag.  I did not know if he would attempt to shoot someone else.

*Id*.

Second, Interrogatory No. 7 asked: "State the basis for Your denial of the allegations in Complaint ¶ 79 that You 'were wearing a BWC during the [Chestnut Hill] [s]hooting' but did not activate[] it until after the shooting.'" *Id*. at p. 3.  Defendant Officer Godin answered : "I was not wearing my BWC during the incident and did not activate it at any time." *Id*. at p. 4.

Defendant Officer Godin signed his interrogatory answers under the pains and penalties of perjury (*id*. at p. 7); his counsel signed the answers as well (*id*. at p. 6).

**4.     Video Footage Shows Defendant Officer Godin Was Wearing a BWC When He Shot Mr. Root in Chestnut Hill.**

Some BPD officers at the scene of the Chestnut Hill shooting had activated their BWCs. A BWC video with the file name "Officer_Involved_Shooting_And_Person_With_Gun.mp4"[3] captured the aftermath of the shooting.  A copy of that recording is being submitted to the Court on a disk in connection with this motion and is labeled **Exhibit 5**.  Still images from the footage are compiled in **Exhibit 6**; some of those images are embedded in the following paragraphs. Counsel for Plaintiff added the orange arrows to the still images.

This recording starts while the Unidentified Officer is driving a cruiser, presumably during the pursuit of Mr. Root.  Seven minutes and 10 seconds into the recording, at which point the time stamp on the upper right corner reads "T14:31:05Z,"[4] he parks in Chestnut Hill near the scene of the shooting and exits the cruiser.  He runs on Route 9 through the intersection at Hammond Street and toward the mulched area where Mr. Root had been killed.  The shooting had already occurred

---

[3] Plaintiff received this video from the Norfolk Country District Attorney's Office and produced to Defendants with the Bates label ROOT_0000938.  Plaintiff does not yet know which BPD officer was wearing the BWC that captured this footage, but the officer is not a defendant in this case.  Plaintiff refers to this BPD officer as the "Unidentified Officer."

[4] In the upper right corner of the footage, there is a date stamp that reads "2020-02-07" and a timestamp that beings with "T14."  The timestamp is often difficult to read because it is superimposed over the video footage, and its legibility depends on the scene in the upper right corner of the frame.  The amount of time that has elapsed in the video—here, 7 minutes and 10 seconds—can be ascertained using the video progress bar.

by the time this officer arrived.  Roughly 45 seconds later, the Unidentified Officer sees Defendant Officer Godin, points at him, and asks if he is alright.  *See* **Exhibit 6** at Image 1:

**IMAGE 1**



Timestamp:  T14:31:51Z.  Video progress bar:  07:55.

Defendant Officer Godin walks toward the Unidentified Officer and, four or five seconds later, is an arm's length away from the Unidentified Officer.  A BWC is clearly visible on the right side of Defendant Officer Godin's chest.  *See id*. at Image 2.

The Unidentified Officer asks Defendant Officer Godin, "What do you need?"  Defendant Officer Godin says, "I gotta get out of here."  The Unidentified Officer asks, "You want to go in my car?  Dave?"  Defendant Officer Godin, who had been walking away, turns back toward the Unidentified Officer.  Again a BWC is clearly visible on the right side of Defendant Officer Godin's chest while he gestures with his right hand, which is empty.  *See id*. at Images 3 and 4:

**IMAGE 3**



Timestamp:  T14:32:10Z.  Video progress bar:  08:15.

**IMAGE 4**



Timestamp:  T14:32:11Z.  Video progress bar:  08:16.

Defendant Officer Godin asks whether anyone was shot "at Brigham," to which the Unidentified Officer answers that he does not think so.  He then asks Defendant Officer Godin, "What do you need?"  Defendant Officer Godin responds, "I'm good," waves the officer off, and starts to walk away.  His right hand is still empty.  *See id*. at Images 5 and 6.

As Defendant Officer Godin walks toward a parked cruiser that has its driver's side front door open, he reaches upward with his right arm. *See id*. at Image 7. The Unidentified Officer follows, and Defendant Officer Godin is seen holding a black object in the palm of his hand as he walks toward the cruiser. *See id*. at Images 8, 9, and 10. With his right arm, Defendant Officer Godin tosses the black object into the cruiser's open door. *See id*. at Images 11 and 12. The video shows that Defendant Officer Godin's right hand is empty after he tosses the black object into the cruiser. *See id*. at Images 13 and 14. Defendant Officer Godin reaches into the cruiser's open door and turns around holding a light-colored object that he apparently took from inside the cruiser. When he turns around, the bracket to which his BWC had been affixed is clearly visible on his jacket, but the BWC is gone. *See id*. at Image 15.

