UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNIFER ROOT BANNON, as the Special Personal Representative of the Estate of Juston Root, <br><br> Plaintiff, <br><br> v. <br><br> BOSTON POLICE OFFICERS DAVID GODIN, JOSEPH McMENAMY, LEROY FERNANDES, BRENDA FIGUEROA, and COREY THOMAS; <br><br> MASSACHUSETTS STATE TROOPER PAUL CONNEELY; and <br><br> THE CITY OF BOSTON, MASSACHUSETTS; <br><br> Defendants. | Civil Action No. 1:20-cv-11501-RGS <br><br><br> **HEARING REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS 1–2, 5–6, AND 8–9**

## TABLE OF CONTENTS

Factual Background ........................................................................................................... 1

    1.    Defendant Godin and Another BPD Officer Shot Juston Root at Brigham & Women's Hospital. ........................................................................................ 1

    2.    Defendant McMenamy Intentionally "Rammed" Mr. Root's Car During the Ensuing Vehicle Pursuit. ....................................................................................... 2

    3.    Mr. Root Was in a Car Accident in Brookline that Rendered His Car Undrivable. ..................................................................................................... 3

    4.    The Individual Defendants Shot and Killed Mr. Root. ......................................... 4

    5.    After the Shooting, the Individual Defendants Did Not Give Mr. Root Medical Assistance and Instead Crassly Described their Conduct. ...................................... 8

Summary Judgment Standard ............................................................................................. 8

Argument ........................................................................................................................... 9

    1.    Count 1:  The Individual Defendants Used Excessive Force in Shooting Mr. Root. ............................................................................................................ 9

    2.    Count 2:  The Individual Defendants Interfered with Mr. Root's Rights by Threats, Intimidation, and/or Coercion. .............................................................. 16

    3.    Counts 5 and 6:  Defendant McMenamy Used Excessive Force in Performing a PIT Maneuver and in Kicking Mr. Root. ........................................................... 18

    4.    Counts 8 and 9:  The Individual Defendants Are Liable for Assault and Battery and Mr. Root's Wrongful Death. .......................................................................... 20

Conclusion ........................................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alicea v. Thomas*,
    815 F.3d 283 (7th Cir. 2016) ............................................................................19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...........................................................................................9

*Atain Specialty Ins. Co. v. Davester LLC*,
    518 F. Supp. 3d 551 (D. Mass. 2021) ...............................................................9

*Boozer v. Sarria*,
    No. 1:09-CV-2109-TWT, 2010 WL 3937164 (N.D. Ga. Oct. 4, 2010) ...........19

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................9

*Coffman v. Battle*,
    No. 4:18-CV-000022-HLM, 2019 WL 10303633 (N.D. Ga. Jan. 22, 2019) ...................11

*Cooper v. Brown*,
    156 F. Supp. 3d 818 (N.D. Miss. 2016)...........................................................11

*Dean v. City of Worcester*,
    924 F.2d 364 (1st Cir. 1991).............................................................................20

*Graham v. Connor*,
    490 U.S. 386 (1989)...........................................................................10, 15, 18

*Jarrett v. Town of Yarmouth*,
    331 F.3d 140 (1st Cir. 2003) (per curiam).......................................................10

*Lachance v. Town of Charlton*,
    990 F.3d 14 (1st Cir. 2021)...............................................................................13

*McGrath v. Tavares*,
    No. 17-P-326, 2018 WL 3040710 (Mass. App. Ct. June 20, 2018) .................20

*McKenney v. Mangino*,
    873 F.3d 75 (1st Cir. 2017)..........................................................10, 12, 14, 15

*Mullenix v. Luna*,
    577 U.S. 7 (2015)..............................................................................................11

*Palma v. Johns,*
    27 F.4th 419 (6th Cir. 2022) ....................................................................13

*Parker v. Town of Swansea,*
    310 F. Supp. 2d 356 (D. Mass. 2004) ..............................................9, 14, 15

*Phillips v. Cmty. Ins. Corp.,*
    678 F.3d 513 (7th Cir. 2012) ...................................................................10

*Planned Parenthood League of Mass., Inc. v. Blake,*
    417 Mass. 467 (1994) .............................................................................16

*Plumhoff v. Rickard,*
    572 U.S. 765 (2014)................................................................................19

*Powers v. Sturtevant,*
    199 Mass. 265 (1908) .............................................................................20

*Estate of Rahim by Rahim v. United States,*
    506 F. Supp. 3d 104 (D. Mass. 2020) ....................................................20

*Raiche v. Pietroski,*
    623 F.3d 30 (1st Cir. 2010)...............................................................16, 20

*Rakes v. United States,*
    352 F. Supp. 2d 47 (D. Mass. 2005) .........................................................8

*Sarvis v. Boston Safe Deposit & Tr. Co.,*
    47 Mass. App. Ct. 86 (1999)...................................................................16

*Scott v. Harris,*
    550 U.S. 372 (2007)..........................................................................18, 19

*Sheffield v. Pieroway,*
    361 F. Supp. 3d 160 (D. Mass. 2019) .....................................................17

*Spencer v. Roche,*
    755 F. Supp. 2d 250 (D. Mass. 2010) .....................................................16

*Stamps v. Town of Framingham,*
    38 F. Supp. 3d 146 (D. Mass. 2014) .........................................................9

*Stamps v. Town of Framingham,*
    813 F.3d 27 (1st Cir. 2016).................................................................9, 11

*Tennessee v. Garner,*
    471 U.S. 1 (1985)............................................................................10, 12

*United States v. Mendenhall*,
446 U.S. 544 (1980) ................................................................................................11, 19

*Whitfield v. Melendez-Rivera*,
431 F.3d 1 (1st Cir. 2005) .......................................................................................15

**Statutes**

42 U.S.C. § 1983 ...............................................................................................................9, 16, 20

G.L. c. 12, §§ 11H & 11I ..................................................................................................16

G.L. c. 229, § 2(2) ...........................................................................................................20

**Other Authorities**

Fourth Amendment ................................................................................................ *passim*

