UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JENNIFER ROOT BANNON, as the Special
Personal Representative of the Estate of
Juston Root,

     Plaintiff,

     v.

BOSTON POLICE OFFICERS DAVID
GODIN, JOSEPH McMENAMY, LEROY
FERNANDES, BRENDA FIGUEROA, and
COREY THOMAS;

MASSACHUSETTS STATE TROOPER
PAUL CONNEELY; and

THE CITY OF BOSTON,
MASSACHUSETTS;

     Defendants.

Civil Action No. 1:20-cv-11501-RGS

**HEARING REQUESTED**

## PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the District of Massachusetts, Plaintiff Jennifer Root Bannon ("Plaintiff") submits the following statement of undisputed material facts in support of her Motion for Partial Summary Judgment on Counts 1–2, 5–6, and 8–9 of the Complaint against the Individual Defendants.[1]  Documents referred to herein are annexed to the accompanying Declaration of Alison T. Holdway in support of Plaintiff's Motion for Partial Summary Judgment and are referred to as "Ex."

---

[1] Each Boston Police ("BPD") officer defendant and Defendant Trooper Paul Conneely are individually referred to as "Defendant [Last Name]."  The BPD officer defendants are collectively referred to as the "BPD Officer Defendants" and, together with Defendant Conneely, are collectively referred to as the "Individual Defendants."  Defendant City of Boston is referred to as the "City."

1.      **Brigham & Women's Hospital Shooting**

1.      On the morning of February 7, 2020 ("February 7"), Juston Root ("Mr. Root") drove his car to the intersection of Fenwood Road and Vining Street in Boston, Massachusetts near Brigham & Women's Hospital ("BWH").  Ex. 5, Defendant Godin Tr. at 17:6–18, 127:4–128:5, 136:12–138:2, 176:19–177:4, 200:6–10; Ex. 15, Officer St. Peter Interview at COB 2717, 2722–2723.

2.      As of February 7, each of the BPD Officer Defendants was a BPD officer.  Ex. 2, Defendant Fernandes Interview at COB 2683–2684; Ex. 4, Defendant Figueroa Interview at COB 2668; Ex. 6, Defendant Godin Interview at COB 2616; Ex. 8, Defendant McMenamy Interview at COB 2650–2651; Ex. 10, Defendant Thomas Interview at COB 2702.

3.      As of February 7, Defendant Conneely was a trooper with the Massachusetts State Police ("MSP").  Ex. 12, Defendant Conneely Interview at COB 2751.

4.      Mr. Root's car was a silver Chevrolet Volt.  Ex. 32, FDIT Report at COB 5423; Ex. 29, Photos of Car.

5.      On the morning of February 7, BPD received a call concerning a person with a gun in the area around BWH.  Ex. 5, Defendant Godin Tr. at 122:21–123:5; Ex. 15, Officer St. Peter Interview at COB 2721–2722.

6.      Defendant Godin responded to the call.  Ex. 5, Defendant Godin Tr. at 125:10–12.

7.      BPD Officer Michael St. Peter also responded to the call.  Ex. 15, Officer St. Peter Interview at COB 2721–2722.

8.      Defendant Godin testified that he saw Mr. Root's car parked on Fenwood Road, so he parked his cruiser, got out, and as he turned onto Vining Street, he saw Mr. Root walking in the direction toward him on the sidewalk, who said to Defendant Godin, "I'm law enforcement.  I'm

law enforcement." Ex. 5, Defendant Godin Tr. at 136:17–138:8, 141:8–18, 142:20–143:2, 146:10–147:6.

9.    Defendant Godin further testified that Mr. Root had what turned out to be a paintball gun in his waist area and pulled the trigger.  Ex. 5, Defendant Godin Tr. at 147:20–148:9, 149:4–9, 151:21–152:18.

10.    Defendant Godin testified that he heard gunshots, he fired his gun more than once at Mr. Root's "[c]enter mass," and believed he had shot Mr. Root.  Ex. 5, Defendant Godin Tr. at 149:4–9, 149:16–22, 160:22–162:16, 163:1–16.

11.    Officer St. Peter told investigators working on behalf of the Norfolk County District Attorney's Office ("NDAO") that Mr. Root was walking on the sidewalk on Vining Street toward Fenwood Road; Officer St. Peter parked his cruiser at that intersection; Mr. Root "ha[d] what appear[ed] to be a firearm"; and Officer St. Peter went to "the engine block area" of the driver's side of his cruiser while an incident with Mr. Root was "happening somewhere on the other side, on like, the passenger side."  Ex. 15, Officer St. Peter Interview at COB 2722–2723.

12.    Officer St. Peter told investigators with the NDAO:  "I then pull out my firearm, telling this individual to drop the gun, drop the gun, and then there's shots fired.  I then, you know, start shooting at this individual, and I'm not quite sure how many times I shot, and the guy goes down . . . I then, uh, assuming that the, the suspect is down, he's down, and he is grimacing, and then I, um, he gets back up, and he, I thought he was mortally wounded."  Ex. 15, Officer St. Peter Interview at COB 2723–2724.

13.    Officer St. Peter further told investigators with the NDAO:

Q:  "Okay, all right, and then [sic] suspect you said at some point in time is down?"

A:  "Yes."

Q:  "And you say he's grimacing."

A:  "Yes."

Q:  "Do you believe he was shot at that time?"

A:  "Yes."

Ex. 15, Officer St. Peter Interview at COB 2735.

14.     Defendant Godin testified that after he fired his weapon, he took a step back and "just tripped" and fell into the street.  Ex. 5, Defendant Godin Tr. 154:12–155:15.

15.     Video cameras at BWH recorded the interaction between Mr. Root and Defendant Godin.  Ex. 26, BWH Video Camera (COB 4211) at 03:00–03:18; Ex. 27, BWH Video Camera (COB 4215) at 01:25–01:35.

16.     The following are stills taken from videos recorded by cameras at BWH that show the interaction between Mr. Root and Defendant Godin and the proximity of Defendant Godin's cruiser to Officer St. Peter's cruiser at the intersection of Fenwood Road and Vining Street:



Ex. 27, BWH Video Camera (COB 4215) at 01:26.



Ex. 27, BWH Video Camera (COB 4215) at 01:27.



Ex. 27, BWH Video Camera (COB 4215) at 01:28.



Ex. 27, BWH Video Camera (COB 4215) at 01:28.



Ex. 27, BWH Video Camera (COB 4215) at 01:29.



Ex. 27, BWH Video Camera (COB 4215) at 01:30.



Ex. 27, BWH Video Camera (COB 4215) at 01:31.



Ex. 27, BWH Video Camera (COB 4215) at 01:31.



Ex. 27, BWH Video Camera (COB 4215) at 01:31.



Ex. 27, BWH Video Camera (COB 4215) at 01:32.



Ex. 26, BWH Video Camera (COB 4211) at 02:47.



Ex. 26, BWH Video Camera (COB 4211) at 02:56.



Ex. 26, BWH Video Camera (COB 4211) at 03:01.



Ex. 26, BWH Video Camera (COB 4211) at 03:06.



Ex. 26, BWH Video Camera (COB 4211) at 03:14.



Ex. 26, BWH Video Camera (COB 4211) at 03:25.

17.    Mr. Root limped to his vehicle, which was on Fenwood Road.  Ex. 26, BWH Video Camera (COB 4211) at 03:08–03:19; Ex. 27, BWH Video Camera (COB 4215) at 01:25–01:35; Ex. 15, Officer St. Peter Interview at COB 2724, 2735.

18.    Officer St. Peter told investigators with the NDAO, "I thought for sure [Mr. Root] was gonna succumb to his injuries at some point there."  Ex. 15, Officer St. Peter Interview at COB 2726.

