UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-11501-RGS

JENNIFER ROOT BANNON

v.

BOSTON POLICE OFFICERS DAVID GODIN,
JOSEPH MCMENAMY, LEROY FERNANDES,
COREY THOMAS, and BRENDA FIGUEROA;
MASSACHUSETTS STATE TROOPER PAUL
CONNEELY; and THE CITY OF BOSTON

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR
SUMMARY JUDGMENT

December 5, 2022

STEARNS, D.J.

On February 7, 2020, Juston Root was shot and killed by law enforcement after pointing and discharging what appeared to be a firearm at a Boston police officer and then leading police on a car chase through Boston and Brookline.  Root's sister, Jennifer Root Bannon, acting as the special personal representative for Root's estate, sued the officers involved in Root's death as well as the City of Boston as their employer.  At the close of discovery, the parties cross-moved for summary judgment.  Although the circumstances of this case are undeniably tragic, the court is constrained by

legal precedent and the undisputed facts to rule in defendants' favor. Accordingly, for the reasons that follow, the court will grant defendants' motions for summary judgment and deny Bannon's motion for partial summary judgment.

## BACKGROUND

On the morning of February 7, 2020, the Boston Police Department (BPD) received a call warning that a person with a gun had been seen on the grounds of Brigham & Women's Hospital (BWH), located on Francis Street in Boston. Bannon Statement of Undisputed Material Facts (BSUMF) (Dkt # 88) ¶¶ 1, 5. Boston Police Officer David Godin responded to the call and encountered Root, who falsely identified himself as a law enforcement officer. *Id.* ¶¶ 6, 8. Root then aimed what was later determined to be a paintball gun at Godin and pulled the trigger. *Id.* ¶ 9. Godin returned fire and tripped backwards onto the street. *Id.* ¶¶ 10, 14. Another officer who responded to the call, Michael St. Peter, witnessed the exchange and fired his weapon at Root. *Id.* ¶¶ 11-13.

Injured, Root limped to his nearby vehicle and drove in the direction of Huntington Avenue. *Id.* ¶¶ 17, 22. Godin and St. Peter gave chase, while Godin reported over the BPD radio that shots had been fired and that he believed Root had been hit. *Id.* ¶¶ 24-25. Other BPD officers joined the

pursuit, including Joseph McMenamy, Leroy Fernandes, Brenda Figueroa, and Corey Thomas.  *Id.* ¶¶ 29, 31.  In an effort to stop Root, McMenamy performed a "PIT maneuver," ramming the side of Root's vehicle with his police cruiser.  *Id.* ¶¶ 37-41.[1]

Undeterred by the collision, Root continued westbound onto Route 9 in Brookline, where Massachusetts State Trooper Paul Conneely joined the chase.  *Id.* ¶¶ 54-55.  Root collided with other vehicles at the intersection of Route 9 and Hammond Street, and his vehicle – which at this point was heavily damaged – came to a stop.  *Id.* ¶¶ 56-60.  Root exited his vehicle, limped onto the sidewalk, and fell.  *Id.* ¶¶ 67-69.  He then got back up, walked to a mulched area adjacent to the sidewalk, and collapsed.  *Id.* ¶¶ 70-71.

Shelly McCarthy, an EMS-certified passerby who had been sitting in her car when Root's vehicle came to a stop, ran over to assist Root.  *Id.* ¶¶ 73-75.  Root, in McCarthy's estimation, was gravely injured.  *Id.* ¶¶ 78-81.  McCarthy stated that during the entire time that Root was in her line of sight, his right hand clutched his chest while his left hand dangled at his side.  *Id.* ¶ 82.  At that point, officers converged on the scene and began shouting commands over one another.  *Id.* ¶¶ 84-88; *see id.* ¶ 89 ("McMenamy,

---

[1] McMenamy's maneuver was done in violation of written BPD policy. *See id.* ¶ 50 (BPD Rule 301 provides that "[o]fficers shall not use their police vehicle to deliberately make contact with a pursued vehicle").

Thomas, and Conneely stated that the scene . . . was chaotic."). McCarthy heard an officer yell at her to "run," and she did. *Id.* ¶¶ 85-86. Officers continued to give Root overlapping verbal commands to "get on the ground," "stay down," and "show me your hands." *Id.* ¶¶ 90, 94, 98, 100. McMenamy closed in and pushed Root to the ground with the bottom of his left foot. *Id.* ¶¶ 108-110.