A third officer asks the Unidentified Officer if the cruiser with the open door into which Defendant Officer Godin tossed the black object is "Dave's car." The Unidentified Officer responds that it is. The third officer then leans into the cruiser's open door, comes back out, and closes the door. That third officer was wearing a BWC. *See id*. at Image 16.

**5.     A BPD Sergeant Detective Reported That He Transported Defendant Officer Godin to Headquarters Where Defendant Officer Godin Turned Over His BWC and Stated He Had Not Reviewed Any Footage on It.**

According to a FDIT Investigative Report prepared by BPD Sergeant Detective William Doogan, he transported Defendant Officer Godin and another BPD officer "to BPD Headquarters for interview" on February 7. **Exhibit 7** at 2 (relevant portions of the report are highlighted in yellow). According to Sgt. Det. Doogan, "[d]uring the ride, there was no conversation between us/them about the circumstances of the incident." *Id*. At Headquarters, "Officer Godin surrendered his body-warn camera and the accompanying cell phone. Prior to doing so, **Officer Godin told Sgt. Det. Doogan that he had not reviewed any footage**." *Id*. at 3 (emphasis added).

Sgt. Det. Doogan then transported Defendant Officer Godin and the other BPD officer to the BPD station to which they were assigned.  *Id*.

## 6.   Defendant Officer Godin and the City Have Failed to Produce Responsive Documents Concerning BWCs.

Plaintiff requested documents from Defendant Officer Godin and the City concerning his and other BPD officers' use or activation of BWCs on February 7.  Specifically, Plaintiff sought from Defendant Officer Godin "All Documents and Communications concerning whether You used or activated a BWC before, during, or after the Vehicle Pursuit or the Chestnut Hill Shooting." **Exhibit 8** at Request No. 6.  Defendant Officer Godin made several objections to this request and referred to two documents that the City Produced:  the Norfolk County District Attorney's Office's interview of Godin Bates stamped COB 2615-2649 (**Exhibit 2**) and the audio recording of that interview Bates stamped COB 3095 (which is not an exhibit to this motion).

As for the City, Plaintiff propounded three relevant document requests:

> Request No. 9:  "All Documents and Communications, including but not limited to, reports, transcripts, notes, memoranda, audio recordings, radio transmissions, video recordings, photographs, text messages, and e-mails concerning the Chestnut Hill Shooting. This Request includes all BWC footage recorded on any BWC worn by any BPD officer who was at the scene before, during, or after the Chestnut Hill Shooting."
>
> Request No. 10:  "All Documents and Communications identifying all BPD officers who were at the scene before, during or after the Chestnut Hill Shooting."
>
> Request No. 11:  "All Documents and Communications concerning the BPD Officer Defendants' use or lack of use of BWCs on February 7, 2020."

**Exhibit 9** at Request Nos. 9-11.  In response to both Request Nos. 9 and 11, the City made several objections and referred to the following sets of documents it produced, many of which have nothing to do with BWCs:  text messages and voicemails that Defendant Officer Thomas sent or

received (COB 2469-2487); text messages and voicemails that Defendant Officer Godin sent or received (COB 2581-2614); and transcripts and audio recordings of the Norfolk County District Attorney's Office's interviews of the individual defendants and various eyewitnesses, reports from the Brookline Fire and Police Departments, reports from the State Police, reports from the Norfolk County District Attorney's Office's investigation, videos and photos of the scene at Chestnut Hill, BWC footage (not tied to any specific officer), and photos of searches of Mr. Root's car and home (collectively at COB 2615-3490).  In response to Request No. 10, the City objected on the grounds that "communication" is vague and ambiguous but represented that it is in the process of compiling responsive records and will supplement its response.

Neither Defendant Officer Godin nor the City has produced documents or communications concerning the collection of his equipment, including his BWC; any video or audio footage from his BWC; audit information with respect to his BWC; whether Defendant Officer Godin or a supervisor followed the requirements of BPD Rule 405 with respect to when "an officer fails to activate the BWC, fails to record the entire contact, or interrupts the recording"; or whether any supervisor or investigator followed up with Defendant Officer Godin about his purported failure to wear a BWC on February 7.