Duane Wolfe, *Why Loud & Repetitive Verbal Commands Can Hinder
Compliance* (Jan. 16, 2018),
https://www.police1.com/evergreen/articles/why-loud-repetitive-verbal-
commands-can-hinder-compliance-PXizJoAkV8JIIr45/ ....................................12

Fed. R. Civ. P. 56 ..............................................................................................................1, 8

Gordon Graham, *Conflicting Commands* (May 7, 2019),
https://www.lexipol.com/resources/todays-tips/conflicting-commands/ ..........................12

Oleoresin Capsicum: Pepper Spray as a Force Alternative, National Institute of
Justice, United States Depart of Justice (Mar. 1994), *available at*
https://www.ojp.gov/pdffiles1/nij/grants/181655.pdf ........................................7

Von Kliem, *Rethinking "Show Me Your Hands!"* (Jan. 28, 2021),
https://www.lexipol.com/resources/blog/rethinking-show-me-your-hands/ ....................13

Based on the sworn incontrovertible deposition testimony and statements of each of the Individual Defendants and indisputable video evidence, under Fed. R. Civ. P. 56, Plaintiff Jennifer Root Bannon ("Plaintiff") moves for partial summary judgment on liability on Counts 1–2, 5–6, and 8–9 of the Complaint against the Individual Defendants.[1]

## FACTUAL BACKGROUND

**1.     Defendant Godin and Another BPD Officer Shot Juston Root at Brigham & Women's Hospital.**

On the morning of February 7, 2020, Plaintiff's brother Juston Root died after the Individual Defendants shot at him 31 times. *See* SoF ¶¶ 1, 160–166, 178.  Earlier that day, Mr. Root had driven his silver Chevrolet Volt to the intersection of Fenwood Road and Vining Street in Boston, Massachusetts near Brigham & Women's Hospital ("BWH").  SoF ¶¶ 1, 4.  At that intersection, Mr. Root encountered Defendant Godin and BPD Officer Michael St. Peter.  SoF ¶¶ 8–16.  Both officers were responding to a call concerning a person with a gun near BWH.  SoF ¶¶ 5–7.  Defendant Godin saw Mr. Root's car parked on Fenwood Road, got out of his cruiser, and then saw Mr. Root walking toward him on the sidewalk on Vining Street.  SoF ¶ 8.  Around the same time, Officer St. Peter parked his cruiser in the intersection, got out of the cruiser, and stood by its engine block.  SoF ¶¶ 11, 16.  Security camera footage shows that as Mr. Root's back was turned toward Defendant Godin, Defendant Godin drew his firearm and then pointed it at Mr. Root.  SoF ¶ 16; Ex. 27, BWH Video Camera (COB 4215) at 01:25–01:35.  Mr. Root removed a clear plastic paintball gun from his waist and pointed it below Defendant Godin's waist.  SoF ¶¶ 9,

---

[1] Each Boston Police ("BPD") officer defendant and Defendant Trooper Paul Conneely are individually referred to as "Defendant [Last Name]."  The BPD officer defendants are collectively referred to as the "BPD Officer Defendants" and, together with Defendant Conneely, are collectively referred to as the "Individual Defendants."  Defendant City of Boston is referred to as the "City."

This Memorandum cites Plaintiff's Statement of Undisputed Material Facts ("SoF") and the exhibits to the accompanying Declaration of Alison T. Holdway ("Ex."), which are being filed herewith.

16.   Defendant Godin testified that during this interaction, Mr. Root twice said, "I'm law enforcement."   SoF ¶ 8.   Defendant Godin and Officer St. Peter both contend that they heard gunshots and then fired their weapons at Mr. Root.   SoF ¶¶ 10, 12.   Both believed they had shot Mr. Root, and Officer St. Peter believed Mr. Root was going to "succumb to his injuries."   SoF ¶¶ 10, 12–13, 18.   Mr. Root managed to limp back to his car and drive away.   SoF ¶¶ 17, 22. Neither Defendant Godin nor Officer St. Peter knew the other was at the scene.   SoF ¶¶ 19–20.

## 2.   Defendant McMenamy Intentionally "Rammed" Mr. Root's Car During the Ensuing Vehicle Pursuit.

After getting back in his car, Mr. Root drove down Fenwood Road and took a right onto Huntington Avenue.   SoF ¶¶ 22–23.   Defendant Godin and Officer St. Peter returned to their cruisers and pursued Mr. Root.   SoF ¶ 24.   Other officers joined the pursuit, including Defendants Fernandes, Figueroa, McMenamy, Thomas, and Conneely.   SoF ¶¶ 29–31, 55.   During the pursuit, Defendant Godin stated over BPD radio for all units to hear that Mr. Root had been shot, and the BPD dispatcher replied over the radio, "Suspect shot."   SoF ¶¶ 25–26; *see also id*. ¶ 130; Ex. 22, BPD Officer Justin Evangelista's BWC Footage (COB 3082) at 01:15–01:19.   Defendant Fernandes heard the radio call that Mr. Root had been shot.   SoF ¶¶ 27, 103.   Defendant Thomas was a passenger in the cruiser being driven by Defendant Fernandes when the radio call announcing that Mr. Root had been shot was made.   SoF ¶¶ 27, 30.   Defendant Figueroa testified at her deposition that she did not recall whether she heard that radio call, but she acknowledged that she would have wanted to know whether Mr. Root had been shot.   SoF ¶ 28.