19.    Defendant Godin testified that he did not see Officer St. Peter's cruiser parked in the intersection of Fenwood Road and Vining Street, and he did not know that Officer St. Peter was at the scene.  Ex. 5, Defendant Godin Tr. at 138:20–140:10, 164:7–10.

20.    Officer St. Peter did not know that another BPD officer (Defendant Godin) was the person with whom Mr. Root was interacting.  Ex. 15, Officer St. Peter Interview at COB 2730–2731, 2733.

21.    Mr. Root was carrying a clear plastic paintball gun outside of BWH.  Ex. 5, Defendant Godin Tr. at 152:1–10, 178:6–179:15; Ex. 28, Photos marked as Exhibit 13 at the deposition of Defendant Godin at pp. 16–17.

**2.    Vehicle Pursuit**

22.    Mr. Root got in his car and drove toward Huntington Avenue.  Ex. 5, Defendant Godin Tr. at 200:6–13, 203:1–10; Ex. 15, Officer St. Peter Interview at COB 2726.

23.    Mr. Root turned right off of Fenwood Road onto Huntington Avenue.  Ex. 5, Defendant Godin Tr. at 203:1–10.

24.    Defendant Godin and Officer St. Peter pursued Mr. Root's vehicle.  Ex. 5, Defendant Godin Tr. at 203:1–10; Ex. 15, Officer St. Peter Interview at COB 2726, 2738.

25.     Defendant Godin stated over the BPD radio that he believed Mr. Root had been shot.  Ex. 5, Defendant Godin Tr. at 218:6–13; Ex. 22, BPD Officer Justin Evangelista's BWC Footage (COB 3082) at 01:15–01:19.

26.     In response, the BPD dispatcher stated over the radio, "Suspect shot."  Ex. 22, Officer Justin Evangelista's BWC Footage (COB 3082) at 01:15–01:19; Ex. 5, Defendant Godin Tr. at 281:2–20, 283:7–11.

27.     Defendant Fernandes testified that he recalls hearing a radio call that Mr. Root had been shot and the fact that Mr. Root had been shot was important information for him to know, but he does not remember whether he and Defendant Thomas, who was riding in the passenger seat, discussed that Mr. Root had been shot.  Ex. 1, Defendant Fernandes Tr. at 113:18–115:1, 123:4–124:8.

28.     Defendant Figueroa testified that she did not recall whether she heard over the radio that Mr. Root had been shot, but when asked if she would have wanted to know during the pursuit that he had been shot, Defendant Figueroa responded, "Absolutely.  Anything that's transmitted on the radio we want to know."  Ex. 3, Defendant Figueroa Tr. at 94:23–96:11, 104:4–13.

29.     Other BPD officers in cruisers joined the vehicle pursuit.  Ex. 1, Defendant Fernandes Tr. at 119:23–120:21; Ex. 3, Defendant Figueroa Tr. at 67:5–21; Ex. 7, Defendant McMenamy Tr. at 105:5–106:4, 112:20–115:6; Ex. 9, Defendant Thomas Tr. at 96:8–99:5.

30.     Defendant Fernandes was driving a cruiser in which Defendant Thomas was in the passenger seat.  Ex. 1, Defendant Fernandes Tr. at 113:18–115:1.

31.     Defendant McMenamy was driving a cruiser in the pursuit.  Ex. 7, Defendant McMenamy Tr. at 105:5–106:4, 112:20–115:6.

32.     Defendant Godin initially was the first police vehicle behind Mr. Root's car.  Ex. 5, Defendant Godin Tr. at 200:6–16, 203:1–24; Ex. 15, Officer St. Peter Interview at COB 2726, 2736–2737.

33.     Defendant McMenamy passed Defendant Godin's cruiser and another cruiser during the pursuit.  Ex. 7, Defendant McMenamy Tr. at 115:10–116:9, 121:9–122:9, 123:11–124:23, 128:10–24; *see also* Ex. 5, Defendant Godin Tr. at 204:8–16.

34.     Defendant McMenamy did not inform Defendant Godin or the driver of the other cruiser that he was going to pass them.  Ex. 7, Defendant McMenamy Tr. at 126:3–17.

35.     Defendant McMenamy did not seek permission from any supervisor before he passed Defendant Godin and the other cruiser.  Ex. 7, Defendant McMenamy Tr. at 126:18–21.

36.     Defendant McMenamy testified that at the time he passed those cruisers, the pursuit was traveling at approximately 20 to 30 miles per hour, which he described as "noticeably slow." Ex. 7, Defendant McMenamy Tr. at 114:13–115:6, 122:7–9, 124:8–12.

37.     Defendant McMenamy then used his cruiser to intentionally hit Mr. Root's car.  Ex. 7, Defendant McMenamy Tr. at 124:24–125:2, 128:10–131:18.; Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 02:59–03:04; Ex. 8, Defendant McMenamy Interview at COB 2656 ("It was just, it was clear, and I, I rammed [Mr. Root], I tried to pit maneuver him on the, uh, driver's side of his car, bringing his car and mine to a complete stop.").

38.     Defendant McMenamy used the term "PIT maneuver" to describe the act of using his cruiser to intentionally hit Mr. Root's car.  Ex. 7, Defendant McMenamy Tr. at 122:7–9, 128:10–129:19.

39.     Defendant McMenamy described the PIT maneuver:  "I drove up next to [Mr. Root] and then veered right connecting the front of my vehicle, the front – I would say the front

passenger's side of my vehicle into – whether it was his back driver's side door or wherever it was on his vehicle exactly I don't recall, it might have been closer to his front tire, that area of his vehicle, bringing both vehicles to a complete stop."  Ex. 7, Defendant McMenamy Tr. at 129:9–19.

40.     When Defendant McMenamy's and Mr. Root's vehicles came to a stop, Defendant McMenamy's cruiser was at a "45 degree" angle to Mr. Root's car.  Ex. 7, Defendant McMenamy Tr. at 133:1–10.

41.     Defendant McMenamy performed the PIT maneuver on Huntington Avenue.  Ex. 7, Defendant McMenamy Tr. at 121:15–122:16.

42.     There are trolley tracks embedded in Huntington Avenue.  Ex. 1, Defendant Fernandes Tr. at 123:23–24.

43.     Defendant McMenamy's body worn camera ("BWC") was affixed to his uniform, but he did not have it activated during the vehicle pursuit.  Ex. 7, Defendant McMenamy Tr. at 216:19–219:3; Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 02:40–02:44 ("I turned it on after.").

44.     Defendant McMenamy turned on his BWC later that morning after the vehicle pursuit ended and after the fatal shooting of Mr. Root.  Ex. 7, Defendant McMenamy Tr. at 216:19–219:3; Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 02:40–02:44 ("I turned it on after.").

45.     Audio from Defendant McMenamy's BWC footage recorded him telling another BPD officer, "I thought we lost [Mr. Root].  I thought he turned off earlier 'cause I rammed him on Huntington.  Like everybody was kinda following him, so I came in, and I just boom."  Ex. 20,

Defendant McMenamy's BWC Footage (COB 3073) at 02:59–03:04; Ex. 7, Defendant McMenamy Tr. at 223:22–224:3.

46.     A still image taken from Defendant McMenamy's BWC footage shows him making a T-bone gesture with his hands while explaining to another BPD officer that he used his cruiser to "ram[]" Mr. Root's car:



Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 03:05.

47.     Defendant McMenamy testified that as of the time he performed the PIT maneuver, BPD policy prohibited officers from performing PIT maneuvers.  Ex. 7, Defendant McMenamy Tr. at 130:6–131:18.

48.     Defendant McMenamy did not let anyone know that he was planning to perform a PIT maneuver.  Ex. 7, Defendant McMenamy Tr. at 129:1–3, 130:23–131:7.