Fernandes testified that Root "reached into what appeared to be a jacket" and that he saw Root's "'arm, shoulder, arm motion' like it was 'coming out' of the jacket." *Id.* ¶¶ 112, 115. Figueroa stated that she witnessed Root "'removing his hand out of his jacket,' and 'the handle of a firearm was shown.'" *Id.* ¶ 122. Godin recalled Root "reaching with his right hand into his jacket, and someone yelling gun." *Id.* ¶ 127. McMenamy stated that he saw Root "'open up his jacket,' 'saw a floating gun in [Root's] chest,' and 'saw [Root's] hand reach over and get to there.'" *Id.* ¶ 135. Conneely testified that Root's "right hand went inside his jacket" and he saw Root's "hand around a black handle coming up." *Id.* ¶ 154.

Fernandes, Figueroa, Godin, McMenamy, Conneely, and Thomas opened fire on Root, rapidly unloading a total of thirty-one rounds. *Id.* ¶¶ 160-166. Thomas did not see Root reach into his jacket, but he testified that he "heard . . . one gunshot and . . . presumed [Root] was shooting at the

other officers," which "caused [him] to start shooting as well." *Id.* ¶ 146.  A bystander, Dr. Victor Gerbaudo, witnessed "Root reach inside his jacket just before the officers discharged their firearms."   City Defs.' Statement of Undisputed Material Facts (CDSUMF) (Dkt # 95) ¶ 58.

Root was transported by ambulance to Beth Israel Deaconess Medical Center where he was pronounced dead.  BSUMF ¶ 178.  Officers recovered a "bb" gun with a metal rod extending from its barrel in the mulch near Root's body. *Id.* ¶ 182.

## DISCUSSION

"Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'" *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018), quoting *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation

5

and from which a reasonable jury could find for the nonmoving party."
*Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).

## Deadly Force by Individual Defendants (Counts I, VIII-IX)

The crux of Bannon's excessive force, assault and battery, and wrongful death claims against the individual defendants is that their use of deadly force against Root at the Route 9 crash scene was unreasonable and unjustified. The individual defendants contend that their use of deadly force in the chaotic, highly emotive, and ambiguous circumstances surrounding the final confrontation with Root did not violate his Fourth Amendment rights. In any event, the officers maintain that they are protected by the doctrine of qualified immunity.

Qualified immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The inquiry into whether a constitutional right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *See Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 45 (1st Cir. 2016), quoting *Mullenix v. Luna*, 557 U.S. 7, 12 (2015). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but

the plainly incompetent or those who knowingly violate the law.'" *Hunter v.*

*Bryant*, 502 U.S. 224, 229 (1991) (per curiam), quoting *Malley v. Briggs*, 475

U.S. 335, 343 (1986).

> Law enforcement officers quite often are required to assess . . .
> probabilities[] and to weigh the attendant contingencies.  And it
> is precisely such spontaneous judgment calls—borne of necessity
> in rapidly evolving, life-endangering circumstances—that the
> qualified immunity doctrine was designed to insulate from
> judicial second-guessing in civil actions for money damages,
> unless the challenged conduct was clearly incompetent or
> undertaken in plain violation of established law.

*Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1377 (1st Cir. 1995).

When faced with a claim of qualified immunity, a court may choose to

"first determine whether the plaintiff has alleged a deprivation of an actual

constitutional right at all." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  The

"threshold" question in this mode of analysis can be stated as follows:

> Taken in the light most favorable to the party asserting the
> injury, do the facts alleged show the officer's conduct violated a
> constitutional right? . . . If no constitutional right would have
> been violated were the allegations established, there is no
> necessity for further inquiries concerning qualified immunity.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "Deciding the constitutional

question before addressing the qualified immunity question also promotes

clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).[2]

Turning to the constitutional issue — and after viewing the undisputed facts in the light most favorable to Bannon — the court concludes that the defendant officers did not violate Root's Fourth Amendment rights.  We begin with some basic Fourth Amendment principles.  "[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest" are to be decided under a Fourth Amendment standard of reasonableness, the proper application of which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 395-396 (1989) (emphasis in original) (rejecting a Fourteenth Amendment substantive due process analysis of excessive force claims).  The standard by