The City has been similarly evasive in its interrogatory answers.  In response to the four interrogatories concerning the use or activation of BWCs on February 7, the City raised objections and then stated, "Notwithstanding and without waiving this objection, the City agrees to produce the Boston Police Department's investigatory documents upon the completion of the investigation and will supplement this answer accordingly."  **Exhibit 10** at Interrogatory Nos. 11-14.[5]  In other

---

[5] Beyond Interrogatory Nos. 11-14, the City has not substantively answered *any* of Plaintiff's interrogatories.  In response to each Interrogatory, the City merely stated it would supplement its answer.  *See* **Exhibit 10**.

words, the City is refusing to answer interrogatories concerning BWC use until the completion of the BPD's investigation.  The City has not indicated when that might be.

## **ARGUMENT**

1.  **An Evidentiary Hearing Is Necessary to Ascertain What Happened to the Video Footage from Defendant Officer Godin's BWC on February 7, the Steps Taken by the BPD Recover His BWC and Preserve Its Footage, and Whether Defendant Officer Godin or the BPD Followed BPD Rules for BWCs.**

Given Defendant Officer Godin's repeated dishonest conduct and the City's failure to properly review and produce responsive documents and answer interrogatories, an evidentiary hearing is necessary to ensure evidence is preserved and to ascertain how BPD handled BWC evidence after the fatal shooting.

Video footage, especially BWC footage, is the most probative evidence of what happened before and during the shooting at BWH, the vehicle pursuit, and the fatal shooting in Chestnut Hill.  As the City itself acknowledges, BWCs "reinforce the public's perception of police professionalism and preserve factual representations of officer-civilian interactions."  BPD Rule 405, § 1 (**Exhibit 1**).  For this reason, Defendant Officer Godin was required to wear and activate his BWC on February 7, and the City was required to collect his BWC and preserve footage from February 7 related to the shootings.  *See id.* at §§ 2.2, 3.1, 3.2, 6.3, 9.2.  Video evidence clearly shows that he was wearing a BWC in the minutes after he shot and killed Mr. Root.  Video evidence also shows that within minutes of his having fired several bullets into Mr. Root and before Mr. Root's body had even been removed from the scene, Officer Godin made the conscious decision to remove his BWC from his chest and throw it into his cruiser.  Yet just days later, during his interview with the Norfolk County District Attorney's Office, Defendant Officer Godin concocted a story about how he was not even wearing his BWC, and that instead, it was in his duty bag.  *See* **Exhibit 2** at COB 2629-2630.  He stuck to that false story in his sworn interrogatory answers.  *See*

**Exhibit 4** at Interrogatory Nos. 2 and 7.  Why would Officer Godin lie about not even having worn his BWC on February 7 unless he was attempting to conceal harmful footage it recorded?

According to a BPD FDIT Investigative Report prepared by Sgt. Det. Doogan, Defendant Officer Godin was taken to BPD Headquarters where he turned over his BWC and, in doing so, told Sgt. Det. Doogan that that he had not reviewed any footage on it.  *See* **Exhibit 7**.  Defendant Officer Godin's statement to Sgt. Det. Doogan clearly implies that he knew there was footage on his BWC.  But the City has not produced any footage taken on February 7 from Officer Godin's BWC; any documents reflecting the collection of Defendant Officer Godin's BWC; any documents reflecting the upload, review, or preservation of footage from Defendant Officer Godin's BWC; any investigation into the accuracy of Defendant Officer Godin's repeated false statements that he was not wearing his BWC on February 7; or any of the required reporting that should have occurred when Defendant Officer Godin informed investigators that in violation of BPD Rule 405 he had not worn or activated his BWC on February 7.

The BWC footage in **Exhibit 5** and the City's refusal to answer interrogatories and produce responsive documents related to Defendant Officer Godin's BWC raise serious questions about the thoroughness of the BPD's investigation of the February 7 shootings, the thoroughness of the Norfolk County District Attorney's Office's investigation of the shooting in Chestnut Hill, and Defendant Officer Godin's and the City's conduct in this litigation.  Where is the BWC that Defendant Officer Godin surrendered?  Where is the footage from his BWC that Defendant Officer Godin claimed he had not reviewed?  Was it preserved?  Was that or any other footage deleted or altered?  Did Defendant Officer Godin and/or a supervisor follow the requirements of BPD Rule 405, § 2.2 to properly document his claimed failure to wear and activate his BWC?  If so, where is that documentation?  Did BPD supervisors comply with the requirements of BPD Rule 405,

§ 6.3 for collecting and securing BWC footage following a fatal shooting?  Did the BPD conduct any investigation into its officers' use and activation of BWCs on February 7?

These questions must be answered.  They are directly relevant to Defendant Officer Godin's and the City's credibility and liability.  Because Defendant Officer Godin has proven himself to be untruthful and the City has not taken its investigatory and discovery obligations seriously, an evidentiary hearing, conducted under the supervision of this Court, is the only reliable means of uncovering the truth.  It is undeniably the best and most efficient way to secure testimony and documentary evidence establishing the answers to these questions.