Defendant Godin was initially the lead police vehicle in the pursuit, but other BPD cruisers—including one driven by Defendant McMenamy at approximately 20 to 30 miles per hour—passed him early on.   SoF ¶¶ 32–33, 36.   Defendant McMenamy neither informed Defendant Godin that he was going to pass him nor sought permission from any supervisor before

2

doing so.  SoF ¶¶ 34–35.  After passing Defendant Godin and another BPD cruiser, Defendant McMenamy used his cruiser to "ram[]" Mr. Root's car while on Huntington Avenue, which has trolley tracks embedded in it.  SoF ¶¶ 37, 39–42, 45–46.  Defendant McMenamy described this intentional striking as a "PIT maneuver."  SoF ¶ 38.  Defendant McMenamy's body worn camera ("BWC")—which he activated only later that morning after shooting Mr. Root—captured him telling another BPD officer, "I thought we lost [Mr. Root].  I thought he turned off earlier 'cause I rammed him on Huntington.  Like everybody was kinda following him, so I came in, and I just boom."  Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 02:59–03:04; SoF ¶ 45.  His BWC camera shows him making a T-bone gesture with his hands while he relayed this story.  Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 03:05; SoF ¶ 46.  Defendant McMenamy's PIT maneuver brought both his cruiser and Mr. Root's car to a stop.  SoF ¶ 39.  His cruiser was at a "45 degree" angle to Mr. Root's car.  SoF ¶ 40.  Defendant McMenamy exited his cruiser and drew his firearm, but Mr. Root drove away.  SoF ¶¶ 52–53.

BPD Rule 301, Section 7.4.3 prohibits BPD officers in a pursuit from passing the primary pursuit vehicle.  SoF ¶ 50; Ex. 35, BPD Rule 301 at COB 11–12.  BPD Rule 301, Section 7.6.7 prohibits BPD officers from "us[ing] their police vehicle to deliberately make contact with a pursued vehicle."  SoF ¶ 50; Ex. 35, BPD Rule 301 at COB 14.  The BPD trains its officers that using a police vehicle to strike a pursued vehicle violates BPD policy.  SoF ¶ 51.  Defendant McMenamy testified that when he performed the PIT maneuver, he was not thinking about BPD policy, and he did not alert anyone that he was planning to "ram[]" Mr. Root's car.  SoF ¶¶ 48–49.

The pursuit continued down Huntington Avenue and onto Route 9 in Brookline.  SoF ¶ 54.

### 3.    Mr. Root Was in a Car Accident in Brookline that Rendered His Car Undrivable.

At the intersection of Route 9 and Hammond Street in Brookline, Mr. Root's car collided with other vehicles.  SoF ¶ 56.  His car was extensively damaged:  the airbags deployed, glass

shattered, two of its wheels fell off, and a third wheel came off its rim.  SoF ¶¶ 57–64, 66.
Defendant Conneely testified that he "couldn't believe [Mr. Root] got out of" the car (SoF ¶ 58),
and Defendant Figueroa testified that she assumed Mr. Root was injured in the crash (SoF ¶ 61).
Mr. Root's car came to a stop at the entrance to a shopping center parking lot.  SoF ¶ 65.

**4.      The Individual Defendants Shot and Killed Mr. Root.**

Mr. Root managed to get out of his car and limp around the front of it and onto the sidewalk
where he fell.  SoF ¶¶ 67–69; Ex. 23, Brookline Traffic Camera (COB 3088) at 00:22–00:42.  He
got up from the sidewalk, limped toward a mulched area next to the sidewalk, and fell to the
ground.  SoF ¶¶ 70–72; Ex. 23, Brookline Traffic Camera (COB 3088) at 00:42–00:54.

Shelly McCarthy, a bystander who had previously graduated from the Boston EMS training
program and passed the City's and Commonwealth's EMS certification exams, had been sitting in
her car in the parking lot near where Mr. Root's car had come to a stop.  SoF ¶¶ 73–74.  She ran
to Mr. Root's side to help him.  SoF ¶¶ 75–76; Ex. 25, Cell Phone Video (COB 3086) at 00:27–
00:30.  According to Ms. McCarthy, Mr. Root appeared to be covered in blood, said nothing to
her, "was struggling to breathe," was "making a lot of gurgling noises," was "gurgling blood,"
appeared to have the "[l]ights on[,] no one home," and his eyes were "bouncing around like ping-
pong balls."  SoF ¶¶ 77–81.  She testified that the entire time she saw Mr. Root, "his right hand
remained on his chest," "[h]is left hand remained hanging down," and he did not try to get up.  SoF
¶¶ 82–83.

While Ms. McCarthy was attempting to assist Mr. Root, police officers arrived and
screamed multiple different commands.  SoF ¶¶ 84–100.  According to the Individual Defendants,
the commands included:  "Let me see your hands," "Get on the ground," "Show us your hands,"
"Stay on the ground and show me your hands," "Get down," "Let me see your hands," and "Stay
down."   SoF  ¶¶ 90–91,  94, 99, 100.   The Individual Defendants yelled these commands

simultaneously (SoF ¶¶ 88, 90, 92, 98–100), which Ms. McCarthy described as unintelligible, "confus[ing]," and "chao[tic]" (SoF ¶¶ 84). Defendants McMenamy, Thomas, and Conneely acknowledged that the scene was chaotic. SoF ¶ 89. Training materials for Defendant Conneely's Massachusetts State Police ("MSP") recruit class state that multiple officers on-scene "tend to all give commands/directions at the same time, creating confusion. The key to verbalization is simplicity. If feasible, give simple commands in a clear, loud voice. . . . If there is more than one officer present, the contact (initiating) officer should be the only one to issue commands." SoF ¶ 101; Ex. 37, MSP Basic Police Firearms Training Program at ROOT_0002429, 2466. Along with yelling commands at Mr. Root, Defendants Godin and McMenamy (and potentially Defendant Conneely) yelled at Ms. McCarthy to get away. SoF ¶¶ 85, 86.

While police, including the Individual Defendants, were yelling multiple different commands at Mr. Root—according to the Individual Defendants—he was "on the ground" (SoF ¶¶ 90, 138–139, 148), was on his knees (SoF ¶¶ 91, 120–121, 148), was sitting on the ground (SoF ¶¶ 124–125), was "like in a half lying, half kneeling type of position (SoF ¶¶ 138, 140),"was stumbling" (SoF ¶ 140), was "lying, kneeling" but "was never able to get up" (SoF ¶¶ 148, 150), and was not fleeing (SoF ¶¶ 125, 134, 149). Defendant Figueroa testified that Mr. Root did not get up or move but instead remained on his knees from the time she exited her cruiser to when he was killed. SoF ¶¶ 120–121. Similarly, Defendant Godin testified that Mr. Root was sitting on the ground and was not fleeing (SoF ¶ 125), and Defendant McMenamy testified that Mr. Root was not fleeing or running away (SoF ¶ 134). Defendant Conneely testified that he did not see Mr. Root fleeing or running away and that Mr. Root "never got up. . . . He was never able to get up." SoF ¶¶ 148–149. The Individual Defendants testified that they were each between approximately five and 15 feet away from Mr. Root. SoF ¶¶ 116, 120, 126, 136, 141, 151.