49.     Defendant McMenamy testified that "[a]t the time," he "wasn't considering" that BPD policy prohibited PIT maneuvers.  Ex. 7, Defendant McMenamy Tr. at 131:12–15.

50.     BPD Rule 301 provides:

- Section 7.4.3:  "The Secondary Pursuit Unit shall assume the primary position if the Primary Pursuit Unit must drop out of the pursuit, but he/she will not pass the Primary Pursuit Unit unless requested to do so over the radio by the Primary Pursuit Unit."  Ex. 35, BPD Rule 301 (eff. Apr. 29, 2013) at COB 11–12.

- Section 7.6.7:  "Officers shall not use their police vehicle to deliberately make contact with a pursued vehicle."  Ex. 35, BPD Rule 301 (eff. Apr. 29, 2013) at COB 14.

51.     BPD officers are trained that PIT maneuvers or using a police vehicle to deliberately make contact with a pursued vehicle violates BPD policy.  Ex. 13, BPD Officer Downey Tr. at 8:17–9:7, 40:3–41:24, 44:3–45:15; Ex. 5, Defendant Godin Tr. at 212:6–213:2; Ex. 9, Defendant Thomas Tr. at 104:9–13; Ex. 15, Officer St. Peter Interview at COB 2737 (Q by BPD Det. Sgt. Broderick:  "At some point in time you say there's, there's somebody makes a move to try to block the car in."  A by Officer St. Peter:  "Yes."  Q by Det. Sgt. Broderick:  "Pit it o – well, not pitted – "  A by Officer St. Peter:  "No."  Det. Sgt. Broderick:  "– 'cause that's not one of our procedures, but something' similar to that."  A by Officer St. Peter:  "Correct, yeah.").

52.     Defendant McMenamy testified that after he performed the PIT maneuver, he exited his vehicle and drew his firearm.  Ex. 7, Defendant McMenamy Tr. at 132:2–6, 135:4–15.

53.     Mr. Root drove away.  Ex. 7, Defendant McMenamy Tr. at 133:18–134:5.

3.     **The Brookline Shooting**

54.     The vehicle pursuit crossed into Brookline, Massachusetts and continued westbound on Route 9 in Brookline.  Ex. 5, Defendant Godin Tr. at 228:2–229:2, 288:7–10; Ex. 9, Defendant Thomas Tr. at 99:6–11.

55.     Defendant Conneely joined the pursuit in Brookline.  Ex. 11, Defendant Conneely Tr. at 84:2–88:5.

56.     At the intersection of Route 9 and Hammond Street in Brookline, Mr. Root's car collided with other vehicles.  Ex. 23, Brookline Traffic Camera (COB 3088) at 00:05–00:20.

57.     Defendant Conneely testified that he "heard a massive explosion," then came upon "a massive crash at Route 9 and Hammond," and saw "massive carnage that had been created by this car" accident.  Ex. 11, Defendant Conneely Tr. at 88:6–13, 90:16–91:4.

58.     Defendant Conneely testified that Mr. Root's car had "no tires and [had] massive damage," he "couldn't believe [Mr. Root] got out of it," and the car was destroyed.  Ex. 11, Defendant Conneely Tr. at 90:16–91:4, 96:11–22.

59.     Defendants Godin, McMenamy, and Thomas testified that they saw that Mr. Root's car was severely or heavily damaged.  Ex. 5, Defendant Godin Tr. at 229:3–11, 234:1–3, 250:11–251:18; Ex. 7, Defendant McMenamy Tr. at 145:10–146:15, 148:2–18; Ex. 9, Defendant Thomas Tr. at 115:3–6, 115:23–116:9.

60.     Defendant Figueroa testified that the accident was "a very bad one" where "[a]irbags [were] deployed, glass shattered."  Ex. 3, Defendant Figueroa Tr. at 114:9–19, 123:3–9.

61.     Defendant Figueroa further testified that based on the extent of the accident, she assumed the driver of Mr. Root's car was injured.  Ex. 3, Defendant Figueroa Tr. at 122:15–123:2.

62.     Defendant Godin told investigators with the NDAO that Mr. Root's car was "all smashed to everything."  Ex. 6, Defendant Godin Interview at 2649.

63.     Defendant McMenamy testified, "There was a significant amount of debris kind of all around the road. . . . I saw a severely damaged motor vehicle, . . . I believe I saw the driver's side tire was missing."  Ex. 7, Defendant McMenamy Tr. at 146:10–15, 148:2–9.

64.     Defendant Thomas testified, "It looked like someone was just T-boned.  And then we ended up stopping and then looking ahead.  You can see the suspect's vehicle looked like it was – I don't – I'm not really sure – like it was wrecked."  Ex. 9, Defendant Thomas Tr. at 110:4–17.

65.     Mr. Root's car came to a stop near the entrance to a parking lot of a shopping center in the Chestnut Hill neighborhood of Brookline.  Ex. 23, Brookline Traffic Camera (COB 3088) at 00:20–00:26; Ex. 7, Defendant McMenamy Tr. at 146:16–21.

66.     By the time Mr. Root's car came to a stop, two of its wheels had fallen off, and a third wheel was off its rim.  Ex. 29, Photos of Car.

67.     Mr. Root exited his car.  Ex. 23, Brookline Traffic Camera (COB 3088) at 00:22–00:28.

68.     Mr. Root walked with a limp from the driver's door around the front of his car and onto the sidewalk.  Ex. 23, Brookline Traffic Camera (COB 3088) at 00:28–00:38.

69.     Mr. Root then fell on the sidewalk.  Ex. 23, Brookline Traffic Camera (COB 3088) at 00:38–00:42.

70.     Mr. Root got up from the sidewalk and walked with a limp toward a mulched area adjacent to the sidewalk where he had fallen.  Ex. 23, Brookline Traffic Camera (COB 3088) at 00:42–00:54.

71.     While on the mulched area, Mr. Root stumbled to the ground.  Ex. 25, Cell Phone Video (COB 3086) at 00:27–00:30; Ex. 16, McCarthy Tr. at 32:2–3, 32:24–33:17; Ex. 11, Defendant Conneely Tr. at 97:13–24.

72.     Defendant Godin reported to investigators with the NDAO that when he arrived at the scene in Chestnut Hill, he "saw [Mr. Root], like staggering up on that, that mulch area.  Um, not even staggering, almost like crawling."  Ex. 6, Defendant Godin Interview at 2649.

73.     A bystander named Shelly McCarthy had been sitting in her car in the parking lot near where Mr. Root's car stopped.  Ex. 16, McCarthy Tr. at 20:1–25:8.

74.     Ms. McCarthy testified that she graduated from the Boston EMS training program and passed the EMS certification exams offered by the City and the Commonwealth of Massachusetts.  Ex. 16, McCarthy Tr. at 9:15–10:13, 12:19–13:12.

75.     Ms. McCarthy ran to help Mr. Root.  Ex. 16, McCarthy Tr. at 33:21–34:15; Ex. 24, Brookline Traffic Camera (COB 3089) at 01:03–01:11; Ex. 25, Cell Phone Video (COB 3086) at 00:27–00:30.

76.     Defendants Godin, McMenamy, and Conneely testified that they saw Ms. McCarthy approach Mr. Root or near Mr. Root.  Ex. 5, Defendant Godin Tr. at 236:17–23, 237:17–238:4; Ex. 7, Defendant McMenamy Tr. at 157:18–158:14, 159:3–11; Ex. 11, Defendant Conneely Tr. at 106:6–108:3, 122:2–22.

77.     Ms. McCarthy testified that Mr. Root "was covered in what appeared to be blood"; one of his shoulders did not have blood on it, so she put her hand on that shoulder and tried to help him up.  Ex. 16, McCarthy Tr. at 34:1–9, 37:7–14; *see also* Ex. 23, Brookline Traffic Camera (COB 3088) at 00:46–00:53.