---

[2] This analytical sequence is not mandated.  "There are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking," *Pearson v. Callahan*, 555 U.S. 223, 239 (2009), as there are cases "in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Id.*

which excessive force is to be gauged is an objective one: "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397. *See also Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994) (officers attempting to subdue a violent, mentally ill suspect acted reasonably in resorting to deadly force after being unexpectedly fired upon). *Cf. Roy v. City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994) ("[W]hether substantive liability or qualified immunity is at issue, the Supreme Court intended to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases.").

The officers were aware that Root was reportedly armed and dangerous, having pointed what appeared to be a firearm at Godin and pulled the trigger during the BWH confrontation.[3] Further, Root had just fled the initial crime scene, leading the officers on a dangerous car chase through a densely populated area, culminating in Root's violent collision with vehicles driven by civilian passersby. Despite Root's injuries, the

---

[3] Although the weapon wielded by Root at the BWH scene ultimately turned out to be nonlethal, a reasonable officer in Godin's and St. Peter's situation would have been warranted in the belief that Root had discharged a deadly firearm at Godin.

9

officers had reason to believe that Root continued to pose an immediate threat to themselves and to the public.

This threat of danger was escalated when Root reached into his jacket, an action that officers reasonably interpreted as an attempt to retrieve a firearm. Given the circumstances, the officers had reason to believe that Root was armed, and his behavior "would lead almost anyone to believe that he was reaching for a weapon." *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018). Where, as here, "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable [to use] deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).[4]

Bannon has provided no evidence to rebut the officers' testimony that Root was reaching into his jacket before the officers opened fire. Although McCarthy testified that Root's hands did not change position while he was in

_____

[4] The case that Bannon relies on in support of her argument that deadly force was unreasonable, *Woodcock v. City of Bowling Green*, 679 F. App'x 419 (6th Cir. 2017), is inapposite. There, the Sixth Circuit explained that the use of deadly force where the decedent had a hand in his pocket was objectively unreasonable because the officer "may have thought that [the decedent] had a gun, but [the decedent] never gave [the officer] reason to think he would use it imminently." *Id.* at 424-425. Unlike in *Woodcock*, Root was observed to be reaching into his jacket, an affirmative action that gave the officers "reason to think" that (as earlier at BWH) Root had a firearm *and* that "he would use it imminently." *Id.*

her line of sight, she had turned away to run at the officers' command and did not see what Root's hands were doing at the time the officers started shooting. Moreover, although Bannon takes issue with the self-serving nature of the officers' statements, self-serving deposition testimony may properly be considered on summary judgment. *See Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 18 (1st Cir. 2007) (providing that the deponent's testimony "sets forth specific facts, within his personal knowledge that, if proven, would affect the outcome of the trial, the testimony must be accepted as true for purposes of summary judgment"). In any event, the court does not have to simply take the officers at their word. Dr. Gerbaudo, a disinterested bystander who witnessed the events, stated that he saw Root reach into his jacket immediately before the officers opened fire.[5]

---

[5] Bannon's reliance on Dr. Jennifer Lipman's expert testimony that, "had Mr. Root's hand been as close to the bb gun as the Individual Defendants contend, it is unlikely that the bb gun would have emerged unscathed while Mr. Root's hand suffered multiple gunshot wounds," Bannon Opp'n to Individual Defs.' Mot. (Dkt # 113) at 18, is misplaced. At most, Dr. Lipman's testimony creates a dispute of fact as to whether Root was reaching for the bb gun. However, the actual presence of the bb gun on Root's person is irrelevant where, as here, there is uncontested evidence that the officers had probable cause to believe that Root was armed and that he was reaching into his jacket in a manner that strongly suggested — given the attendant circumstances — that he was grasping for a firearm. *See Garner*, 471 U.S. at 11.

Bannon argues that the officers failed to provide Root with clear verbal commands and that they "did not take cover, use any de-escalation techniques, use less-lethal force options like OC spray or a baton, or warn . . . Root that deadly force may be used." Bannon Mem. (Dkt # 87) at 12-13.  That may well be true.   But, as the officers point out, the "calculus of reasonableness" in the Fourth Amendment context must make "allowance" for law enforcement "to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.  Such is essentially the case here.