**2.      Sanctions Are Warranted Against Both Defendant Officer Godin and the City.**

Interrogatories must be answered "fully" and "in writing under oath."  Fed. R. Civ. P. 33(b)(3).  The person making the answers must sign them, and an attorney who raises objections to interrogatories must sign as to the objections.  *See id*. at 33(b)(5).  In responding to document requests, the responding party must either object to a request or produce (or permit inspection of) responsive documents.  *See* Fed. R. Civ. P. 34(b)(2).  A signature on discovery responses is a certification "that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," the responses are "consistent with [the Federal Rules of Civil Procedure] and warranted by existing law."  Fed. R. Civ. P. 26(g)(1).  "If a certification violates [Rule 26(g)] without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both."  *Id*. at 26(g)(3).  Sanctions "may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."  *Id*.  Moreover, "[i]f a party fails to provide information," that party "is not allowed to use that information to supply evidence" in the case, "unless the failure was substantially justified or is harmless"—neither of which applies here.  Fed. R. Civ. P. 37(c)(1).  Beyond that sanction, the court may order the payment of reasonable expenses caused by the

failure to properly provide information, may inform the jury of the party's failure to provide that information, and "may impose other appropriate sanctions, including" those listed in Rule 37(b)(2)(A)(i)-(vi). *Id*. at 37(1)(A)-(C) ("other appropriate sanctions" include directing facts to be taken as established, prohibiting disobedient party from opposing claims or from introducing designated matters into evidence, striking pleadings, rendering default judgment against disobedient party, and treating failure to obey a court order as contempt of court).

In addition, under its inherent powers to control discovery, the Court has discretion to enter default judgment against a party for abuse of the discovery process. *See Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 10, 12 (1st Cir. 1985) (district court acted within its "wide discretion" in entering default judgment against defendant who repeatedly abused discovery process, had a "history of evasiveness and intransigence," and failed to explain its sudden revelation that it did not retain evidence that was central to the case); *see also id*. at 11 ("A federal district court must be able 'to protect the administration of justice by levying sanctions in response to abusive litigation practices.'") (quoting *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 386 (2d Cir. 1981)); *accord Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1538, (11th Cir. 1993) (affirming imposition of the following sanctions against defendants and defense counsel who resisted discovery and deliberately withheld discoverable information court had ordered them to produce:  default judgment on issue of liability, stricken discovery responses, award of plaintiff's costs and attorneys' fees, and fines).  The Court's "inherent power is said to be 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Brockton Sav. Bank*, 771 F.2d at 11 (quoting *Link v. Wabash R.R.*, 370 U.S. 626, 630-31 (1962)).

Defendant Officer Godin's conduct has been egregious, and the City's conduct has not been much better.  During Defendant Officer Godin's February 12, 2020 interview conducted by a State Police lieutenant and a BPD detective sergeant in connection with the criminal investigation of the Norfolk County District Attorney's Office, he unequivocally stated that his BWC was not affixed to him on the day of the shooting but was in his duty bag.  That statement was a lie. Defendant Officer Godin repeated the lie, under the penalties of perjury, in his interrogatory answers.  In his answer to Interrogatory No. 2, Defendant Officer Godin claimed, "I was more concerned with apprehending the suspect who I believed just fired at me than with taking my camera out of my bag."  **Exhibit 4**.  That statement too was a lie.  BPD—and, by extension the City—knew or should have known that Defendant Officer Godin's statement about his BWC was false given that the footage at **Exhibit 5**—which shows he was wearing his BWC in Chestnut Hill on February 7—was taken by another BPD officer's BWC.

BPD Rule 405 contains multiple provisions that governed Defendant Officer Godin's and BPD supervisors' conduct related to his BWC:

- Defendant Officer Godin was required to wear and activate his BWC at BWH and keep it on throughout the vehicle pursuit and his interactions with Mr. Root that followed (Rule 405 §§ 2.2, 3.1);

- after failing to activate his BWC, he was required to complete an incident report documenting that failure (*id*. at § 2.2);

- if he failed to complete the incident report, he was required to submit a BWC Special Notification Form his to supervisor, and the supervisor was required to submit the Form through the chain of command to the Bureau Chief (*id*.);

- after the deadly shooting, a supervisor was required to collect Defendant Officer Godin's BWC equipment, transport it to his assigned district or the Homicide Unit, and upload it to the system (*id*. at § 6.3);

- BPD is required to retain the footage indefinitely (*id*. at § 9.2); and

- BPD supervisors were required to ensure that Defendant Officer Godin complied with Rule 405 (*id*. at § 5.1).