5

The Individual Defendants knew Mr. Root had been in a very serious motor vehicle accident (SoF ¶¶ 57–64, 130–131), and at least Defendants Godin and Fernandes believed he had been shot outside of BWH (SoF ¶¶ 25, 27).  The Individual Defendants did not engage Mr. Root in conversation or try to assess his condition or ascertain whether he was capable of understanding their commands.  SoF ¶¶ 103–107, 126, 132.  Defendants Fernandes, Figueroa, Thomas, and Conneely testified that they did not hear Mr. Root say anything.  SoF ¶¶ 102, 105, 126, 132.

While Mr. Root was "crouching down" and "fumbling around" in the mulched area, Defendant McMenamy "got real close to" Mr. Root, "put [his] leg up, and kicked" Mr. Root with "the flat of [his] foot like . . . a soccer kick."  SoF ¶ 108.  More specifically, Defendant McMenamy told investigators, "I put my foot up like [at a] 90-degree angle and kicked [Mr. Root] down to the ground with my left leg."  SoF ¶ 108; *see also* SoF ¶ 109.  The kick caused Mr. Root to fall onto the ground.  SoF ¶¶ 108–110.

While Ms. McCarthy observed Mr. Root clutching his chest with his right hand the entire time she saw him (SoF ¶ 82), the BPD Officer Defendants could not see Mr. Root's hands or do not remember whether they could see his hands; they acknowledged that his right hand was in his chest area and claim that when they fired 31 shots at Mr. Root they believed he must have been reaching for a weapon.[2]  SoF ¶¶ 112–115, 120, 123, 127, 135–136.  Defendant Fernandes testified that he does not remember whether he ever saw Mr. Root's hands.  SoF ¶¶ 114–115.  Defendant Figueroa testified that Mr. Root's hands were in his coat where she could not see them.  SoF ¶ 120.  Defendant Godin testified that Mr. Root's right hand reached into his jacket.  SoF ¶ 127.

---

[2] The Individual Defendants raised the claim that Mr. Root was supposedly "reaching" into his jacket when they were interviewed the week after the shooting and after the BPD Officer Defendants had met together as a group with their attorney and the BPD union president Larry Calderone to prepare for their interviews (SoF ¶¶ 187–190), in violation of BPD Rule 303, Section 11, which requires that all witnesses be separated before being interviewed (Ex. 36 at COB 28; *see also* SoF ¶¶ 192–195).

Defendant McMenamy was watching for Mr. Root's hands, but they were not visible and appeared to be under his body.  SoF ¶ 133.  Defendant Thomas testified that he could not see Mr. Root's hands.  SoF ¶¶ 141, 144.  Defendant Conneely testified that Mr. Root's "right hand went inside his jacket," while his left hand supported his body.  SoF ¶ 153.

Defendant Fernandes did not give Mr. Root any warning that he intended to use deadly force (SoF ¶ 118); there is no evidence that any officer gave Mr. Root any verbal warning either. The Individual Defendants did not take cover and did not use any de-escalation techniques or less-lethal force option like OC spray[3] or a baton.  SoF ¶¶ 167–172.

Defendants Figueroa and Conneely claim that they fired because they thought they saw the handle of a gun.  SoF ¶¶ 122–123, 154, 156.  Defendants Fernandes and Thomas claim that they fired because they heard a gunshot.  SoF ¶¶ 116, 146–147.  Defendant Godin claims that he fired his gun because he heard another officer say the word "gun."  SoF ¶ 128.  Defendant McMenamy claims that he fired his gun because he saw Mr. Root open his jacket, "saw a floating gun in [Mr. Root's] chest," and saw Mr. Root reach in that direction.  SoF ¶ 135.  None of the Individual Defendants saw a gun in Mr. Root's hand before firing at him.  SoF ¶¶ 114–115, 120, 129, 133, 141, 144, 145, 148, 153, 157.  And Mr. Root was not in possession of a firearm.  SoF ¶ 186.

Defendant Fernandes fired two rounds, Defendant Figueroa fired three rounds, Defendant Godin fired eight rounds, Defendant McMenamy fired 10 rounds, Defendant Thomas fired three rounds, and Defendant Conneely fired five rounds.  SoF ¶¶ 160–166.

A cell phone video reflects that approximately 15 seconds elapsed between when Ms. McCarthy approached Mr. Root and when the Individual Defendants opened fire.  SoF ¶ 158;

---

[3] "OC" stands for oleoresin capsicum, and "OC spray" refers to pepper spray.  *See* Oleoresin Capsicum:  Pepper Spray as a Force Alternative, National Institute of Justice, United States Depart of Justice (Mar. 1994), *available at* https://www.ojp.gov/pdffiles1/nij/grants/181655.pdf.

Ex. 25, Cell Phone Video (COB 3086) at 00:28–00:43.  The entire shooting lasted approximately

four seconds.  SoF ¶ 159.

After the shooting, Mr. Root was taken by ambulance to Beth Israel Deaconess Medical

Center, where he was pronounced dead.  SoF ¶ 178.  An autopsy report reflects that he suffered

multiple gunshot wounds to both hands, including penetrating and perforating gunshot wounds to

his right hand.  SoF ¶¶ 179–181.

A bb gun was recovered at the scene in Brookline near Mr. Root's body.  SoF ¶ 182.  A

metal rod extends from the barrel of the bb gun.  SoF ¶ 182.  The bb gun was not damaged and did

it have blood on it when it was recovered.  SoF ¶¶ 183–185.

### 5. After the Shooting, the Individual Defendants Did Not Give Mr. Root Medical Assistance and Instead Crassly Described their Conduct.