78.     Ms. McCarthy told investigators that Mr. Root "didn't say anything to [her], and he, he was a mess . . . by the time [she] was standing over him," and he "wasn't . . . groaning, he wasn't making noises."  Ex. 17, McCarthy Interview at COB 2957; *see also* Ex. 16, McCarthy Tr. at 37:2–3 ("He couldn't talk.), 39:16–19 ("Q:  "Did he ever say anything to you?"  A:  "No.  I don't – in my opinion, even being an EMT aside, I don't think there was any way he could have spoke.").

79.     Ms. McCarthy testified that Mr. Root's eyes were "bouncing around like ping-pong balls."  Ex. 16, McCarthy Tr. at 37:3–4; *see also id*. at 37:18–19.

80.     Ms. McCarthy testified that Mr. Root "was struggling to breathe," he "start[ed] making a lot of gurgling noises with his breathing," and was "gurgling blood."  Ex. 16, McCarthy Tr. at 39:7–13, 40:20.

81.     Ms. McCarthy described Mr. Root as having "[l]ights on[,] no one home," and she thought he was having a heart attack or was in shock.  Ex. 17, McCarthy Interview at COB 2953, 2956–2958, 2961; Ex. 16, McCarthy Tr. at 29:20–30:1.

82.     Ms. McCarthy testified that "the entire time from getting out of his vehicle to the last [Ms. McCarthy] saw him, his right hand remained on his chest.  His left hand remained hanging down."  Ex. 16, McCarthy Tr. at 35:2–9; *see also id*. at 35:21–36:4, 41:8–10.

83.     Ms. McCarthy testified that Mr. Root did not try to get up, and, in her opinion, he "[a]bsolutely [could] not" have gotten up onto his feet at any point after she saw him.  Ex. 16, McCarthy Tr. at 40:3–10.

84.     Ms. McCarthy testified that while she was with Mr. Root, "I just heard tons of screaming.  Men screaming all sorts of commands and other things. . . .  Some of it was [intelligible].  Some of it wasn't.  You know, 'Get Down! Show me your hands! Lay down! Stand

up!'  I was just so confused."  Ex. 16, McCarthy Tr. at 43:2–4, 44:20–23; *see also id.* at 48:16–23

(describing the scene as "chaos"), 50:13–18 ("I remember hearing one person say at one time, 'Get

up!'· And I was like, wait, what?· Like, who are you talking to?· I don't know if they were talking

to me.· He can't get up.").

86. Ms. McCarthy testified that she heard an officer yell, "Run!"  Ex. 16, McCarthy Tr.

at 43:10–11, 60:10–15.

86. Defendants Godin and McMenamy testified that they each commanded Ms.

McCarthy to "get away," and Defendant Conneely testified that he thinks he told Ms. McCarthy

to get away.  Ex. 5, Defendant Godin Tr. at 240:12–18, 242:1–3; Ex. 7, Defendant McMenamy Tr.

at 159:10–160:19; Ex. 11, Defendant Conneely Tr. at 124:2–18.

87. Ms. McCarthy testified that she never heard anyone yell, "Drop the gun."  Ex. 16,

McCarthy Tr. at 49:22–50:19.

88. Defendants Fernandes, Figueroa, Godin, McMenamy, and Thomas testified that

police officers were screaming multiple different commands.  Ex. 1, Defendant Fernandes Tr. at

153:12–154:17, 172:23–173:3; Ex. 3, Defendant Figueroa Tr. at 146:8–14, 147:18–148:11; Ex. 5,

Defendant Godin Tr. at 247:2–17, 266:20–23; Ex. 7, Defendant McMenamy Tr. at 169:21–170:4,

188:18–21, 191:14–21; Ex. 9, Defendant Thomas Tr. at 133:17–19, 134:2–10, 138:21–23, 141:21–

142:20.

89. Defendants McMenamy, Thomas, and Conneely testified that the scene in

Brookline was chaotic.  Ex. 7, Defendant McMenamy Tr. at 121:22–23; Ex. 9, Defendant Thomas

Tr. at 142:11–20; Defendant Conneely Tr. at 195:13–20.

90. Defendant Thomas reported to investigators with the NDAO, "I see [Mr. Root].

He's on the ground.  I'm to, to his – excuse me – I'm to his left 'cause he's facing all the other

officers.  I have my gun drawn.  I'm givin' him verbal commands, 'let me see your hands!  Get on the ground!  Get on the ground!'  Um, I'm hearing other officers give out multiple commands for him to get on the ground, show us your hands."  Ex. 10, Defendant Thomas Interview at COB 2704 (emphasis omitted).

> 91.    Defendant Thomas testified:
>
> Q:    "So let's just pretend I'm Mr. Root and you're yelling to me get on the ground and I'm on my knees or I'm on one knee.  What am I supposed to do?"
>
> A:    "You're supposed to put your chest to the ground and put your arms out."
>
> Q:    "Did anyone say put – did you say, 'Put your chest down, put your arms out'?"
>
> A:    "No."
>
> Q:    "Just 'Get on the ground'?"
>
> A:    "'Show us your hands and get on the ground.'"

Ex. 9, Defendant Thomas Tr. at 166:2–13.

> 92.    Defendant Conneely testified that he yelled commands, and he heard other officers yell commands.  Ex. 11, Defendant Conneely Tr. at 127:2–128:3.

> 93.    Defendant Conneely testified, "I tried to stop talking at one point to be a little clearer with the commands."  Ex. 11, Defendant Conneely Tr. at 126:10–11.

> 94.    Defendant Conneely testified that he gave commands "along th[e] lines" of "'Stay down on the ground and show me your hands.'"  Ex. 11, Defendant Conneely Tr. at 127:6–11.

> 95.    Defendant Conneely testified that as of the time he gave those commands, he had not seen Mr. Root in possession of a gun.  Ex. 11, Defendant Conneely Tr. at 129:8–16.

96.     Defendants Godin and McMenamy testified that they did not hear anyone yell, "Drop the gun."  Ex. 5, Defendant Godin Tr. at 256:17–18; Ex. 7, Defendant McMenamy Tr. at 191:24–192:2.

97.     Defendant Fernandes testified that he does not remember whether he heard anyone yell, "Drop the gun."  Ex. 1, Defendant Fernandes Tr. at 172:23–173:3.

98.     Video footage recorded by Defendant Figueroa's BWC reflects that police officers were screaming multiple different commands.  Ex. 19, Defendant Figueroa's BWC Footage (COB 3080) at 00:29–00:38.

99.     That footage reflects that Defendant Figueroa yelled, "Get down!  Get down!  Get down!  Let me see your hands!  Let me see your hands!"  Ex. 19, Defendant Figueroa's BWC Footage (COB 3080) at 00:29–00:38.

100.    That footage reflects that a male officer yelled, "Stay down!"  Ex. 19, Defendant Figueroa's BWC Footage (COB 3080) at 00:37.

101.    The MSP's Basic Police Firearms Training Program for the 77th Recruit Training Troop, of which Defendant Conneely was a member, states:

> **VERBALIZATION**:  Verbalization is a key component of officer survival and situational control.  Officers often tend to either say nothing during high-stress engagements, or, if more than one officer is present, they tend to all give commands/directions at the same time, creating confusion.  The key to verbalization is simplicity.  If feasible, give simple commands in a clear, loud voice.  Repeat these commands slowly until compliance is achieved or other means of control are required.  If there is more than one officer present, the contact (initiating) officer should be the only one to issue commands.

Ex. 37, MSP Basic Police Firearms Training Program at ROOT_0002429, 2466.