Finally, the court rejects Bannon's contention that the number of shots fired at Root – by six officers in rapid succession lasting only a few seconds – was constitutionally excessive.  "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

While the forceful outcome of the constitutional analysis is to my mind conclusive, for the sake of completeness, I will turn to the defendant officers' qualified immunity claims.  Because of the fact-intensive nature of the inquiry, when it comes to excessive force claims, the qualified immunity

doctrine has special bite. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152-1153, 1154 (2018) (per curiam) (cautioning courts of appeals against undue generality in their approach and noting that under Supreme Court precedent officers are entitled to qualified immunity unless a prior case "squarely governs" – "a reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious").

In *Kisela*, the defendant officer used deadly force to subdue a woman wielding a large knife in the (perhaps mistaken) belief that she posed a threat to another woman at the scene. *Id.* at 1153. The Supreme Court faulted the lower court for its over-reliance on its own less than clear precedent. If anything, the Court concluded, the precedent favored officer Kisela. While they post-date the encounter with Root, two cases – one from the Supreme Court, the other from the First Circuit – are "squarely" on point, *id.*, and based on numerous cases that predate the encounter. In *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9 (2021) (per curiam), officers were called to the scene of a domestic disturbance. They encountered Rollice, the trespassing and intoxicated ex-husband of the complainant. When Rollice retreated into his ex-wife's garage, the officers followed. Rollice refused the officers' commands to stop walking. He then grabbed a hammer from a

workbench with both hands and turned to face the officers in a fighting stance "as if preparing to swing a baseball bat." *Id.* at 10.  The officers opened fire in response, killing Rollice.  A Ninth Circuit panel ruled that the district court had committed error in dismissing Rollice's estate's wrongful death claim on qualified immunity ground.  The Supreme Court rejected the circuit court's theory that the officers had provoked the confrontation by "cornering" Rollice.  Rather, the Court held that the officers were entitled to qualified immunity because neither the lower court nor the respondent had "identified a single precedent finding a Fourth Amendment violation under similar circumstances." *Id.* at 12.

A recent First Circuit decision, *Estate of Rahim v. Doe*, 51 F.4th 402 (1st Cir. 2022), is of similar if not greater import.  Rahim, a terrorist suspect, was overheard by authorities expressing in a phone message to one of his confederates his frustration at the slow pace of a planned terrorist attack in New York City and his determination to undertake a vigilante action against the "boys in blue" "right here in Massachusetts." *Id.* at 405.  A surveillance team was notified and informed that Rahim was armed with a knife.  The team was ordered to stop Rahim from boarding any public transportation. At 7:00 a.m., the team followed Rahm from his apartment to a bus stop in front of a CVS on Washington Street.  The officers approached Rahim with

their weapons drawn and ordered him to put his hands up and drop the knife.

Rahim refused and began advancing on the officers as they retreated though

CVS parking lot, taunting them as he did so.

Given the constellation of events, the majority of the First Circuit panel

determined that:

> An objective officer would conclude Rahim had chosen to
> escalate the situation and that Rahim was an increasing threat.
> And Rahim's actions were consistent with his words: he kept
> advancing on the officers, despite their attempts by retreating to
> not let him close the distance. When he had come close enough
> to them to be a lethal threat to the officers and others, they had
> split-second decisions to make about what was needed to stop
> him. And two officers almost simultaneously reached the same
> decision. Doe 1 fired twice and Doe 2 fired once. Rahim was hit.
> The entire encounter unfolded over about thirty seconds.

*Id.* at 406. The district court denied the officers' claim of qualified immunity,

holding that a grant of immunity would be warranted based on the events of

the confrontation itself, but not when consideration was given to the

information gathered by the officers in the days leading up to the fatal

encounter, including their "plans, actions, observations, and means available

to respond." *Id.* at 409.

The First Circuit reversed, holding that the district court had erred in

importing events that had occurred prior to the fatal shooting into the

analysis rather than focusing on the moment of the shooting. *Id.* at 410.