Despite these clear rules, the City has objected to document requests and interrogatories related to the use and activation of BWCs on February 7, and it has not produced documents reflecting what happened to Defendant Officer Godin's BWC after the fatal shooting. The City's failure to engage in basic discovery of highly probative evidence concerning the only officer involved in both the BWH and Chestnut Hill shootings is an unacceptable flouting of the discovery process.

Based on the footage showing Defendant Officer Godin remove his BWC and toss it into his cruiser (**Exhibits 5 and 6**), his repeated lie about his BWC being in his duty bag (**Exhibits 2, 3, and 4**), and Sgt. Det. Doogan's report stating the Defendant Officer Godin told him that he had not viewed any footage from his BWC (**Exhibit 7**), the only reasonable inferences are that (1) his BWC contained footage from February 7, (2) he was extremely concerned about the contents of that footage, and (3) he wanted to ensure that the footage was concealed. If he believed the video footage would have exonerated him, he would not have hidden it.

At bottom, Plaintiff has been denied the most compelling piece of evidence available to demonstrate that Defendant Officer Godin's and the other individual defendants' use of deadly force against Mr. Root was unreasonable. Footage from Defendant Officer Godin's BWC may have also contained evidence of Defendant BPD Officer Joseph McMenamy kicking Mr. Root seconds before the fatal shooting.[6]  Of the other officers who shot Mr. Root in Chestnut Hill, Defendant Trooper Conneely was not required to wear a BWC, Defendant Officers Fernandes and Thomas were apparently working overtime shifts (and, for some inexplicable reason, BPD policy does not require BWCs to be worn on overtime shifts), Defendant Officer McMenamy was wearing his BWC but only activated it *after* the shooting, and Defendant Officer Figueroa had

---

[6] Counts 5 and 6, brought under 42 U.S.C. § 1983 and Mass. G.L. c. 12, §§ 11H and 11I, respectively, relate to Defendant Officer McMenamy having kicked Mr. Root immediately before the fatal shooting.

activated her BWC but had her arm over the BWC during the shooting.  The City has not produced BWC footage from any other officer showing the shooting itself.

Defendant Officer Godin has repeatedly been dishonest.  He lied to the Norfolk County District Attorney's Office investigators and falsified his interrogatory answers.  On the day of the shooting, he told Sgt. Det. Doogan that he had not reviewed footage of the shooting on his BWC— footage he obviously believed existed at the time.  Moreover, the City was required to collect Defendant Officer Godin's BWC, upload and review the footage on it, and produce that footage to the Plaintiff.  It has failed to do so.  It too has hidden behind Defendant Officer Godin's perjured testimony that his BWC was sitting in his duty bag on February 7.  The City's supervision of its police officers is paramount.  As armed agents of the City, BPD officers are responsible for following BPD policies and respecting civilians' constitutional rights.  Defendant Officer Godin and the City have failed to comply with their discovery obligations.  Accordingly, sanctions— including default judgment and Plaintiff's costs and attorneys' fees in bringing this motion and conducting an evidentiary hearing—are warranted against both.  Short of default judgment, in the alternative, Plaintiff seeks as sanctions adverse inference jury instructions that Defendant Officer Godin had activated his BWC on February 7, the BWC recorded both shootings, and the footage would show that Defendant Officer Godin's use of deadly force in Chestnut Hill was unreasonable.

## CONCLUSION

Because Defendant Officer Godin has repeatedly lied about whether he wore a BWC on February 7 and the City has not produced information related to his BWC or any footage from February 7 that his BWC may have recorded, Plaintiff respectfully requests an evidentiary hearing on the issues laid out in Argument Section 1.  Plaintiff also respectfully requests that the Court impose sanctions on Defendant Officer Godin and the City as outlined in Argument Section 2.

Dated:  May 4, 2021                          Respectfully submitted,

                                             PLAINTIFF JENNIFER ROOT BANNON,

                                             By her attorneys,

                                             */s/ Mark A. Berthiaume*
                                             Mark A. Berthiaume (BBO # 041715)
                                             Gary R. Greenberg (BBO # 209420)
                                             Alison T. Holdway (BBO # 690569)
                                             Greenberg Traurig, LLP
                                             One International Place, Suite 2000
                                             Boston, MA 02110
                                             Tel.: 617-310-6000
                                             Fax:  617-310-6001
                                             berthiaumem@gtlaw.com
                                             greenbergg@gtlaw.com
                                             holdwaya@gtlaw.com