Defendants Fernandes, Figueroa, McMenamy, Thomas, and Conneely testified that they

did not provide medical aid to Mr. Root after the shooting  SoF ¶ 176.  Video footage recorded on

a BPD officer's BWC reflects that Defendant Godin also did not provide medical aid to Mr. Root.

SoF ¶ 177.  Instead, after the shooting, Defendant Godin told other officers, "I killed the

motherf*cker" and "I emptied my magazine on him."  SoF ¶ 173.  Defendant Conneely shook

Defendant McMenamy's hand after learning that he too had shot Mr. Root; Defendant Conneely

then told Defendant McMenamy to "shut your f*ckin' mouth," to which Defendant McMenamy

replied, "I won't talk."  SoF ¶¶ 174–175.

## SUMMARY JUDGMENT STANDARD

The court must enter summary judgment when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  The movant can meet this burden "by demonstrating an 'absence of evidence to

support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass.

2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  While the court views the summary judgment record in the light most favorable to the nonmovant, any inferences the court draws in the nonmovant's favor must be reasonable.  *See Stamps v. Town of Framingham*, 38 F. Supp. 3d 146, 150 (D. Mass. 2014).

"Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine issue of disputed fact remains."  *Atain Specialty Ins. Co. v. Davester LLC*, 518 F. Supp. 3d 551, 555 (D. Mass. 2021).  The nonmovant must "present affirmative evidence" and may not simply 'rest upon mere allegation or denial of his pleading.'"  *Stamps*, 38 F. Supp. 3d at 150 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 248–49 (emphasis in original).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Id*. at 249–50.

## ARGUMENT

### 1.    Count 1:  The Individual Defendants Used Excessive Force in Shooting Mr. Root.

Count 1 asserts a civil rights claim against the Individual Defendants under 42 U.S.C. § 1983.  "Section 1983 is a vehicle for vindicating substantive rights conferred by the Constitution or laws of the United States that have been violated by persons acting under color of state law."  *Stamps*, 38 F. Supp. 3d at 150.  The Fourth Amendment protects individuals from "a police officer's use of excessive force in effectuating a seizure."  *Stamps v. Town of Framingham*, 813 F.3d 27, 35 (1st Cir. 2016).  Force is excessive when the amount of force used is objectively unreasonable.  *See Parker v. Town of Swansea*, 310 F. Supp. 2d 356, 366 (D. Mass. 2004) (citation

omitted).  The "use of deadly force is deemed a seizure under the Fourth Amendment, and such an extreme action is reasonable (and therefore constitutional) only when 'at a minimum, a suspect poses an immediate threat to police officers or civilians.'"  *McKenney v. Mangino*, 873 F.3d 75, 81 (1st Cir. 2017) (quoting *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003) (per curiam)); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").  The reasonableness analysis requires "'careful balancing'" and "is a 'fact-intensive inquiry that is highly sensitive to the circumstances of a particular case.'"  *Jarrett*, 331 F.3d at 148 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The officer's conduct is "judged from the perspective of a reasonable officer on the scene."  *Graham*, 490 U.S. at 396. "[T]he most relevant factors" in assessing whether an officer's use of lethal force was objectively reasonable "are the immediacy of the danger posed by the decedent and the feasibility of remedial action."  *McKenney*, 873 F.3d at 84.  Other factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396. As the First Circuit has explained, "the use of deadly force, even if reasonable at one moment, may become unreasonable in the next if the justification for the use of force has ceased.  Put another way, a passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."  *McKenney*, 873 F.3d at 82 (quotation marks and citations omitted).  Further, "[w]hen feasible, a police officer must give some sort of warning before employing deadly force."  *Id*.

As the Seventh Circuit has noted, the "[o]bjective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide."  *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012).  Accordingly, where, as here, the defendants

acknowledge and do not contest the material facts, the question of objective reasonableness can be decided as a matter of law. *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015); *Cooper v. Brown*, 156 F. Supp. 3d 818, 829 (N.D. Miss. 2016) ("In certain cases, . . . [where] the facts will either be undisputed, or the defendant's actions will appropriately be regarded as either reasonable or unreasonable under either party's version of the facts, . . . summary judgment on the issue of objective reasonableness may well be appropriate, or even required.").  Indeed, courts grant summary judgment against officers where the undisputed evidence shows that they used excessive force. *See, e.g.*, *Cooper*, 156 F. Supp. 3d at 830 ("[T]his court can find no justification not to grant plaintiff's motion for summary judgment on the basis of Brown's actions being merely 'unreasonable.'  Indeed, reserving these issues for ruling at trial might only give Brown an incentive to try to recant his own deposition testimony, but this court finds that testimony to be clear enough."); *Coffman v. Battle*, No. 4:18-CV-000022-HLM, 2019 WL 10303633, at *14 (N.D. Ga. Jan. 22, 2019) (granting summary judgment for plaintiff where parties "conteste[ed] whether Defendant's use of force was legally justified," but "[t]he facts of th[e] case [we]re largely undisputed," "neither side denie[d] the tasing itself or the events leading up to it," and "prison cameras have recorded this incident and placed most of the key facts beyond reasonable dispute").

It is undeniable that Mr. Root was seized twice:  when the Individual Defendants drew their firearms on him and when they shot him.  *See Stamps*, 813 F.3d at 35 ("Stamps was undoubtedly seized. . . . No reasonable person could possibly have felt free to leave with an assault rifle pointed directly at his head.") (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, . . . or

11

the use of language or tone of voice indicating that compliance with the officer's request might be compelled."")); *Garner*, 471 U.S. at 7; *McKenney*, 873 F.3d at 81.

The second seizure—shooting at Mr. Root 31 times in approximately four seconds resulting in numerous gunshot wounds that killed him—was not objectively reasonable.  The entire time the Individual Defendants were in Mr. Root's presence, he was "on the ground" (SoF ¶¶ 90, 138–139, 148), was on his knees (SoF ¶¶ 91, 120–121, 148), was sitting on the ground (SoF ¶¶ 124–125), was "like in a half lying, half kneeling type of position (SoF ¶¶ 138, 140),"was stumbling" (SoF ¶ 140), was "lying, kneeling" but "was never able to get up" (SoF ¶¶ 148, 150), and was not fleeing (SoF ¶¶ 125, 134, 149).  When the Individual Defendants fired their guns, they were between five and 15 feet from Mr. Root, and seconds earlier, Defendant McMenamy was close enough to kick him.  SoF ¶¶ 108–110, 116, 120, 126, 136, 141, 151.  They knew Mr. Root had been in a serious car accident (SoF ¶¶ 57–64, 103, 130), and at least Defendants Godin and Fernandes believed that Mr. Root had previously been shot (SoF ¶¶ 25, 27, 103, 130).  Despite this knowledge, none of the Individual Defendants took steps to determine the extent of Mr. Root's injuries or to assess his physical or mental condition or whether he was capable of responding to, or even comprehending, the Individual Defendants' commands.  SoF ¶¶ 103–107, 126, 132. Instead, they simultaneously shouted multiple commands at Mr. Root (SoF ¶¶ 84–100), and, at one point, Defendant Conneely stopped yelling commands because they were not being sufficiently clear (SoF ¶ 93).[4]  The Individual Defendants did not take cover, use any de-escalation

---

[4] MSP training materials specifically warn that when multiple officers "give commands/directions at the same time," it "create[es] confusion," so a single officer should "give simple commands in a clear, loud voice."  SoF ¶ 101.  In addition, law enforcement-related websites have published articles emphasizing the importance of having one officer give clear commands.  *See, e.g.*, Duane Wolfe, *Why Loud & Repetitive Verbal Commands Can Hinder Compliance* (Jan. 16, 2018), https://police1.com/evergreen/articles/why-loud-repetitive-verbal-commands-can-hinder-compliance-PXizJoAkV8JIIr45/ ("Only one officer should do the talking.  Too many voices – possibly giving contradictory commands – only add to the confusion and stress of the situation."); Gordon Graham, *Conflicting Commands* (May 7, 2019), https://www.lexipol.com/resources/todays-tips/conflicting-commands/ ("Commands should be clear and concise" and "given by one officer only.  And don't give conflicting orders.  If you start yelling

techniques, use less-lethal force options like OC spray or a baton, or warn Mr. Root that deadly force may be used. SoF ¶¶ 118, 167–172. None of the Individual Defendants saw Mr. Root holding a gun. SoF ¶¶ 114–115, 120, 129, 133, 141, 144, 145, 148, 153, 157. Nevertheless, they now claim they opened fire because they saw either a gun (McMenamy, SoF ¶ 135) or the handle of a gun (Figueroa and Conneely, SoF ¶¶ 122–123 154, 156), heard another officer say the word "gun" (Godin, SoF ¶ 128), or heard a gunshot (Fernandes and Thomas, SoF ¶¶ 116, 146–147).

Even assuming the Individual Defendants were telling the truth, none of these reasons justifies an officer firing at a person in Mr. Root's condition. *See, e.g.*, *Palma v. Johns*, 27 F.4th 419, 443 (6th Cir. 2022) ("An officer does not have probable cause to justify deadly force just because the person's hands are in his pockets and the officer cannot see his hands," "cannot shoot based on a 'mere hunch' that the person might be armed," and cannot "use lethal force merely because someone disobeys the officer's orders") (citations omitted). None of the Individual Defendants warned Mr. Root that deadly force might be used against him. SoF ¶ 118; *see supra* p. 7. Only approximately 15 seconds elapsed between the time that Ms. McCarthy approached Mr. Root to render aid and the time that the Individual Defendants began firing. SoF ¶ 158. In a span of approximately four seconds, the Individual Defendants fired 31 rounds at Mr. Root with each Individual Defendants firing at least twice and Defendant McMenamy firing 10 times. SoF ¶¶ 159, 161–166. Each shot was a new use of lethal force, and the Individual Defendants indisputably failed to reassess the need for lethal force before each time they fired. *See Lachance v. Town of Charlton*, 990 F.3d 14, 21–26 (1st Cir. 2021).

---

one thing and then something different, the suspect may not be able to process and respond."); Von Kliem, *Rethinking "Show Me Your Hands!"* (Jan. 28, 2021), https://www.lexipol.com/resources/blog/rethinking-show-me-your-hands/ (where "one officer order[s] the suspect not to move, while a second officer order[s] the suspect to 'show me your hands!,'" it will not be "clear whether the suspect's [hand] movement was evidence of an imminent threat or a desperate attempt to comply").

McKenney v. Mangino and Parker v. Town of Swansea are instructive.   In McKenney,

officers came to the home of a man who was holding a gun and would not put it down after officers

asked.  873 F.3d at 78.  The man "never pointed his weapon" at the officers in the house and did

not "utter anything resembling a threat."  Id.  Police retreated outside and watched the man

"amble[] nonchalantly" in and out of the house.  Id.  When he came outside "with his gun dangling

from his hand," the defendant officer "yelled at him three times to 'drop the dun.'"  Id.  Seconds

later, the man raised the gun over his head."  Id.  He "had a vacant stare," "appeared 'not at home'

mentally," "lowered the gun without firing it," "weave[d] haphazardly into and out of his house,"

and then walked down his driveway toward the defendant's parked cruiser.  Id. at 78–79.  When

he was 69 feet from the defendant's cruiser, the defendant fired at the man's central mass and then

shot him in the head, killing him.  Id. at 79.  "None of the officers warned [the man] that they

would use deadly force if he refused to drop his weapon."  Id.  The First Circuit affirmed the denial

of the defendant's summary judgment motion, reasoning that "the threat presented lacked

immediacy," "alternatives short of lethal force remained open," and "the feasibility of a more

measured approach was apparent."  Id. at 83.  The defendant's arguments that he perceived the

man "as an imminent danger" and had "no choice but to fire his weapon" were unpersuasive given

"the slowness of [the man's] gait, the clear visibility," and "the fact that nobody had warned [the

man] that deadly force would be used if he failed to follow police commands."  Id. at 83–84.

In Parker, police shot the plaintiff multiple times after a vehicle pursuit.  See 310 F. Supp.

2d at 361.  The pursuit ended when the plaintiff crashed his car into a ditch.  Id. at 363.  The

plaintiff exited the car, an officer fired 14 shots at him, and other officers, believing the first officer

had been shot, began firing at him too.  Id.  The first officer then fired at the plaintiff 14 more

times.  Id.  The officers testified that the plaintiff "pretended to be armed and acted accordingly":

the first officer approached the plaintiff's car and commanded him to stay in it and put his hands out the window; the plaintiff briefly put one hand out the window; when the first officer was approximately 10 feet away, the plaintiff "abruptly exited" the car "in a 'combat crouch' shooting position," turned toward the officers with his hands clasped at his waist, and advanced toward the first officer, and the officers fired at the man when he did not comply with their "repeated[]" instructions "to 'get down,' 'show us your hands,' and 'drop the gun.'" *Id.* at 364. This Court held that, as to the first officer, "no police officer could have reasonably believed that the law allowed him to shoot at [the plaintiff] 28 times under the circumstances." *Id.* at 368.

When applied to the undisputed material facts here, the *Graham* factors demand a ruling that the Individual Defendants used an objectively unreasonable level of force exceeding the force permissible under the Fourth Amendment.[5] No rational jury could find that the force used against Mr. Root was objectively reasonable. An objectively reasonable officer in their position would have known that his or her conduct violated the rule of law. There is no doubt that cases, such as cases cited above, have put police on notice that deadly force is constitutionally unreasonable— and not protected by qualified immunity—when used against a subject who, like Mr. Root, posed no immediate threat; was known to have been in a severe motor vehicle collision and likely seriously injured; was facing many officers with guns drawn; was not seen pointing, brandishing, or even holding a weapon; was on the ground and not moving toward the officers; was not resisting arrest; and was not fleeing.[6] Based on the Individual Defendants' testimony and indisputable video evidence, Plaintiff is entitled to summary judgment as to liability on Count 1.

_____

[5] The Court must evaluate the objective reasonableness of each Individual Defendant's use of force. Because their reasonable subjective beliefs are relevant, the unreasonableness of their conduct should be evaluated independently. *See, e.g.*, *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 18–19 (1st Cir. 2005) (affirming verdicts against individual officers).

[6] Officers are protected by qualified immunity only if a reasonable officer could have believed the action taken was lawful in light of established law and the information available at the time. *See McKenney*, 873 F.3d at 83. Plaintiff

2. **Count 2:  The Individual Defendants Interfered with Mr. Root's Rights by Threats, Intimidation, and/or Coercion.**

Count 2 asserts a claim against the Individual Defendants under the Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, §§ 11H & 11I.  "The MCRA is the state analog to § 1983 and provides a cause of action for an individual whose rights under the constitution or laws of either the United States or the Commonwealth of Massachusetts have been interfered with by 'threats, intimidation or coercion.'"  *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) (quoting G.L. c. 12, §§ 11H and 11I).  A threat "involves the intentional exertion of pressure to make another fearful of injury or harm"; intimidation "involves putting in fear for the purpose of compelling or deterring conduct"; and coercion involves "the application to another of such force, either physical or moral, as to constrain a person to do against his will something he would not have otherwise done." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994) (quotation marks and citations omitted).  "Evidence of 'threats, intimidation, or coercion' is to be measured by an objective standard, not the state of mind of the person threatened." *Sarvis v. Boston Safe Deposit & Tr. Co.*, 47 Mass. App. Ct. 86, 92 (1999).  "[N]ormally lawful restraint may constitute coercion" if it "is applied in order to cause the plaintiff to give up his . . . rights." *Spencer v. Roche*, 755 F. Supp. 2d 250, 267 (D. Mass. 2010).

With their guns drawn and pointed at Mr. Root, the Individual Defendants created a needlessly chaotic and confusing situation in which he could not comply with their simultaneous and unclear orders.  The Individual Defendants admitted that they failed to assess whether Mr. Root could understand or respond to their commands, but they nonetheless simultaneously shouted differing and contradictory commands at Mr. Root, including that he get or stay on the ground or

---

has shown that the undisputed facts establish a violation of a constitutional right clearly established as of February 7, 2020, and that the Individual Defendants' conduct was objectively unreasonable in view of clearly established law.

get down when he was already on the ground.  Ms. McCarthy described some commands as unintelligible and testified that she "was just so confused."  SoF ¶ 84.  Defendants Godin and McMenamy (and potentially Conneely) were also yelling at Ms. McCarthy to get away.  SoF ¶¶ 85–86.  This chaotic scene—which the Individual Defendants created and controlled—resulted in a situation where Mr. Root could have properly responded to one officer's commands, and that response could have violated another officer's commands resulting in that officer shooting Mr. Root.  For example, Mr. Root could have heard one officer say, "Get on the ground," and then move to get further onto the ground in compliance with that command, while another officer who had said "Stay on the ground" could have interpreted Mr. Root's movement as non-compliance supposedly justifying the use of force against him.  Mr. Root also could have responded to commands that were supposed to have been for Ms. McCarthy.

By screaming incomprehensible commands with their guns drawn in a manner that made it impossible to properly comply without the Individual Officers using force against Mr. Root, the Individual Defendants intentionally pressured him to make him fearful of injury, used fear to compel or deter Mr. Root's movements, and applied force to Mr. Root to get him to act in a way that he otherwise would not have.  As a result, the Individual Defendants gave commands to Mr. Root to cause him to give up his rights to be free from excessive force, assault and battery, and wrongful death by the police.  These undisputed facts constitute the threats, intimidation, and coercion that establish the Individual Defendants' MCRA liability as a matter of law.  *See Sheffield v. Pieroway*, 361 F. Supp. 3d 160, 168 (D. Mass. 2019) ("A reasonable jury could conclude that the officers' surrounding presence, display of weaponry and non-responsiveness amounted to a threat or intimidation under the MCRA.").

3.      **Counts 5 and 6:  Defendant McMenamy Used Excessive Force in Performing a PIT Maneuver and in Kicking Mr. Root.**

Defendant McMenamy's having intentionally "rammed" his cruiser into Mr. Root's car (Count 5) and kicked Mr. Root (Count 6) are objectively unreasonable seizures.

**PIT Maneuver**:  Using a police vehicle to intentionally strike a vehicle is a use of force subject to the *Graham* reasonableness analysis.  *Scott v. Harris*, 550 U.S. 372, 381 (2007). Contrary to BPD training, on an urban road with embedded trolley tracks, Defendant McMenamy passed multiple BPD cruisers (violating BPD Rule 301, Section 7.4.3) and intentionally drove his cruiser into Mr. Root's (violating BPD Rule 301, Section 7.6.7), bringing both cars to a stop.  SoF ¶¶ 33–51.  Defendant McMenamy drove into Mr. Root's car at a 45-degree angle, described what he did as having "rammed" Mr. Root's car, and made a T-bone motion with his hands while telling the story to a colleague.  SoF ¶¶ 37, 40, 45–46.  And Defendant McMenamy admitted that he was not even thinking about BPD policy and its prohibition of his conduct when he "rammed" Mr. Root.  SoF ¶¶ 47, 49.  Defendant McMenamy does not dispute any of this evidence.  Defendant McMenamy's PIT maneuver was unnecessary and unreasonable.  He could have simply continued pursuing Mr. Root—which every other officer did—but instead chose to drive directly into Mr. Root's car.  This use of force violated Mr. Root's Fourth Amendment rights.

Defendant McMenamy's PIT maneuver was not similar to the officer's conduct in *Scott v. Harris*, where the Supreme Court held that using the bumper of a cruiser to "push" the rear of a suspect's vehicle was not excessive where video footage showed the suspect "racing down narrow, two-lane roads in the dead of night" at "shockingly fast" speeds, "swerve around more than a dozen other cars, cross the double-yellow line, . . . force cars traveling in both directions to their respective shoulders to avoid being hit, run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, [and was] chased by numerous police cars"

18

that "engage[d] in the same hazardous maneuvers just to keep up."  550 U.S. at 375, 379.  Further, this is not a case in which Mr. Root was speeding and putting the public at risk, which might have justified the use of force to terminate the pursuit:  Defendant McMenamy testified that when he hit Mr. Root, they were driving at a "noticeably slow" speed of approximately 20 to 30 miles per hour.  SoF ¶ 36.  *Contra, e.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 781 (2014) ("[T]he Fourth Amendment did not prohibit petitioners from using the deadly force that they employed to terminate the dangerous car chase [exceeding 100 miles per hour] that Rickard precipitated.").

**Kick**:  A police officer kicking a civilian constitutes a seizure.  *See Mendenhall*, 446 U.S. at 554 ("some physical touching of the person of the citizen" is an "[e]xample[] of circumstances that might indicate a seizure")).  The Seventh Circuit has found that "[p]unching, stomping and kicking a suspect who is on the ground and seriously injured . . . violates clearly established law." *Alicea v. Thomas*, 815 F.3d 283, 292 (7th Cir. 2016); *see also Boozer v. Sarria*, No. 1:09-CV-2109-TWT, 2010 WL 3937164, at *6 (N.D. Ga. Oct. 4, 2010) ("No reasonable officer would believe that it was proper to kick a suspect while that suspect was lying on the ground, not resisting in any way.").

Here, Defendant McMenamy "put [his] foot up like [at a] 90-degree angle and kicked [Mr. Root] down to the ground."  SoF ¶ 108.  Immediately before Defendant McMenamy kicked Mr. Root, Ms. McCarthy had been at Mr. Root's side, trying to render aid to him while he gurgled blood, his eyes bounced in his head, and he looked like the lights were on but no one was home. SoF ¶¶ 79–81.  Mr. Root was on the ground, compliant, not fleeing, and not a threat to Defendant McMenamy or anyone else.  Given this indisputable evidence, Defendant McMenamy used unreasonable force in kicking Mr. Root to the ground.

4.    **Counts 8 and 9:  The Individual Defendants Are Liable for Assault and Battery and Mr. Root's Wrongful Death.**

"Massachusetts law allows for assault and battery claims against police officers who use excessive force in conducting an arrest."  *Raiche*, 623 F.3d at 40 (citing *Powers v. Sturtevant*, 199 Mass. 265, 266 (1908) (holding that defendant officer "had not the right to use unreasonable or excessive force and if he did, he is liable to the plaintiff for any injury suffered in consequence thereof")).  Where, as here, "a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the court's] determination of the reasonableness of the force used under§ 1983 controls [its] determination of the reasonableness of the force used under the common law assault and battery claims."  *Raiche*, 623 F.3d at 40 (citing *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991)).  Under Massachusetts law, anyone who "by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted" is liable for the decedent's wrongful death.  G.L. c. 229, § 2(2).  The determination of whether use of force was reasonable under the Fourth Amendment controls the analysis of a wrongful death claim.  *See Estate of Rahim by Rahim v. United States*, 506 F. Supp. 3d 104, 120 (D. Mass. 2020) (citing *McGrath v. Tavares*, No. 17-P-326, 2018 WL 3040710, at *2 (Mass. App. Ct. June 20, 2018)).  Because the Individual Defendants used excessive force against Mr. Root, they are also liable for assault and battery and his wrongful death.  As a result, Plaintiff is entitled to summary judgment on Counts 8 and 9.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court enter partial summary judgment in her favor on liability as to Counts 1–2, 5–6, and 8–9 of the Complaint.

Dated:  August 8, 2022

Respectfully submitted,

PLAINTIFF JENNIFER ROOT BANNON,

By her attorneys,

*/s/ Mark A. Berthiaume*

Mark A. Berthiaume (BBO # 041715)
Gary R. Greenberg (BBO # 209420)
Alison T. Holdway (BBO # 690569)
Courtney R. Foley (BBO # 707181)
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Tel.: 617-310-6000
Fax:  617-310-6001
berthiaumem@gtlaw.com
greenbergg@gtlaw.com
holdwaya@gtlaw.com
foleyc@gtlaw.com