102.    Defendants Fernandes, Thomas, and Conneely testified that they did not hear Mr. Root speak.  Ex. 1, Defendant Fernandes Tr. at 155:19–23; Ex. 9, Defendant Thomas Tr. at 215:1–

3; Ex. 11, Defendant Conneely Tr. at 133:6–8 ("He didn't say a word."); *see also* Ex. 3, Defendant

Figueroa Tr. at 153:11–13 (Q: "You assumed he could talk." A: "Correct."), 209:1–2 (Q: "He

wasn't talking?" A: "You can be alert and not talking.").

103.    Defendant Fernandes testified that he knew that Mr. Root had been shot and had

been in a severe car accident, but Defendant Fernandes did not assess whether Mr. Root was

injured or consider whether Mr. Root was in shock or could understand the officers' verbal

commands. Ex. 1, Defendant Fernandes Tr. at 152:8–23, 165:11–166:7.

104.    During her deposition testimony, Defendant Figueroa could not identify anything

she did to determine whether Mr. Root could understand the police officers' commands, but she

testified that if someone has lost a lot of blood, it can affect their cognitive skills and how they

respond. Ex. 3, Defendant Figueroa Tr. at 129:20–24, 149:5–150:15, 178:9–11, 220:22–221:13.

105.    Defendant Figueroa testified that she assumed Mr. Root could understand

commands and talk, but he did not say anything. Ex. 3, Defendant Figueroa Tr. at 153:2–13,

155:15–156:1, 158:22–161:1, 222:12–223:18.

106.    Defendant Thomas testified that he does not believe the officers asked Mr. Root

any questions to confirm whether he understood what they were saying. Ex. 9, Defendant Thomas

Tr. at 209:23–210:14.

107.    Defendant Conneely testified that he did not know whether Mr. Root understood

the commands, he did not ask Mr. Root his name or whether he was okay, and he did not assess

Mr. Root's physical condition because Mr. Root did not "allow" police to help him. Ex. 11,

Defendant Conneely Tr. at 134:14–24, 135:18–136:3.

108.    Defendant McMenamy reported to investigators with the NDAO that he kicked Mr.

Root: "[Mr. Root was] kinda crouching down, but he's standing, but he's crouching down looking

at me, and I'm still telling him to get on the ground, and he's just not, kinda fumbling around, and that's when I got real close to him, and I walked towards him, and I put my left leg up, and kicked him – not kicked him but like, with the, with the flat of my foot like it was in a soccer kick, like I put my foot up like [at a] 90-degree angle and kicked him down to the ground with my left leg." Ex. 8, McMenamy Interview at COB 2660.

109.    Defendant McMenamy similarly testified:  "And when I got within reaching distance of [Mr. Root], that's when I picked up my left leg, and I pushed him to the ground with my left leg."  Q:  "You kicked him?"  A:  "With the flat of my foot, yeah.  I put my leg up in a 90 degree angle and made contact with the bottom of my foot in his chest area."  Q:  "And at that point did he fall to the ground?"  A:  "Yes."  Ex. 7, Defendant McMenamy Tr. at 174:4–15.

110.    Defendant McMenamy testified that after he kicked Mr. Root, Mr. Root "fell backwards."  Ex. 7, Defendant McMenamy Tr. at 174:16–22.

111.    Defendant Fernandes reported to investigators with the NDAO that it "seemed like as if [Mr. Root] was trying to stand but he wasn't standing.  He wasn't standing up."  Ex. 2, Defendant Fernandes Interview at COB 2692.

112.    Defendant Fernandes testified, "Officers were yelling commands to allow us to see [Mr. Root's] hands, get down on the ground, at which point Mr. Root reached into what appeared to be a jacket, and shortly after, shots were fired."  Ex. 1, Defendant Fernandes Tr. at 155:2–6.

113.    Defendant Fernandes testified that Mr. Root reached into his jacket with one hand, but Defendant Fernandes does not recall whether it was the left or right hand.  Ex. 1, Defendant Fernandes Tr. at 158:1–7.

114.    Defendant Fernandes testified that he does not remember where Mr. Root's hands were before he reached into his jacket, whether he ever saw Mr. Root's hands, whether he ever

saw Mr. Root holding anything, or what Mr. Root's non-reaching hand was doing.  Ex. 1, Defendant Fernandes Tr. at 155:7–16, 156:24–157:20, 158:8–24.

115.    Defendant Fernandes testified that after Mr. Root reached inside his jacket, Defendant Fernandes saw Mr. Root's "arm, shoulder, arm motion" like it was "coming out" of the jacket, but Defendant Fernandes did not see Mr. Root's hand.  Ex. 1, Defendant Fernandes Tr. at 159:10–15, 160:6–11.

116.    Defendant Fernandes testified that he was "maybe 10, 15 feet away" from Mr. Root, that he heard shots before he fired his weapon, and that part of the reason he fired his service firearm was because he heard shots and did not know where they were coming from.  Ex. 1, Defendant Fernandes Tr. at 141:8–12, 161:15–162:14.

117.    Defendant Fernandes testified:

> Q:    "Did you see anyone with a gun, other than the police officers?"
>
> A:    "Did I see anyone with a gun, other than the police officers?  No, not at that time."
>
> Q:    "Did you ever see a gun in Mr. Root's hands?"
>
> A:    "I don't – I don't think I recall seeing a gun in his hands at that time."
>
> Q:    "Did you see a gun in his hands at any time?"
>
> A:    "I don't recall.  I feel like – I feel like I remember seeing an object in his hand once after the shots were fired, but I don't recall exactly if I did.  I'm trying to remember.  I just don't recall if I did."

Ex. 1, Defendant Fernandes Tr. at 162:10–163:1.

118.    Defendant Fernandes testified that he did not give Mr. Root any warning that he could be subject to deadly force.  Ex. 1, Defendant Fernandes Tr. at 176:16–19.

119.    Defendant Figueroa's BWC footage reflects that she drew her weapon approximately five seconds after she exited her cruiser in Chestnut Hill while she was crossing the

westbound lanes of Route 9 and that two people were standing in the mulched area with a third person on the ground between them.  Ex. 19, Defendant Figueroa's BWC Footage (COB 3080) at 00:23–00:30.

120.    Defendant Figueroa testified that Mr. Root was about five to 10 feet away from her and was "kneeling," was "[o]n his knees," and his hands were "[u]nderneath his coat" "in his control area, stomach area, chest area" where she could not see them.  Ex. 3, Defendant Figueroa Tr. at 137:18–20, 138:10–141:14, 161:2–164:14, 282:2–8.

121.    Defendant Figueroa further testified that when officers were giving Mr. Root verbal commands, he did not get up or move, and he remained on both his knees from the time she got out of her cruiser to when he was killed.  Ex. 3, Defendant Figueroa Tr. at 165:11–166:4.

122.    Defendant Figueroa testified that she saw Mr. Root "removing his hand out of his jacket," and "the handle of a firearm was shown," so she started shooting because her "instinct was he's going to do something with that firearm."  Ex. 3, Defendant Figueroa Tr. at 173:8–174:15, 175:5–176:10, 176:20–177:19, 179:7–180:23.

123.    Defendant Figueroa testified that the handle she saw was in Mr. Root's "chest/torso area.  That's where [she] remember[s] his hands. . . . [I]t was around his chest area, stomach area, around that area," and she fired in that direction at Mr. Root's center mass.  Ex. 3, Defendant Figueroa Tr. at 212:17–215:7; *see also id*. at 154:14–20.

124.    Defendant Godin reported to investigators with the NDAO that when he fired his gun, Mr. Root was in "a seated position, um, actually he was leaning to his right-hand side on a, like a seated position."  Ex. 6, Defendant Godin Interview at COB 2620.

125.    Defendant Godin testified that when he fired his gun, Mr. Root was sitting on the ground, Defendant Godin never saw Mr. Root standing on his own two feet, and Mr. Root was not

fleeing.  Ex. 5, Defendant Godin Tr. at 237:8–16, 239:12–15, 247:18–21, 251:19–21, 254:10–17, 255:7–9, 270:21–22.

126.   Defendant Godin testified that he was 10 to 15 feet away from Mr. Root, was not looking at Mr. Root's face, he did not ask Mr. Root any questions to determine whether he could understand the officers' commands, and he did not make any effort to engage in conversation with Mr. Root.  Ex. 5, Defendant Godin Tr. at 245:11–246:9, 248:2–19, 252:12–253:9.

127.   Defendant Godin reported to investigators with the NDAO, "I remember [Mr. Root] reaching with his right hand into his jacket, and someone yelling gun, and at that time, I fired my firearm."  Ex. 6, Defendant Godin Interview at COB 2620.

128.   Defendant Godin testified that he fired his gun because he heard other officers yell the word "gun."  Ex. 5, Defendant Godin Tr. at 256:4–23.

129.   Defendant Godin never saw Mr. Root in possession of a gun.  Ex. 5, Defendant Godin Tr. at 255:24–256:3.

130.   Defendant Godin testified that when he fired his gun, he "believed that [Mr. Root] had been shot" outside of BWH, and he knew that Mr. Root had been in a car accident.  Ex. 5, Defendant Godin Tr. at 250:7–251:18.

131.   Defendant McMenamy testified that he believed Mr. Root was injured prior to when Defendant McMenamy fired his service firearm at Mr. Root.  Ex. 7, Defendant McMenamy Tr. at 172:5–11.

132.   Defendant McMenamy testified that he did not attempt to engage Mr. Root in a conversation or ask him his name, and Mr. Root did not verbally respond to commands.  Ex. 7, Defendant McMenamy Tr. at 172:21–173:9.

133.    Defendant McMenamy testified that he was "watching [Mr. Root's] hands," but "his hands were not visible . . . It looked like they were underneath his body."  Ex. 7, Defendant McMenamy Tr. at 176:17–22.

134.    Defendant McMenamy testified that he believes that "[e]ventually . . . [Mr. Root] got up to [be on] both feet," but Mr. Root was not fleeing or running away.  Ex. 7, Defendant McMenamy Tr. at 179:8–10, 188:6–10.

135.    Defendant McMenamy testified that he fired his gun because he saw Mr. Root "open up his jacket," "saw a floating gun in [Mr. Root's] chest," and "saw [Mr. Root's] hand reach over and get to there."  Ex. 7, Defendant McMenamy Tr. at 193:2–8.

136.    Defendant McMenamy further testified that he fired his weapon when, while Mr. Root was approximately six or seven feet away from Defendant McMenamy, Mr. Root's hand reached over to what Defendant McMenamy thought was a gun.  Ex. 7, Defendant McMenamy Tr. at 178:5–9, 192:18–193:8, 193:19–21.

137.    Defendant McMenamy testified that he did not see a gun in Mr. Root's hand and does not recall if he saw Mr. Root griping a gun.  Ex. 7, Defendant McMenamy Tr. at 194:10–196:7.

138.    Defendant Thomas reported to investigators with the NDAO that Mr. Root was "on the ground" and was "like in a half lying, half kneeling type of position.  Um, he wasn't standing or fully sitting.  He was on the ground."  Ex. 10, Defendant Thomas Interview at COB 2704, 2709 (emphasis omitted); *see also id*. at 2712; *see also* Ex. 9, Defendant Thomas Tr. at 167:13–168:8.

139.    Defendant Thomas testified that Mr. Root was on the ground.  Ex. 9, Defendant Thomas Tr. at 165:22–166:1.

140.     Defendant Thomas testified that Mr. Root "was stumbling" and was on the ground half-lying or kneeling, but Defendant Thomas did not see Mr. Root either standing up or sitting. Ex. 9, Defendant Thomas Tr. at 134:20–137:6, 165:18–21, 167:3–12, 212:19–22.

141.     Defendant Thomas testified that he was approximately 10 to 15 feet from Mr. Root, saw Mr. Root's side profile, could see Mr. Root's left shoulder down to his elbow, but was not able to see Mr. Root's hands, which were close to Mr. Root's body.  Ex. 9, Defendant Thomas Tr. at 138:1–140:14, 148:3–149:5, 169:16–18, 172:3–17, 173:8–174:1, 185:16–24, 241:12–14.

142.     Defendant Thomas testified that he also could not see Mr. Root's right arm or right leg. Ex. 9, Defendant Thomas Tr. at 170:3–21, 172:3–17, 185:13–15.

143.     Defendant Thomas testified that he assumed that Mr. Root's was right-handed and that Mr. Root's right arm was "[c]lose to his body, either next to his hip where most people carry a firearm if it's holstered, it can be near his groin area where some people also carry firearms, or – it's not where I wanted it to be."  Ex. 9, Defendant Thomas Tr. at 174:2–175:1, 185:16–24.

144.     Defendant Thomas testified that Mr. Root's arms were moving quickly near his chest area, but Defendant Thomas could not see Mr. Root's hands.  Ex. 9, Defendant Thomas Tr. at 191:18–23, 194:17–195:9.

145.     Defendant Thomas testified that he could not see what Mr. Root might have been grabbing and did not see Mr. Root with a weapon or anything pointed at any officer.  Ex. 9, Defendant Thomas Tr. at 141:8–9, 212:23–214:3.

146.     Defendant Thomas reported to investigators with the NDAO, "I heard one, um, one gunshot and I presumed [Mr. Root] was shooting at the other officers and that caused me to start shooting as well, um, because, um, I, I gotta protect my other fellow officers as well."  Ex. 10, Defendant Thomas Interview at COB 2709; *see also* COB 2712.

147.    Defendant Thomas testified that when he heard a gunshot, he started firing.  Ex. 9, Defendant Thomas Tr. at 200:23–201:2.

148.    Defendant Conneely testified that when he approached the mulch area, Mr. Root was "lying, kneeling.  He was on his hands and knees trying to get up at certain points," and Mr. Root "looked like he had fallen down and had both hands on the ground trying to get up.  There was no gun in his hand at that time."  Ex. 11, Defendant Conneely Tr. at 110:18–19, 111:15–17.

149.    Defendant Conneely testified that he did not see Mr. Root fleeing or running away; instead, Mr. Root "appeared to fall trying to stand."  Ex. 11, Defendant Conneely Tr. at 113:11–17.

150.    Defendant Conneely testified that Mr. Root "never got up . . . He was never able to get up." Ex. 11, Defendant Conneely Tr. at 120:14–16; *see also id*. at 133:9–10 ("He never got to the upright position.").

151.    Defendant Conneely testified that when he was giving commands to Mr. Root, they were five or six feet from each other.  Ex. 11, Defendant Conneely Tr. at 130:5–18.

152.    Defendant Conneely testified that he never saw Mr. Root physically resist an officer.  Ex. 11, Defendant Conneely Tr. at 134:1–5.

153.    Defendant Conneely testified, "[Mr. Root's] right hand came up.  His right hand went inside his jacket.  I lost sight of his hand just for whatever amount of time that I lost sight of it. . . . Left hand was supporting himself to try and get up."  Ex. 11, Defendant Conneely Tr. at 137:2–9.

154.    Defendant Conneely testified, "I saw a black handle, [Mr. Root's] hand around a black handle coming up.  And the Boston police officer to my left yelled, 'He's got a gun.  There's a gun' and so forth."  Ex. 11, Defendant Conneely Tr. at 139:6–12.

155.    Defendant Conneely testified:

Q:      "And if he's been ordered to – if he had been commanded to drop the gun, how was he supposed to do that?"

A:      "Take his hands off the gun.  He never should have put his hands on the gun to begin with.  Had Mr. Root done as we had told him, never   put his hand on that gun, never reach for his – underneath his jacket, laid down on the ground, we would have got him in an ambulance.  We would have got him medical help.  And this would have been all settled."

Q:      "I'm asking you how was he supposed to comply with the supposed command to drop the gun?"

A:      "Take his hand off it.  Take his hand off the gun.  Plain and simple, take your hand off the gun.  Commonsense would dictate that, sir."

Q:      "So as you say, he has his hand in his jacket pulling his hand out; right? Pulling his hand out of his jacket and at what point do you fire?"

A:      "When that gun is coming up and I see it coming out of his jacket – out of his vest.  Because it was strapped to his chest.  That's when I pulled the trigger."

Ex. 11, Defendant Conneely Tr. at 139:13–140:11.

156.    Defendant Conneely further testified, "When I saw the gun, I fired the round. . . . I see the gun, and I believe that's when I fired."  Ex. 11, Defendant Conneely Tr. at 156:19–22.

157.    When Defendant Conneely was interviewed by investigators with the NDAO on February 14, 2020, he was asked, "[W]hen you see the suspect go into his jacket do you see the gun coming out?" and he responded, "No, honestly I, I had, he had his hand on something coming out.  That was the best I could say."  Ex. 12, Defendant Conneely Interview at COB 2756.

158.    A video recorded by an unknown bystander using a cell phone reflects that approximately 15 seconds elapsed between when Ms. McCarthy approached Mr. Root and when the Individual Defendants opened fire.  Ex. 25, Cell Phone Video (COB 3086) at 00:28–00:43.

159.   Defendant Figueroa's BWC footage reflects that the entire shooting lasted approximately four seconds.  Ex. 19, Defendant Figueroa's BWC Footage (COB 3080) at 00:37–00:40.

160.   A final report prepared by Sergeant Detective Marc Sullivan of the BPD's Firearm Discharge Investigation Team ("FDIT") concerning the shooting of Mr. Root in Brookline reflects that the BPD Officer Defendants collectively fired 26 shots at Mr. Root.  Ex. 32, FDIT Report at COB 5422–5423.

161.   According to the final FDIT report, Defendant Fernandes fired two rounds.  Ex. 32, FDIT Report at COB 5422.

162.   According to the final FDIT report, Defendant Figueroa fired three rounds.  Ex. 32, FDIT Report at COB 5423.

163.   According to the final FDIT report, Defendant Godin fired eight rounds.  Ex. 32, FDIT Report at COB 5422–5423.

164.   According to the final FDIT report, Defendant McMenamy fired 10 rounds.  Ex. 32, FDIT Report at COB 5423.

165.   According to the final FDIT report, Defendant Thomas fired three rounds.  Ex. 32, FDIT Report at COB 5422.

166.   In addition to the BPD Officer Defendants' 26 shots, Defendant Conneely fired five rounds at Mr. Root, bringing the total to 31 shots.  Ex. 18, Defendant Conneely's Answers to Plaintiff's Interrogatories at Interrogatory No. 7.

167.   Defendant Fernandes testified that he did not consider using OC spray, using any de-escalation techniques, or taking cover.  Ex. 1, Defendant Fernandes Tr. at 163:10–13, 164:3–5, 171:6–8.

168.     Defendant Figueroa testified that, even before she saw what she thought was the handle of a firearm, she did not consider options other than racing up to Mr. Root, did not consider taking cover behind vehicles, did not consider attempting to de-escalate the situation, and did not consider using OC spray or a baton against Mr. Root.  Ex. 3, Defendant Figueroa Tr. at 184:2–189:5, 189:22–190:8.

169.     Defendant Godin testified that before shooting Mr. Root, he never considered backing off of Mr. Root and taking cover, using OC spray, or physically engaging with Mr. Root. Ex. 5, Defendant Godin Tr. at 266:24–267:2, 269:2–15.

170.     Instead, Defendant Godin decided to move toward Mr. Root.  Ex. 5, Defendant Godin Tr. at 270:13–272:3.

171.     Defendant Thomas testified that he did not observe anyone use OC spray toward Mr. Root.  Ex. 9, Defendant Thomas Tr. at 237:16–238:10.

172.     Defendant Conneely testified that he did not take cover.  Ex. 11, Defendant Conneely Tr. at 110:8–12, 112:2–19, 115:3–16.

**4.      Aftermath of the Brookline Shooting**

173.     After the shooting, BPD officers' BWCs captured Defendant Godin saying, "I killed the motherf*cker" (Ex. 22, Officer Justin Evangelista's BWC Footage (COB 3082) at 08:46–08:49) and "I emptied my magazine on him" (Ex. 21, BPD Officer Kevin Coakley's BWC Footage (COB 3071) at 04:08–04:15; Ex. 22, Officer Justin Evangelista's BWC Footage (COB 3082) at 08:51–8:53).  *See also* Ex. 5, Defendant Godin Tr. at 299:23–301:08, 313:16–314:21.

174.     After the shooting, Defendant McMenamy's BWC captured Defendant Conneely approach Defendant McMenamy and ask, "You alright?  You shoot too?"  Defendant McMenamy responded that he had, and Defendant Conneely shook his hand.  Defendant Conneely then asked another BPD officer whether he had shot, and when that officer responded that he had not,

Defendant Conneely did not shake that officer's hand.  Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 01:44–02:02.

175.    After the shooting, Defendant McMenamy's BWC captured Defendant Conneely say to Defendant McMenamy, "Just shut your f*ckin' mouth.  You got – you got a rep comin'?" Defendant McMenamy responded, "Yeah.  I won't – I won't talk."  Defendant Conneely asked if Defendant McMenamy's BWC was on and told him that he "[d]id nothin' wrong."  Ex. 20, Defendant McMenamy's BWC Footage (COB 3073) at 02:07–02:23.

176.    Defendants Fernandes, Figueroa, McMenamy, Thomas, and Conneely testified that they did not provide medical aid to Mr. Root after the shooting.  Ex. 1, Defendant Fernandes Tr. at 176:20–22; Ex. 3, Defendant Figueroa Tr. at 218:3–7; Ex. 7, Defendant McMenamy Tr. at 205:11–206:13; Ex. 9, Defendant Thomas Tr. at 269:3–6; Ex. 11, Defendant Conneely Tr. at 176:9–17.

177.    BWC footage from the scene after the shooting reflects that Defendant Godin did not provide medical aid to Mr. Root after the shooting.  Ex. 22, Officer Justin Evangelista's BWC Footage (COB 3082) at 07:44–12:39; *see also* Ex. 5, Defendant Godin Tr. at 279:2–281:15, 290:17–303:4 (identifying himself on Officer Evangelista's BWC footage).

178.    Mr. Root was transported by ambulance to Beth Israel Deaconess Medical Center where he was pronounced dead.  Ex. 34, Beth Israel Deaconess Medical Center Records at ROOT_0012770.

179.    Christina Stanley, M.D. of the Commonwealth's Office of the Chief Medical Examiner ("OCME") performed an autopsy of Mr. Root's body.  Ex. 33, Autopsy Report.

180.    According to Dr. Stanley's Autopsy Report, Mr. Root sustained the following:

   a.    "14 GUNSHOT WOUND OF TORSO (8 PERFORATING AND 6 PENETRATING)";

    b.      "4 GUNSHOT WOUNDS OF RIGHT THIGH (2 PERFORATING AND 2 PENETRATING)";

    c.      "4 GUNSHOT WOUNDS OF LEFT LEG (1 PERFORATING, 3 PENETRATING)";

    d.      "4 GUNSHOT WOUNDS OF LEFT ELBOW (ALL PERFORATING) WITH COMMINUTED FRACTURES AND PRESUMED VASCULAR INJURY";

    e.      "4 GUNSHOT WOUNDS OF RIGHT HAND (3 PERFORATING[,] ONE PENETRATING)";

    f.      "PERFORATING GUNSHOT WOUND OF LEFT THUMB"; and

    g.      "5 GRAZE GUNSHOT WOUNDS (2 CHEST, 1 RIGHT ARM, AND 2 RIGHT WRIST)."

Ex. 33, Autopsy Report at ROOT_0012843.

181.    According to Dr. Stanley's Autopsy Report, Mr. Root's right hand sustained the following injuries:

    a.      "PENETRATING GUNSHOT WOUND OF DISTAL RIGHT HAND":  a "3/8 inch diameter round entrance [wound] . . . over the distal radial edge of the knuckle . . . of the little finger . . . The 5th metacarpal and proximal 5th phalanx are also fractured";

    b.      "PERFORATING GUNSHOT WOUND OF DISTAL RIGHT 4th DIGIT (RING FINGER)": a "5/16 inch diameter round entrance wound . . . located over the distal portion of the distal 4th interphalangeal joint" with an "exit wound [that] is a 'V' shaped, 5/8 x 3/8 inch wound with the point directed distally and small lacerations of the proximally attached skin tag";

    c.      "PERFORATING GUNSHOT WOUND OF CENTER HAND":  an "oblique/tangential entrance . . . on the palm just proximal to the base of the right 4th digit (ring finger).  The 1-1/4 x 1/2inch, irregular, vertically oriented wound has lacerations directed proximally from and near its proximal end"; "The bullet passed proximally through the hand with a dorsal and radial slant fragmenting the 4th metacarpophalangeal joint, proximal 2nd and 3rd metacarpal bones and as [sic] least some of the carpal cones"; "An unabraded, irregular, ¾ x 3/8 inch, full-thickness laceration along the dorsal edge of the webspace between the 3rd and 4th digits (middle and ring fingers) extends slightly distally onto the radial aspect of the 4th finger and is attributed to the energy from this oblique gunshot wound"; "The exit is a near transverse, 'H' shaped, unabraded, ¾ x ¼ inch wound with a fragment of bone displaced though it but still attached internally and

is at the proximal end of an associated pink ecchymosis that extend distally over the gunshot wound track"; and

d.   "PERFORATING TANGENTIAL GUNSHOT WOUND OF ULNAR RIGHT HAND":  a "vertically oriented, irregular 1-3/4 x 5/8 entrance on the ulnar aspect of the hand connects to the similarly oriented irregular 1-1/2 x 1/2 inch exit wound"; "The two wounds connect 2/3rds of the way between their proximal ends near the wrist and the distal ends at the base of the 5th digit resulting in a longer triangular, proximally attached skin flap than the similar triangular distally attached skin flap.  The underlying soft tissues are exposed, dry and darkened with only focal exposure of tendons on the dorsal wound.  On x-ray there is fragmentation of the 5th metacarpal including fractures extending into the joints at either end of this bone."

Ex. 33, Autopsy Report at ROOT_0012855–12856.

182.   A bb gun with a metal rod extending from its barrel was recovered in the area near Mr. Root's body.  Ex. 32, FDIT Report at COB 5421; Ex. 30, Photos of bb gun at COB 6608–6609; Ex. 31, Photos of bb gun at ROOT_0008811–8816.

183.   The recovered bb gun was not damaged.  Ex. 30, Photos of bb gun at COB 6608–6609; Ex. 31, Photos of bb gun at ROOT_0008811–8816; Ex. 14, Sergeant Detective Sullivan Tr. at 53:6–19.

184.   The recovered bb gun does not appear to have blood on it.  Ex. 30, Photos of bb gun at COB 6608–6609; Ex. 31, Photos of bb gun at ROOT_0008811–8816.

185.   Law enforcement investigators did not test the bb gun for blood evidence.  Ex. 14, Sergeant Detective Sullivan Tr. at 52:9–23.

186.   Mr. Root was not in possession of a firearm.  Ex. 32, FDIT Report at COB 5405, 5420–5421, 5426; *see also* Ex. 3, Defendant Figueroa Tr. at 200:24–201:2.

**5.   BPD Officer Defendants' Meeting**

187.   On February 12, 2020 each BPD Officer Defendant was interviewed by investigators with the NDAO concerning the events of February 7, 2020.  Exs. 2, 4, 6, 8, 10, and 12 (BPD Officer Defendants' Interviews).

188.    Before being interviewed by investigators with the NDAO, the Defendants Fernandes, Figueroa, Godin, and McMenamy met all together with their attorney Kenneth Anderson in advance of being interviewed by investigators concerning the events of February 7, 2020.  Ex. 1, Defendant Fernandes Tr. at 216:22–218:14; Ex. 3, Defendant Figueroa Tr. at 50:15–55:5; Ex. 5, Defendant Godin Tr. at 327:21–333:23, 335:18–22; Ex. 7, Defendant McMenamy Tr. at 236:2–11, 237:12–15, 238:1–239:13.

189.    The president of the BPD's union, Larry Calderone, attended a portion of that meeting with the BPD Officer Defendants.  Ex. 1, Defendant Fernandes Tr. 218:15–219:16.

190.    Defendant Thomas also met with Attorney Anderson and union president Calderone a day or two before he was interviewed by investigators with the NDAO concerning the events of February 7, 2020.  Ex. 9, Defendant Thomas Tr. at 215:23–217:9, 224:23–225:23, 234:7–235:7.

191.    BPD Sergeant Detective Marc Sullivan signed the BPD FDIT final report concerning the events of February 7, 2020.  Ex. 32, FDIT Report at COB 5403, 5430.

192.    Sergeant Detective Sullivan testified that "it's very important" that officers who are involved in a deadly use of force incident not speak to each other about the incident before being interviewed by investigators because Sergeant Detective Sullivan "want[s] their story.  And everybody is going to have a different perception of the incident, and every story – everybody's recollection is going to be different.  I want their recollection of the incident."  Ex. 14, Sergeant Detective Sullivan Tr. at 70:8–21.

193.    Sergeant Detective Sullivan testified that he has "had several meetings with the[] union president, Larry Calderone.  And it's been confrontational, but we've instilled upon him the importance that his [union] membership shouldn't talk.  [Sergeant Detective Sullivan has]

provided training to all levels of the Boston Police that they are not allowed to talk to each other, that they shouldn't conference or confer about their use-of-force incidents." Ex. 14, Sergeant Detective Sullivan Tr. at 68:16–70:1.

194.     Sergeant Detective Sullivan testified that before learning it at his deposition, he did not know that the BPD Officer Defendants met together to prepare to be interviewed by investigators with the NDAO. Ex. 14, Sergeant Detective Sullivan Tr. at 75:10–77:3.

195.     Sergeant Detective Sullivan testified that the BPD Officer Defendants having met together to prepare to be interviewed by investigators "would taint the interview[s]." Ex. 14, Sergeant Detective Sullivan Tr. at 75:20–76:2.

Dated:  August 8, 2022

Respectfully submitted,

PLAINTIFF JENNIFER ROOT BANNON,

By her attorneys,

/s/ Mark A. Berthiaume
Mark A. Berthiaume (BBO # 041715)
Gary R. Greenberg (BBO # 209420)
Alison T. Holdway (BBO # 690569)
Courtney R. Foley (BBO # 707181)
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Tel.: 617-310-6000
Fax:  617-310-6001
berthiaumem@gtlaw.com
greenbergg@gtlaw.com
holdwaya@gtlaw.com
foleyc@gtlaw.com