When viewed in the proper focus, the court held that a reasonable officer at

the situation of the moment "would have understood Rahim to have a lethal knife in his hands . . . [and] would have understood Rahim's actions to show that he had every intention to use this knife to kill the officers and, if they were unsuccessful in stopping him, to kill other people." *Id.* at 413.  The propriety of a grant of qualified immunity, moreover, was justified in light of ample precedent, citing among other cases, *City of Tahlequah*, *supra*, and *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam).

Applying the same analysis as used in *City of Tallequah* and *Rahim* to the facts at hand, the case for qualified immunity is even more compelling, particularly in light of the officers' reasonable belief that Root was armed not with a hammer or a knife but with a gun that he was prepared to use.

**Excessive Force by McMenamy (Count V)**

Bannon first challenges McMenamy's use of a "PIT maneuver" on Root's vehicle during the car chase as an excessive use of force.  Although McMenamy's blocking maneuver was in clear violation of BPD policy, an action under § 1983 may not be based on a violation of a state law or an internal departmental regulation unless the act complained of also violates a secured federal right.  *See White v. Olig*, 56 F.3d 817, 821 (7th Cir. 1995); *see also Boveri v. Town of Saugus*, 113 F.3d 4, 7 (1st Cir. 1997) ("A regulatory violation, like a violation of state law, is not inherently sufficient to support

a § 1983 claim."). There is no federally secured right under either the Fourth

or the Fourteenth Amendments to be free from police pursuits.  *See Cnty. of

Sacramento v. Lewis*, 523 U.S. 833, 853, 854 (1998) ("[W]e hold that high-

speed chases with no intent to harm suspects physically or to worsen their

legal plight do not give rise to liability under the Fourteenth Amendment,

redressable by an action under § 1983."); *Scott v. Harris*, 550 U.S. 372, 386

(2007) ("A police officer's attempt to terminate a high-speed car chase that

threatens the lives of innocent bystanders does not violate the Fourth

Amendment, even when it places the fleeing motorist at risk of serious injury

or death.").  Here, as in *Scott*, the traffic video footage shows Root driving at

a high rate of speed through a heavily populated area.  The danger that Root's

vehicle posed to the public was underscored by the violent end of the chase,

which saw Root colliding with two vehicles driven by civilian passersby.

Thus, the court concludes that McMenamy's pursuit of Root or his resort to

a PIT maneuver did not violate the Fourth Amendment.

The court also rejects Bannon's argument that McMenamy's use of his

foot to push Root to the ground at the Route 9 crash scene was

constitutionally unreasonable.  "'Not every push or shove, even if it later may

seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth

Amendment." *Graham*, 490 U.S. at 396, quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

**Massachusetts Civil Rights Act (Counts II, VI)**

The Massachusetts Civil Rights Act (MCRA) "provides a cause of action for any person whose rights under the Constitution, federal law, or state law have been interfered with by threats, intimidation, or coercion of another." *Kelley v. LaForce*, 288 F.3d 1, 10 (1st Cir. 2002), citing Mass. Gen. Laws ch. 12, §§ 11H, 11I. "The Supreme Judicial Court of Massachusetts has interpreted the MCRA to be co-extensive with § 1983 except for two disparities: (1) the MCRA does not require any state action . . . , and (2) a claim under the MCRA requires a violation by threats, intimidation, or coercion." *Id.*

Because, as discussed above, Bannon has failed to demonstrate that the officers violated any constitutional provision or law, her MCRA claims also fail. Moreover, the court notes that it cannot discern the presence of threats, intimidation, or coercion in any of the officer's challenged actions.

**Failure to Train or Supervise (Count VII)**

The City argues that Bannon has failed to establish a triable issue that it failed to properly train or supervise its officers such that it is liable under § 1983. The court agrees. A foundational element of a municipal liability

18

claim under § 1983 is the occurrence of a "constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *see also Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 902 (1st Cir. 1988).  Here, Bannon has not demonstrated that any BPD officer committed a constitutional deprivation of Root's rights.  It follows then that Bannon's municipal liability claim cannot stand.

## ORDER

For the foregoing reasons, the court ALLOWS defendants' motions for summary judgment on the finding that no Fourth Amendment violation occurred, or in the alternative, that qualified immunity attaches to the defendant officers' actions.  Bannon's motion for partial summary judgment is DENIED.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE