# United States Court of Appeals
## For the First Circuit

---

No. 22-1958

JENNIFER ROOT BANNON, as the Special Personal
Representative of the Estate of Juston Root,

Plaintiff, Appellant,

v.

DAVID GODIN, Boston Police Officer; JOSEPH MCMENAMY, Boston
Police Officer; LEROY FERNANDES, Boston Police Officer; BRENDA
FIGUEROA, Boston Police Officer; COREY THOMAS, Boston Police
Officer; PAUL CONNEELY, Massachusetts State Trooper; THE CITY OF
BOSTON,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Gelpí, Lynch, and Montecalvo,
Circuit Judges.

---

Mark A. Berthiaume, with whom Gary R. Greenberg, Alison T.
Holdway, Courtney R. Foley, and Greenberg Traurig, LLP were on
brief, for appellant.
Edward F. Whitesell, Jr., with whom Bridget I. Davidson and
City of Boston Law Department were on brief, for appellees David
Godin, Joseph McMenamy, Leroy Fernandes, Brenda Figueroa, Corey
Thomas, and the City of Boston.
Daniel J. Moynihan, Jr., with whom Mark A. Russell and Law
Office of Daniel J. Moynihan, P.C. were on brief, for appellee
Paul Conneely.

April 22, 2024

**LYNCH**, **Circuit Judge**.  On February 7, 2020, after Juston Root pointed a gun at a hospital security guard and a responding Boston police officer, shot that gun at police and disregarded police instructions to drop the weapon, led the officers on a high-speed chase down busy urban streets and crashed his Chevrolet Volt, and then ran from the officers and disregarded further commands to stop and drop his gun, six law enforcement officers from two separate law enforcement agencies responding to the reports of his activities fired at him, all simultaneously perceiving that he was again reaching for his gun.  Their shots proved to be fatal.  After the event, the officers confirmed that he indeed had a gun on his person at the time of the shootings and was carrying two additional guns in his car.

His sister, Jennifer Root Bannon, acting as the representative of his estate, sued six of the officers involved -- Massachusetts State Trooper Paul Conneely and Boston Police Department ("BPD") Officers Leroy Fernandes, Brenda Figueroa, David Godin, Joseph McMenamy, and Corey Thomas -- and the City of Boston ("City"), alleging, inter alia, that the officers employed excessive force in violation of the Fourth Amendment during the fatal shooting.  The district court granted summary judgment to the defendants.  See Bannon v. Godin, No. 20-cv-11501, 2022 WL 17417615, at *1 (D. Mass. Dec. 5, 2022).

We agree with the district court's conclusion that the officers acted reasonably under the circumstances during the fatal shooting and so did not violate the Fourth Amendment. We independently hold that the officers are entitled to qualified immunity. We also affirm the grant of summary judgment on Bannon's other claims.

**I.**

**A.**

At roughly 9:20 a.m. on the morning of February 7, 2020, BPD received a report of an individual with a gun at Brigham and Women's Hospital ("BWH").[1] A BPD dispatcher relayed the information that a man had pulled a gun on BWH security. Officer Godin responded to the call, as did BPD Officer Michael St. Peter.

Upon arriving at BWH, Officer Godin was approached by a hospital security officer who said that a man had just pointed a gun at him. The security officer pointed out the man's location to Officer Godin, who parked his cruiser and ran toward Vining Street, in the direction the security officer had pointed. As he turned onto Vining Street, Officer Godin saw a man in an unzipped black jacket, later identified as Root, walking toward him.

---

[1] BWH is a level one trauma center hospital with over 800 patient beds. It conducts roughly 50,000 inpatient stays and 2.25 million outpatient encounters per year.

Officer Godin observed that Root had a gun in his waistband. Bannon does not contest this point.[2]

Root falsely told Officer Godin that he (Root) was "law enforcement" and then turned and pointed up the street. Officer Godin did not believe that Root was law enforcement because law enforcement officers do not carry their firearms in their waistbands. Officer Godin drew his firearm and continued to approach Root. When Officer Godin and Root were within a few feet of one another, Root removed the gun from his waistband and pointed it at Officer Godin.

During this interaction, Officer St. Peter arrived on the scene. He too saw Root holding a gun in his hand. He ordered Root to "drop the gun." Civilian witnesses later told investigators that they also saw Root holding a gun.

Officer Godin saw Root start to pull the trigger on his gun and heard "gunshot noises." In response, Officer Godin shot at Root several times. As he did so, Officer Godin fell backward into the street. After seeing Root point his gun at Officer Godin and hearing shots, Officer St. Peter also shot at Root. Multiple civilian witnesses later told investigators that they believed Root had pulled the trigger and fired shots. Both Officer Godin and Officer St. Peter believed Root had been shot.

---

[2]   Later evidence showed that the gun was one of two paintball guns Root had in his possession in addition to a BB gun.

Still carrying the gun, Root limped to his car, a silver Chevrolet Volt which was parked nearby, and drove away.

Officer Godin returned to his cruiser and began pursuing Root. He also stated over the cruiser's radio that he had been involved in a shooting, that he had been shot at, and that he believed he had shot the suspect.

Additional BPD officers, including Officers Fernandes, Figueroa, McMenamy, and Thomas, joined the pursuit, which traveled down Huntington Avenue.[3] These officers understood Root was armed with a gun.

During the pursuit, Officer McMenamy intentionally struck the side of Root's Volt with his cruiser, in what the parties refer to as a "Precision Immobilization Technique ('PIT') maneuver." Officer McMenamy stated during a deposition that, at the time of the collision, the vehicles were moving at approximately twenty to thirty miles per hour. He also acknowledged that he had been aware at the time that the maneuver violated BPD policy, which forbids intentionally colliding with a pursued vehicle. The collision brought both vehicles to a stop. Officer McMenamy got out of his cruiser, drew his firearm, and ordered Root to show his hands. Root did not obey, rather Root

---

[3]    Huntington Avenue is a major, crowded urban artery used by cars, buses, MBTA trollies, and other forms of transportation, particularly so on a weekday morning.

- 6 -

not only drove away at high speeds, but used his Chevrolet Volt to push Officer McMenamy's cruiser out of the way to do so.

The high-speed pursuit continued down Huntington Avenue and on to Route 9,[4] moving from Boston to Brookline.  Root's Volt reached speeds of up to ninety miles per hour, and traffic camera footage shows him weaving dangerously through other vehicles at high speeds.  At some point along Route 9, State Trooper Conneely joined the pursuit, having heard over his radio that shots had been fired at BWH and that a pursuit was ongoing.

At the intersection of Route 9 and Hammond Street in Brookline, Root's Volt collided with three civilian vehicles and came to a stop on Route 9 near the entrance to a shopping center parking lot.  The collision caused extensive damage to Root's Volt; multiple tires fell off, glass shattered, and the airbags deployed.[5]

Several sources of evidence consistently describe the events that occurred at the site of Root's collision in Brookline. Traffic camera footage, officer body-worn cameras, and civilian

---

[4]    Route 9 separates from Huntington Avenue west of the BWH campus and continues into Brookline.  Like Huntington Avenue, it is a major urban thoroughfare serving large numbers of cars, buses, bikes, and pedestrians.

[5]    Several of the individual defendants stated in their depositions that they observed that the collision was severe when they arrived at the scene moments later.

cell phone footage captured documentary evidence of the events and officers' contemporaneous statements.  Officers and witnesses also described the events in interviews with investigators in the days following the shooting and, in some cases, in later depositions in this case.  We describe each in turn.

*1. Documentary Evidence of Shooting in Brookline*

Traffic camera footage shows that, at the time of the collision and throughout the confrontation that followed, which occurred at roughly 9:30 a.m. on a Friday, there were numerous cars in the parking lot and a steady stream of traffic down the opposite side of Route 9.

Root got out of his car and continued fleeing on foot. He moved toward a mulched area adjacent to the parking lot's entrance.  He fell on the sidewalk but rose to his feet and continued into the mulched area, where he fell again.

Shelly McCarthy, a civilian with EMS training who had been in her car in the parking lot, saw Root leave his vehicle and ran to his side.  McCarthy spent less than ten seconds by Root's side.  Multiple approaching officers, including at least Officers Godin and McMenamy, ordered her to get away from Root, and she did so at a run.

Officer Figueroa's body-worn camera was recording throughout the confrontation in Brookline.  Officer Figueroa ran to the mulched area and ordered Root to "get down" and to "let

[her] see [his] hands." Her camera recorded audio of several other officers giving similar commands. Officer Figueroa adopted a stance which blocked the camera's lens as officers continued to order Root to get on the ground and show his hands. Just before officers fired, the camera recorded an officer begin a command to Root to "drop . . . ."

Officer Figueroa's camera footage shows that after he was shot, Root fell over in a fetal position on his right shoulder facing the officers, with his chest area rolled partially toward the ground.

Officer Figueroa's body-worn camera recorded that she and Trooper Conneely, along with other officers, approached Root immediately after the shooting. The footage shows officers roll Root over and secure his hands. The footage shows Trooper Conneely reach into Root's chest area. An officer asks, "Where is the firearm?" and Officer Figueroa responds, "It's under-- it's underneath him." An officer then says, "I got it, I got it, I got it, it's secure," and Trooper Conneely walks away with a gun in his right hand. The camera recorded Trooper Conneely with Root's gun in his right hand roughly five seconds later and again roughly a minute later.

Shortly after the shooting, Officer McMenamy's body-worn camera recorded him stating to another officer present that after he had ordered McCarthy to run "[Root] starts -- he opens the thing

and he starts reaching for it he's got it right there he starts reaching for it on me and that's when uh."  The camera similarly recorded Trooper Conneely characterize Root's actions as "suicide by cop."

The six officers fired a total of thirty-one shots, all within three seconds.  From the time McCarthy reached Root (and then left) to the time of the shooting, approximately ten seconds elapsed.  After McCarthy left Root's side, she did not see him again, including at the time of the shooting.  She therefore did not witness Root's position and actions immediately prior to and during the shooting.  Root was transported by ambulance to a hospital, where he was pronounced dead.

*2. Involved Officers' Statements to Investigators and Later Deposition Testimony*

Each involved officer gave statements as part of police investigations, and Bannon later deposed the six defendant officers in this case.  Massachusetts state police investigators assigned to the Norfolk County District Attorney's Office conducted at least fourteen interviews of witnesses or officers involved, including interviews of all six officers who fired at Root, between February 7 and 14, 2020.  Officers from BPD's Firearm Discharge Investigation Team ("FDIT") participated in most of

these interviews as part of BPD's own investigations.[6] Bannon also deposed each officer defendant. Each officer testified consistently with his or her own prior statements to investigators and consistently with his or her fellow officers' statements and testimony. We summarize the relevant statements from each officer in turn beginning with his or her arrival at the Brookline scene.

*Officer 1: Joseph McMenamy*

The first arriving officer, Officer McMenamy, was interviewed by Massachusetts state police and FDIT investigators on February 12, 2020. In that interview, Officer McMenamy stated that he was the first officer to pull up to the scene where Root crashed his vehicle. He stated he "saw . . . a white male stumbling around running towards" the shopping center parking lot and that Officer McMenamy "ran . . . directly towards [Root]." Officer McMenamy stated "a woman . . . civilian . . . was running or walking up to him to help him out . . . and [Officer McMenamy] ordered the woman to get away, . . . and she did immediately." Officer McMenamy stated:

> I . . . pointed my . . . firearm at [Root], ordering him to get on the ground, show me your hands . . . several times as I'm still running . . . or[] walking . . . at a fast pace towards [Root].   [Root is] kinda

---

[6]    BPD Sergeant Detective John D. Broderick, Jr., of the FDIT filed a report as to weapon discharges at the BWH scene on February 7, 2020.  BPD Sergeant Detective Marc Sullivan of the FDIT filed a report as to the discharges at the Brookline scene on June 29, 2020.

> crouching down, but he's standing, but
> crouching down looking at me, and I'm still
> telling him to get on the ground, and he's
> just not, kinda fumbling around, and that's
> when I got real close to him, and I walked
> towards him, and I put my left leg up, and
> kicked him -- not kicked him but like, with
> the, with the flat of my foot like it was in
> a soccer kick, like I put my foot up like 90-
> degree angle and kicked him down to the ground
> with my left leg.

Officer McMenamy stated that he "believe[d] [Root] stood back up" and while he and another officer continued to order Root to show his hands Root instead:

> with his left hand, started grabbing at his
> jacket . . . which was unzipped at the time --
> grabbing at his jacket, which revealed . . .
> the backside and the handle of a, a pistol .
> . . that looked like it was holstered. . . .
> [Root's] left hand grabbed the jacket, and his
> right hand went to go reach for the . . .
> handgun, and that's when [Officer McMenamy]
> fired.

Bannon deposed Officer McMenamy on December 7, 2021. Consistent with his interview statements, Officer McMenamy testified at deposition that he was the first officer to arrive at the scene after Root crashed his vehicle and continued fleeing on foot. Officer McMenamy described Root as moving "slumped over as if he was in some pain" and moving at a speed "faster than a walk." Officer McMenamy testified he saw McCarthy reaching out to Root and he began "running up to him [and] commanding her to get away," which she did. He testified he approached Root and "observed both of his hands . . . underneath his chest." Officer McMenamy

- 12 -

testified that he ordered Root to "'[l]et me see your hands,' and '[g]et on the ground,'" that Root was "moving away . . . little by little . . . in a crouched position," and that "when [Officer McMenamy] got within reaching distance of [Root], . . . [Officer McMenamy] picked up [his] left leg, and [he] pushed [Root] to the ground with [it]." Officer McMenamy testified that Root, now six to eight feet away from him, returned to his feet, opened up his jacket, and reached for what "looked like a black gun" with his right hand. Officer McMenamy testified that he fired at Root in response.

*Officer 2: Paul Conneely*

The second arriving officer, State Trooper Conneely, was interviewed by Massachusetts state police investigators on February 14, 2020. In that interview Trooper Conneely stated:

> [I saw Root] had fallen on the mulch, there's a mulch area there. . . . I thought he was just struggling to get up or a Boston cop had tripped him. . . . So I get out [of my cruiser]. I run up onto the sidewalk. He's kind of going down, trying to get up. He's getting up on one knee. . . . As I went to go tackle him a Boston officer to my left . . . yelled he's got a gun, he's got a gun, and it's on his chest, he's grabbing it, and they were yelling. . . . All the proper orders were given. I had my gun out. He reached into his chest. . . . I saw that he had come up and at that point you know, he's going to pull a gun on us. We're not getting shot. . . . I'm going to protect everyone around us and protect the public so I fired my rounds.

Consistent with Officer Figueroa's body-worn camera footage, Trooper Conneely stated:

> There was a female officer to my right. I told her we're going [to] put our gloves on. We're going to go up, take him in custody. . . . We approached. I grabbed his left. She came around to my right. She took custody of his right hand. As I was holding his left hand and she pulled his right hand the gun was in his right hand. Um, she pulled his hand out. I reached in underneath him and I took control of the gun.

Bannon deposed Trooper Conneely on January 12, 2022. Consistent with his interview statements, Trooper Conneely testified at deposition that when he arrived, he saw "Root trying to get up and get away." He testified he gave Root a command "along the lines of[] '[s]tay down on the ground and show me your hands.'" He testified that Root's hands were on the mulch and he was trying to push himself up, and that Root "was not prone to the ground" but "never got to a fully upright position." Trooper Conneely testified that he "contemplate[d] . . . tackling [Root]" but heard an officer yell, "[g]un. He's got a gun," and Trooper Conneely "immediately backed off." Trooper Conneely testified he then "saw a black handle coming out of [Root's] vest. He had it strapped to his chest," and that Root moved his right hand "inside his jacket" and Trooper Conneely "saw a black handle, [Root's] hand around a black handle coming up." Trooper Conneely then fired five shots at Root. Trooper Conneely testified that when he and

Officer Figueroa approached Root to secure his hands, he found Root's gun "in [Root's] right hand under his body when [Trooper Conneely] rolled him to gather his left hand."

*Officer 3: Corey Thomas*

The third officer,[7] Officer Thomas, was interviewed by Massachusetts state police investigators on February 12, 2020. During that interview Officer Thomas stated:

> [W]e get to the [mulched area]. I, I see him. He's on the ground. . . . I'm to his left 'cause he's facing all the other officers. I have my gun drawn. I'm givin' him verbal commands, "let me see your hands! Get on the ground!" . . . I'm hearing other officers give out multiple commands . . . . [H]e wasn't moving his hands in a surrendering manner, as in like just showin' us his hands and wasn't complying. He kept rustling his, his arms . . . they were like close, close to his . . . body. . . . I'm from the side . . . I can't see his hands. I can only . . . see him moving his arms, . . . erratically. . . . I heard . . . one round go off and I actually thought all right, he's firing at officers and I, I discharged my firearm.

Officer Thomas further stated that Root was "on the ground . . . like in a half lying, half kneeling type of position. . . . [H]e wasn't standing or fully sitting."

Bannon deposed Officer Thomas on December 16, 2021. Consistent with his interview statements, Officer Thomas testified

---

[7]     The record does not make clear exactly when the remaining four officers arrived except that it was after Officer McMenamy and State Trooper Conneely arrived.

at deposition that he approached Root and ordered him to "[l]et [him] see [his] hands" and to "[g]et on the ground."  He testified that Root was "stumbling" and "moving" while "in a half lying, half kneeling type of position . . . on the ground"[8] and was not complying with orders to show his hands, instead "keeping his hands close to his body" where Officer Thomas could not see them and "moving very abruptly and aggressively versus in a surrendering manner."  After Officer Thomas heard gunshots and believed Root was firing at his fellow officers, he fired at Root.

*Officer 4: Leroy Fernandes*

The fourth officer, Officer Fernandes, was interviewed by Massachusetts state police investigators on February 12, 2020. During that interview Officer Fernandes stated:

> I exit my motor vehicle, and I see officers
> running towards . . . an area on this Route
> 9. . . . I . . . take out my department-issued
> firearm, and I . . . follow officers who seem
> to be in pursuit of the suspect. . . . [A]s we
> get to this . . . grassy, patchy area . . . I
> observe the suspect . . . . [A]t this time,
> all officers are giving commands, . . . to[]
> show us your hands. . . . [A]t this point, the
> male reaches into his, . . . it appeared to be
> like a jacket of some sort, reaches in as if
> he's going to pull something and at that
> point, shots were fired.

---

[8]     The dissent's position that this testimony is inconsistent with the statement Officer Thomas gave state police investigators is not supported by the record.

Officer Fernandes stated that by the time he joined the officers, Root "seemed like as if he was trying to stand but he wasn't standing."

Bannon deposed Officer Fernandes on January 19, 2022. At that time, consistent with his interview statements, Officer Fernandes testified that he arrived at the mulched area and saw Root "upright. . . . [M]aybe a little bit of a lean-type standing, not fully standing up."[9] He testified that he and the other officers "issued verbal commands to let [them] see his hands, which [Root] didn't comply with. He did the opposite, and reached into his coat as if he was going to pull out a weapon, at which point shots were fired."

*Officer 5: Brenda Figueroa*

The fifth officer, Officer Figueroa, was interviewed by Massachusetts state police investigators on February 12, 2020. During that interview, Officer Figueroa stated:

> Obviously, this individual or this person that we're going after[] has a gun and has hurt somebody already. . . . I'm going with a, a

---

[9] The dissent's position that this testimony is inconsistent with the statement Officer Fernandes gave state police investigators is not supported by the record. In particular, the dissent seizes on one statement Officer Fernandes made at deposition which he immediately clarified, and which the dissent quotes out of context. Officer Fernandes's full testimony was: "He was standing.· Well, upright. I would say maybe a little bit of a lean-type·standing, <u>not fully standing up</u>." (Emphasis added.) That statement is entirely consistent with Officer Fernandes's interview statement that Root "seemed like as if he was trying to stand but he wasn't standing up."

> hundred percent [certainty] I'm [pursuing] a
> person with a gun.  My gun was out. . . . I
> see this individual on his knees.  There were
> maybe, I don't know how many officers, but I
> remember having a state trooper on my side and
> we begged, . . . I mean we begged this person
> to drop his gun, show us his hands and I
> remember him smirk, like, a laugh.  I see it,
> I see the object coming out and I was afraid
> . . . . I was afraid I was gonna get shot.
> Um, someone else was gonna get shot.  And as
> soon as I seen it pulling out, I said either
> it's me or someone innocent is gonna get
> really hurt, and I pressed my, I used my gun.
> I don't recall how many shots were fired.

Consistent with her body-worn camera footage, Officer Figueroa stated during that interview that she and Trooper Conneely then approached Root to "secure[] his hands."  She stated she grabbed one of Root's hands and "[a]t that moment, . . . I remember seeing the, a black gun, and that's the gun that this person had on him."

Bannon deposed Officer Figueroa on December 9, 2021. Consistent with her interview statements and body-worn camera footage, Officer Figueroa testified at deposition that when she arrived at the mulched area Root was "kneeling" ten to fifteen feet away, facing the officers.  She testified that Root's hands were "hiding underneath his coat," and that she and other officers ordered Root to show his hands and gave similar commands.  She testified that Root "smirked" at the officers and "start[ed] taking something out . . . of his jacket, and [Officer Figueroa] s[aw] the handle of a firearm," at which point she fired.  Officer

Figueroa testified that she then approached the body and found Root's gun "under his body."

*Officer 6: David Godin*

The sixth officer, Officer Godin, was interviewed by Massachusetts state police investigators on February 12, 2020. Officer Godin stated:

> I saw [Root] laying up on the corner. He was in like a, it was in front of like a shoppin' plaza or a side mall or whatever, but he was up on the curb . . . it was like all muddy, and he was layin' there, and I remember some lady going up to him and we're all yelling at her to get back. . . . [There are] four or five other officers and we're tellin' him, just, I'm just yellin' at him to lay on the ground with your hands out. Get on the ground 'cause he's in like a seated position . . . he was leaning to his right-hand side on a, like a seated position, and we continue to tell him to lay on the ground hands out, and I remember him reaching with his right hand into his jacket, and someone yelling gun, and at that time, I fired my firearm . . . .

Bannon deposed Officer Godin on December 15, 2021. Consistent with his interview statements, Officer Godin testified at deposition that as he approached the mulched area Root "was in a sitting position," possibly "laying halfway" "on his side" and that he ordered Root to "show [him] his hands," but Root did not do so. Officer Godin further testified that he saw Root reach his right hand "[i]nto his jacket," and after hearing other officers yell "gun," he fired at Root.

*Non-party Officers Christopher Elcock and David Wagner*

- 19 -

Two other officers provided statements about the recovery of Root's gun consistent with Officer Figueroa's body-worn camera and Officer Figueroa's and Trooper Conneely's interview statements and deposition testimony. Massachusetts state police investigators interviewed Brookline police officer and non-party Christopher Elcock. A report summarizing that interview states that Elcock "rolled the suspect over. In doing so, a handgun fell out of the suspect's chest area, which was subsequently removed from the suspect's proximity by an unknown party to Elcock." A similar report based on an interview with Brookline police detective and non-party David Wagner stated that Wagner "saw the suspect get rolled over, which is when he observed a black semi-automatic firearm fall out of the suspect's chest area."

*3. Independent Witness Testimony by Dr. Victor Gerbaudo Corroborating Officers' Accounts*

A medical doctor unaffiliated with any of the defendants, Dr. Victor Gerbaudo,[10] witnessed the incident from Route 9 and was interviewed by Massachusetts state police investigators on February 10, 2020. Dr. Gerbaudo was a BWH doctor

---

[10]    The dissent states that Dr. Gerbaudo was a former reserve police officer. The record shows what Dr. Gerbaudo told investigators was that he had been "a reserve police officer for the Glendale Police Department in Los Angeles from 1989 'til 1994." No evidence suggests that Dr. Gerbaudo has served as a reserve police officer at any point in the twenty-six years between that service and the events here.

driving that morning to BWH.  A few moments before the shooting in
Brookline Dr. Gerbaudo received "a text message from [BWH] telling
[him] that there was . . . a shooter case going on at [the
hospital]."  After driving ten more meters down Route 9, Dr.
Gerbaudo and the surrounding traffic came to a "full stop" in
response to police cars running lights and sirens approaching from
both directions of Route 9.  Dr. Gerbaudo described his location
as "exactly in front of the Star Market parking lot and [he] could
see diagonal to [his] left the CVS."  He stated:

> I saw a white male, 5'11", 6 feet, bald or
> very short hair, dressed with a black jacket
> . . . walking on the sidewalk westbound
> limping.
>
> . . . .
>
> [A]s he comes to exactly the location I'm in
> . . . in my car, . . . he turns right towards
> the grass area or like, little bump between
> the sidewalk and the parking lot of the Star
> Market.
>
> . . . .
>
> And as he reaches the top of that area, the
> police cars had already arrived and police
> officers were already on foot with their guns
> drawn, running after him . . . .
>
> . . . .
>
> [I]t seemed to be that [the officers] were
> asking [Root] to put his hands up, go down on
> his knees or to the ground.  And at the time,
> they actually said probably three, four times
> while pointing their guns at him.  And he
> turned around facing the officers and as he
> did that, he, with his right hand, he took his

- 21 -

> right hand under his coat and at the time that
> happened, um, the police officers discharged
> their firearms on him.

(Emphasis added.)    That statement fully substantiates the officers' versions of events.

Dr. Gerbaudo told investigators that, other than identifying himself as a witness to a police officer on the day of the shooting, he had not "talked to any other police officers or detectives or anyone else" between witnessing the shooting and giving his interview with investigators.

*4. Statements from Civilian Witness Shelly McCarthy*

Massachusetts state police investigators interviewed McCarthy on February 7, 2020, just three hours after the shooting. McCarthy told those investigators that she "didn't really get a look at" "[Root's] face."

McCarthy testified during her November 5, 2021, deposition, some twenty-one months after the event and her interview, as to her memory.  She testified that, for the entire period she observed Root, his right hand was at his chest and his left hand was hanging by his side.  She further testified that, after Root fell in the mulched area, he was lying on his back; he attempted to turn onto his shoulder, but was unable to do so and, in her opinion, could not possibly have returned to his feet.  She testified that Root's jacket was "covered in what appeared to be blood," that "[h]e was struggling to breathe" and "making . . .

- 22 -

gurgling noises with his breathing," and that initially his breath was "rapid."  McCarthy testified that "his eyes [were] all over the place," but his breathing became "very slow," and his eyes became "stuck in the back of his head," despite her having told officers during her interview on the day of the shooting that she "didn't really get a look at" "[Root's] face."  McCarthy did not convey these observations to the officers at the time; she described them only after the incident.

McCarthy testified that she was able to recall several of the commands officers gave Root, including "[g]et down!," "[s]how me your hands!," and "[s]tay down!"  Although McCarthy did not specifically remember hearing any officer command Root to drop a gun, she also stated that she wasn't able to identify every single command the officers gave given the "chaos."

5. *Post-shooting Evidence*

Officers retrieved a black gun from Root's person that was later identified as a BB gun.  Root's hand had been shot several times.  In photographs taken at the scene, the BB gun appeared to have been undamaged and did not have any visible blood on it, although it was wet from the rainy weather that day.

Despite the fact that Root's gun had not been tested for blood evidence and relying entirely on the lack of blood visible to the naked eye, Dr. Jennifer Lipman, a physician retained as an expert witness by Bannon, opined that the BB gun would have been

damaged and had blood on it had it been in Root's hand at the time of the shooting.  Her opinion did not discuss any possible impact of the day's rainy weather on that conclusion.

An examination of Root's vehicle and the surrounding area showed substantial amounts of blood loss.  The search of Root's vehicle also recovered two additional guns, including the gun Root had pointed at BWH security staff and fired at Officer Godin.

Dr. Lipman -- Bannon's expert medical witness -- opined that "[i]t is not possible to quantify the amount of blood . . . Root lost inside the car, except to say that it was significant." She further opined that this blood loss would have "rendered . . . Root physically and mentally impaired" at the time of the Brookline shooting.

### B.

Bannon's complaint includes nine counts, of which seven are relevant to this appeal.[11]  Counts One and Two, brought under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H-11I, respectively, allege that the individual defendants employed excessive force in violation of the

---

[11]    In August 2022, the district court granted Bannon's motion to voluntarily dismiss Counts Three and Four, which alleged that the officers had violated Root's due process rights.

Fourth Amendment during the shooting in Brookline.[12]  Counts Eight
and Nine are state law assault and battery and wrongful death
claims based on the same facts.  Counts Five and Six, brought under
§ 1983 and the MCRA, respectively, allege that Officer McMenamy
employed excessive force in violation of the Fourth Amendment in
executing the PIT maneuver and in kicking Root during the
confrontation in Brookline.  Count Seven is a § 1983 claim against
the City alleging a failure to adequately train and supervise the
defendant BPD officers.  The complaint does not allege that the
initial shooting at BWH violated the Fourth Amendment, and Bannon
does not argue as much on appeal.

On August 8, 2022, following the completion of
discovery,[13] the parties filed cross-motions for summary judgment.
Bannon sought summary judgment on her claims against the individual
defendants, though not on her municipal liability claim against
the City.  The City, Trooper Conneely, and the BPD officers
(represented separately from Trooper Conneely) each moved for

---

[12]    The complaint's MCRA counts also allege that the
officers' use of force violated Article XIV of the Massachusetts
Declaration of Rights.  No party cites this provision on appeal,
so we do not discuss it further.

[13]    Before filing an answer, the City moved to dismiss the
municipal liability count for failure to state a claim.  The
district court denied the motion.  See Bannon v. Godin, No. 20-
11501, 2020 WL 7230902 (D. Mass. Dec. 8, 2020).  That decision is
not before us in this appeal.

summary judgment on all counts in which they were named.  After the parties filed their responses, the district court heard argument on the motions in September 2022.  The court also received post-hearing supplemental briefing on the City's alleged failure to train.

On December 5, 2022, the court granted the defendants' motions for summary judgment and denied Bannon's motion.  See Bannon, 2022 WL 17417615, at *1.  The court reasoned that summary judgment was appropriate on Bannon's excessive force, assault and battery, and wrongful death claims because, construing the record in the light most favorable to Bannon, no reasonable jury could conclude that the officers had not acted reasonably in their use of force, and so the officers had not violated the Fourth Amendment.  See id. at *3-5, *7.  The court emphasized that the officers were aware that (1) having pointed a gun at Godin and pulled the trigger, Root was armed with a gun throughout these events; (2) Root had fled the initial crime scene leading the officers on a dangerous car chase through a densely populated area that ended with a violent collision with vehicles driven by civilian passersby; (3) despite Root's injuries the officers had reason to believe that Root continued to pose an immediate threat to themselves and the public; and (4) that immediate threat escalated when he reached toward the inside of his jacket which the officers reasonably believed meant he was reaching for a gun.

See id. at *4.  The court also concluded that Officer McMenamy had
acted reasonably in attempting the PIT maneuver and, after telling
Root to get on the ground, in using his foot to move him to the
ground.  See id. at *6-7.

The court further reasoned that the officers were, in
any event, entitled to qualified immunity because their actions
were justified under ample Supreme Court and First Circuit
qualified immunity law.  See id. at *5-6.  Finally, the court
reasoned that, since there was no underlying constitutional
violation, Bannon's § 1983 claim against the City also failed.
See id. at *7.

Bannon timely appealed the grant of summary judgment to
the defendants.  She has not appealed the denial of her own summary
judgment motion.

## II.

We review a grant of summary judgment de novo.  Fagre v.
Parks, 985 F.3d 16, 21 (1st Cir. 2021).  We must construe the facts
in the light most favorable to the nonmoving party -- here, Bannon
-- and draw all reasonable inferences in her favor.  Id.  We are
not bound by the district court's reasoning and may affirm on any
grounds supported by the record.  Minturn v. Monrad, 64 F.4th 9,
14 (1st Cir. 2023).

### III.

We begin with Bannon's appeal from the district court's holding entering summary judgment on the merits of the § 1983, MCRA, assault and battery, and wrongful death claims based on the officers' alleged use of excessive force. Both the § 1983 and MCRA claims are premised on an alleged underlying violation of the Fourth Amendment, which prohibits "unreasonable . . . seizures." U.S. Const. amend. IV; see Graham v. Connor, 490 U.S. 386, 395 (1989). Bannon does not dispute that, as a matter of Massachusetts law, if the officers' use of force was reasonable for Fourth Amendment purposes, her assault and battery and wrongful death claims also fail. See Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010); McGrath v. Tavares, 104 N.E.3d 684, 2018 WL 3040710, at *2 (Mass. App. Ct. 2018) (unpublished table decision). We conclude that no reasonable jury could conclude that the officers engaged in excessive force in violation of the Fourth Amendment, for the reasons stated in Part A below. We independently hold that the officers are entitled to qualified immunity as described in Part B below.

### A.

A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's

reasonableness standard.[14]   Plumhoff v. Rickard, 572 U.S. 765, 774 (2014) (citing Graham, 490 U.S. at 386).   "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."   Graham, 490 U.S. at 397.

Reasonableness is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," id. at 396, and must take account of "the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation," id. at 397.

This inquiry requires analyzing the totality of the circumstances.   Plumhoff, 572 U.S. at 774.   We consider "[1][w]hether a reasonable officer on the scene could believe that the suspect 'pose[d] an immediate threat to police officers or civilians,'" Est. of Rahim v. Doe, 51 F.4th 402, 414 (1st Cir. 2022) (second alteration in original) (quoting Fagre, 985 F.3d at 23-24); see also Kisela v. Hughes, 584 U.S. 100, 103 (2018), "[2]

---

[14]    The defendants do not dispute that the officers "seized" Root for Fourth Amendment purposes during each of the instances of allegedly excessive force -- the Brookline shooting, the kick, and the PIT maneuver.   See, e.g., Tennessee v. Garner, 471 U.S. 1, 7 (1985) (discussing meaning of "seizure" under Fourth Amendment).

[w]hether a warning was given before the use of force and whether the suspect complied with this command," Rahim, 51 F.4th at 414 (citing Kisela, 584 U.S. at 106), "[3] [w]hether the suspect was armed . . . at the time of the encounter or whether the officers believed the suspect to be armed," id. (citing City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 612 (2015)), "[4] [t]he speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force," id. (citing Kisela, 584 U.S. at 105-06; Sheehan, 575 U.S. at 612), "[5] [w]hether the suspect was advancing on the officers or otherwise escalating the situation," id. at 415 (citing Sheehan, 575 U.S. at 612-13), "[6] [t]he suspect's physical proximity to the officers at the time of the use of force," id. (citing Kisela, 584 U.S. at 107), such as whether the individual "was within range to seriously injure the officers at the time they fired," id., "[7] [w]hether multiple officers simultaneously reached the conclusion that a use of force was required," id., and "[8] [t]he nature of the underlying crime," id. (citing Graham, 490 U.S. at 396).[15]

---

[15]     In Rahim, we held that officers were entitled to qualified immunity because "objectively reasonable officers in their position would not have understood their actions to violate the law." 51 F.4th at 413. In so holding, we concluded that each of these factors "thought to be relevant" "[i]n the case law concerning the reasonableness of officers' use of force" weighed in favor of the officers. Id. at 413-15.

Each of these eight factors weighs in favor of the officers' use of force.[16]

*1. No reasonable jury could conclude that a reasonable officer would not have determined that Root posed an immediate threat.*

The record makes clear that any reasonable officer would have concluded that Root posed an immediate threat both to the officers and to the public both before and at the time of the fatal split-second decisions by six officers to shoot Root. The first factor above thus weighs in favor of the officers.

The test is not, as the dissent puts it, whether Root "pose[d] an immediate threat to police officers or civilians." Instead, the correct test is whether a reasonable officer on the scene could believe he did so. See Fagre, 985 F.3d at 23 (holding use of deadly force objectively reasonable in part because "[n]o reasonable jury could conclude that it was unreasonable for [officer] to believe that the driver posed an immediate threat").

Each of the officers reasonably believed that Root was armed with a gun. See, e.g., id. at 24 (noting risk created by presence of gun). The officers also had every reason to believe

---

[16]   As the dissent agrees, factors 2, 3, 7, and 8 above (respectively, the warnings given, the suspect's armed status, a simultaneous conclusion that use of force was required, and the nature of the underlying crime) clearly weigh in favor of the officers. The others do as well for the reasons explained below.

Root posed a continuing and immediate threat to them and the public: Officer Godin had witnessed Root fire his gun at him at BWH. Just moments before the shooting, Root had "led [the officers] in a car chase" through an urban area at high speeds, ignoring the officers' "attempt[s] to pull him over," "act[ing] with complete disregard for [the officers'] safety or the safety of anybody else that might have been on the street," and causing a serious collision. <u>McGrath</u> v. <u>Tavares</u>, 757 F.3d 20, 28 (1st Cir. 2014). And throughout his interactions with the officers, Root did not comply with lawful orders meant to defuse the situation and eliminate the danger he posed. These included commands to drop his weapon at BWH, to stop and show his hands following the PIT maneuver, and to show his hands immediately before the shooting in Brookline.

The dissent seeks to separate the shooting in Brookline from the context of the morning's events, arguing the officers' "justification for the use of force ha[d] ceased" before they arrived at the scene in Brookline. Nothing in our precedent supports this attempt to subtract from the analysis the officers' observations of Root's apparent willingness to use deadly force and his disregard for public safety given his choice to lead officers on a high speed chase through rush hour traffic, all of which had occurred just minutes before. Indeed, the dissent's position is inconsistent with this circuit's "case law [that] is

'comparatively generous' to officers facing 'potential danger, emergency conditions or other exigent circumstances,'" McKenney, 873 F.3d at 81 (quoting Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)), and black-letter Supreme Court law holding we must consider "the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation," Graham, 490 U.S. at 397 (emphasis added).

Even setting aside the events at BWH, officers reasonably believed Root was armed and fleeing in close proximity both to the officers and to members of the public driving on Route 9 (such as Dr. Gerbaudo) or present in the parking lot (such as McCarthy). See Conlogue v. Hamilton, 906 F.3d 150, 158 (1st Cir. 2018) (explaining that "anyone within firing range is in proximity to the life-threatening danger" potentially created by a gun); Rahim, 51 F.4th at 415 (explaining that force is more likely to be reasonable when officers are in close proximity to suspect).

We reject Bannon's argument that it was the officers, not Root, who created this situation by closing in on Root's position rather than seeking cover behind their cruisers, creating a perimeter, or delaying in order to assess the situation. A use-of-force expert retained by Bannon opined that the choice to follow Root into the mulched area did not comply with "standard police

- 33 -

practices." As the case law makes clear, in situations such as this that opinion entirely misses the point of the legal test. "[T]he Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases," and "a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently." Roy, 42 F.3d at 695; see also Lamont v. New Jersey, 637 F.3d 177, 185-86 (3d Cir. 2011) (concluding that officers' decision to pursue a suspect into a wooded area rather than create a perimeter -- as would have been a standard practice according to the plaintiff's policing expert -- did not render the officers' subsequent use of force unreasonable).

Video footage shows the incident unfolding in a public place between Route 9 (on which a steady stream of traffic was moving) and a shopping center parking lot. A reasonable officer would conclude that Root, known to be armed with a gun, would endanger the officers and nearby members of the public if not quickly apprehended. See Roy, 42 F.3d at 696; Dean v. City of Worcester, 924 F.2d 364, 368 (1st Cir. 1991) (officers encountering suspect in public area had good reason to "effect the intended arrest with . . . alacrity").

- 34 -

Bannon's appeal, in the end, comes down to an argument that the officers and an independent witness did not see what they consistently testified to and say they saw: that, just before each of the officers made the decision to fire, Root appeared to reach for a gun in his jacket.[17]   That movement, under the undisputed circumstances, would lead reasonable officers to conclude that Root posed an immediate threat to the safety of both the officers and the nearby public.  See, e.g., Lamont, 637 F.3d at 183 (holding that officers reasonably employed deadly force where an apparently armed suspect made "a movement uniformly described by those on the scene as being similar to that of drawing a gun").

Five of the officers gave evidence that each, independently, saw Root reach into his jacket as if to reach for a gun, despite commands to show his hands, drop the gun, etc., in the seconds before the shooting.   The three officers who could recall which hand Root used agreed it was his right.   The other individual defendant, Officer Thomas, testified that while he

---

[17]   The dissent argues from the lack of video footage from what it refers to as the "essential" time period that this means summary judgment was entered in error.   Not so.   This argument ignores the fact that on the evidence of record the officers and an independent witness all gave consistent testimony, and that this testimony is also entirely consistent with the video footage that is available from immediately before and after the shooting. The mere fact that a body camera lens was blocked by an officer's shooting stance at the precise moment officers shot at Root does not, given those other consistent sources of evidence, create a triable issue of fact.

could not see Root's hands, Root's movements were "abrupt[] and aggressive[]" rather than "surrendering."

That is exactly what the independent witness saw. Dr. Gerbaudo's witness statement, taken just six days after the shooting, is entirely consistent with and reinforces the officers' testimony.[18]   He told investigators that, just prior to the shooting, Root "turned around facing the officers" and that "with his right hand, he took his right hand under his coat," at which time the officers fired.   And Dr. Gerbaudo's statement that Root turned reinforces the officers' testimony that Root was moving just before the shooting.

Bannon offers two arguments concerning Root's reach. First, Bannon argues, as does the dissent, that there is a triable issue of fact as to whether the reach occurred.   Second, Bannon argues that even if Root was reaching, other facts still render the officers' use of force unreasonable.   We reject both arguments.

Here, six different officers from two different law enforcement agencies have offered consistent evidence, supported

_____

   [18]   Bannon argues that we may not consider Dr. Gerbaudo's statement because he was not deposed and his statements are hearsay.   These objections are meritless and are made for the first time on appeal and waived.   See Desrosiers v. Hartford Life & Accident Ins. Co., 515 F.3d 87, 91 (1st Cir. 2008) (finding waiver where party failed to object to materials submitted in support of summary judgment).   Bannon chose not to depose Dr. Gerbaudo. Further, she does not argue that Dr. Gerbaudo did not witness the events at issue.

by independent eyewitness statements.  As a result, Bannon bears the burden of producing contrary evidence and not just hypothetical disputes.  See Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010); Lamont, 637 F.3d at 182 ("[T]he party opposing summary judgment in a deadly-force case must point to evidence -- whether direct or circumstantial -- that creates a genuine issue of material fact . . . .").  None of the evidence Bannon argues from contradicts the officers' and Dr. Gerbaudo's description of Root's hand movement toward the inside of his jacket.

Bannon and the dissent argue that a reasonable jury could conclude that "Root was unable to act threateningly during the essential time period."  We see no such evidence in the record. Bannon relies heavily on McCarthy's testimony that Root kept his right hand at his chest and his left arm at his side throughout the time she observed him, that she did not believe he would be able to stand, and that he appeared to have the "[l]ights on[, but] no one home."

Neither McCarthy's testimony nor any other evidence supports a reasonable inference that Root, after McCarthy observed him, could not have reached his right hand under his jacket. McCarthy's testimony as to the time when she observed Root is consistent with the officers' testimony that they saw him later reaching that hand into his jacket.  Even were McCarthy's opinion testimony at her deposition, based on a few seconds of observation,

that Root would have been unable to stand, admissible, it does not contradict the officers' testimony that they saw him reaching into his jacket. Indeed, video of the incident shows Root moving from his vehicle to the mulched area under his own power just seconds before she saw him. Nor are the testimonies of all of the witnesses to the shooting called into question by Bannon's medical expert's opinion that Root's injuries and blood loss would have "rendered [him] physically and mentally impaired." Nor would "impair[ment]" mean it was impossible for him to move his arm. No reasonable jury could conclude, contrary to the witness statements, that Root was unable to move his arm. See Colt Def. LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 709-10 (1st Cir. 2007) (explaining that "a 'mere scintilla' of evidence" is insufficient to create triable issue (quoting Hochen v. Bobst Grp., Inc., 290 F.3d 446, 453 (1st Cir. 2002))). Nor does that expert's opinion that Root's gun would have shown visible blood or damage had it been in his hand at the time of the shooting call into question the reasonableness of any of the officers' conclusions from their observations that Root was reaching inside his jacket for what they believed to be a weapon.

As a fallback position, Bannon asserts that, even if Root did reach, the officers still could not reasonably have

concluded that he posed an immediate threat.[19]  This position is untenable.  The officers did not know the details of Root's medical condition, and Bannon's own expert stops short of any opinion that Root was so incapacitated as to be unable to reach for a gun, point it, or pull a trigger.  Nor were Root's actions an attempt to comply with officer commands to show his hands, as Bannon posits. Multiple officers explicitly stated that Root moved his hand into his jacket -- a movement inconsistent with showing his hands.

We easily reject Bannon's and the dissent's next argument that the "self-serving" officers' testimony means they are not entitled to summary judgment.  This is not circuit law, and the record does not support the contention.

The purported inconsistencies Bannon and the dissent point to do not go to the issue of whether Root reached.  Given

---

[19]    The cases that Bannon cites involving physically or mentally impaired individuals whom courts concluded were not immediate threats are readily distinguishable.  Woodcock v. City of Bowling Green, 679 F. App'x 419 (6th Cir. 2017) (unpublished) (holding force unconstitutional where officers shot man who had not threatened officers or anyone present, made non-threatening movements, and was seventy feet away from officers); Palma v. Johns, 27 F.4th 419 (6th Cir. 2022) (holding force unconstitutional where officer did not reasonably believe suspect was armed or engaged in any serious crime and suspect was not acting aggressively); Est. of Jones v. City of Martinsburg, 961 F.3d 661 (4th Cir. 2020) (holding force unconstitutional where suspect was not engaged in serious crime and was injured on the ground, motionless, and armed only with knife pinned under his body); McKenney v. Mangino, 873 F.3d 75 (1st Cir. 2017) (holding use of force unconstitutional where suspect did not point firearm at anyone or threaten officers, was moving slowly, and was sixty-nine feet away).

that the officers arrived at different times, had different vantage
points, and had only seconds to assess the scene under chaotic
circumstances, these minor differences in testimony are perfectly
consistent.    Beyond that, the officers testified consistently
under oath concerning the reach.[20]  That reach seen by a reasonable
officer would lead the officer to conclude that Root, known to be
armed, presented an immediate threat whether he was seen as
struggling to get up or not.    Not just one officer gave this
account, but every officer at the scene.

    This argument also ignores disinterested sources of
evidence consistent with the officers' statements.    Bannon does
not contend that Dr. Gerbaudo's corroborating statements could
conceivably have been coordinated with the officers.    And body-worn
camera footage from the day shows Trooper Conneely recovering the
BB gun from the area of Root's chest and hands moments after the
shots were fired.    The uncontroverted and disinterested evidence
shows that any reasonable officer would believe (1) that Root was
armed, (2) that such weapons were concealed in his jacket
(particularly given that he had flashed a weapon earlier in the
day by opening his jacket), and (3) that Root reached into that
jacket.    We add that a gun was recovered from the area of his body

---

[20]    No material dispute of fact emerges from the officers
having spoken together after the very tense event putting them in
danger and before speaking to investigators, even if doing so
violated BPD rules (as Bannon asserts).

near which Root's hands had been reaching just seconds before officers fired.

As this court has often held, a party cannot survive summary judgment simply by asserting that a jury might disbelieve the moving party's evidence.  The non-moving party, Bannon, must instead present sufficient affirmative evidence of its own to create material issues of fact.[21]  See, e.g., Sears, Roebuck & Co. v. Goldstone & Sudalter, P.C., 128 F.3d 10, 18 (1st Cir. 1997); see also LaFrenier v. Kinirey, 550 F.3d 166, 167-68 (1st Cir. 2008) (holding that, where two defendant police officers' testimony was consistent as to key point, that testimony could support summary judgment despite fact officers were not "disinterested" in

---

[21]    The dissent suggests that where an officer kills the sole other witness the officer's testimony is inherently not credible and cites Flythe v. District of Columbia, 791 F.3d 13 (D.C. Cir. 2015).  Flythe does not stand for that proposition in the D.C Circuit, nor is that this circuit's law.  Moreover, Flythe is entirely consistent with circuit law and easily distinguishable on the facts.  There, the testimony of a sole officer as to the individual he shot "conflict[ed] with that of every other witness" who saw the event and "conflict[ed] with . . . the physical evidence" which supported the other witness's testimony, creating a material issue of fact.  Id. at 20.  Here, by contrast, every witness to the event testified consistently, and that included independent witnesses.  Indeed, we have engaged in the "careful[] examin[ation] [of the] direct and circumstantial evidence presented by the parties" that the dissent argues our precedent requires and conclude that evidence supports summary judgment for the officers.

result).[22]  In short, we see "nothing inherently unbelievable about [the] officer[s'] testimony."  LaFrenier, 550 F.3d at 168.

Six officers operating under "tense, uncertain, and rapidly evolving" "circumstances," Graham, 490 U.S. at 397, all made identical and simultaneous "split-second judgments," id., that deadly force was necessary to protect themselves and the nearby public from Root.  No reasonable juror could conclude that all six of those officers unanimously, independently, and simultaneously reached an unreasonable conclusion.

*2. No reasonable jury could conclude that the other factors weigh against the officers.*

The remaining factors -- "[t]he speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force,"

---

[22]  The record does not support the dissent's view that officers gave conflicting testimony as to whether Officer McMenamy kicked Root to the ground and that Trooper Conneely testified that he saw Root's gun in his hand which, in the dissent's view, is impossible given the lack of visible blood on Root's gun.  This argument fails to account for the varying arrival times and vantage points of the officers at the time of the shooting.

The dissent also cites Goodwin v. City of Painesville, 781 F.3d 314, 322-23 (6th Cir. 2015), for the proposition that Officer Godin's failure to activate his body-worn camera "could weigh against [his] credibility."  That is not the rule of this circuit. It is also inapposite: in Goodwin there was evidence that the officer had a pattern of "avoiding documentation of his actions" and "had already been warned about his failure to use a recording device during an earlier citizen encounter."  Id. at 322. Here, there is no evidence that Officer Godin had a habit of failing to activate his body-worn camera -- to the contrary, Officer Godin had made two recordings with that camera that very morning.

"[w]hether the suspect was advancing on the officers or otherwise escalating the situation," and "[t]he suspect's physical proximity to the officers at the time of the use of force" such as whether the individual "was within range to seriously injure the officers at the time they fired," Rahim, 51 F.4th at 414-15 -- also favor the officers.

It was Root who escalated the threat when he reached for a gun concealed in his jacket, see, e.g., Conlogue, 906 F.3d at 156 (holding suspect was "escalat[ing] confrontation" where he "raised [a] gun, and waved it back and forth" and "refused to comply" with commands "to drop his weapon"), and certainly "was within range to seriously injury the officers at the time they fired," Rahim, 51 F.4th at 415. Further, Root had just led the officers on a dangerous car chase, stopping only when he had caused a collision that disabled his vehicle. Throughout his interactions with the police, he had repeatedly failed to obey lawful commands. And rather than giving any affirmative indication of surrender, he instead moved his arm in a way that officers perceived to be a reach for a gun. Cf. Johnson v. Scott, 576 F.3d 658, 660 (7th Cir. 2009) (noting that an officer "had no idea how [a suspect] was going to behave once he was cornered" and was not "required . . . to take [the suspect's] apparent surrender at face value, a split second after [the suspect] stopped running").

- 43 -

Finally, the record does not support the dissent's view that "[t]he speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force," Rahim, 51 F.4th at 414, "cuts both ways." Not so. Root led officers on a high-speed chase through heavily trafficked streets during the morning rush hour after pointing an apparent gun at law enforcement officers at a hospital, crashing his car into civilian cars, and continuing to run away. Under those circumstances, "[t]he speed with which officers had to respond to unfolding events," id., points unequivocally in favor of the reasonableness of the officers' use of force here.

Under the totality of the circumstances, no reasonable jury could conclude that the officers acted unreasonably in employing deadly force against Root in violation of the Fourth Amendment.[23] We affirm entry of summary judgment for the defendants on Bannon's § 1983, MCRA, assault and battery, and wrongful death claims arising from the shooting. See Fagre, 985 F.3d at 24; Raiche, 623 F.3d at 40; Tavares, 2018 WL 3040710, at *2.

---

[23]    Bannon argued in the district court that, even if the officers were initially justified in firing at Root, the number of shots fired was excessive. She has not renewed this argument on appeal, so we do not address it.

**B.**

We independently conclude that the officers are entitled to summary judgment on Bannon's § 1983 and MCRA claims[24] based on qualified immunity.  _Fagre_, 985 F.3d at 24; _Rahim_, 51 F.4th at 413-15.

Qualified immunity renders government officials sued in their official capacities immune to damages claims unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  _Fagre_, 985 F.3d at 24 (internal quotation marks omitted) (quoting _Irish_ v. _Fowler_, 979 F.3d 65, 76 (1st Cir. 2020)).  "This is a 'heavy burden' for a plaintiff to meet."  _Johnson_ v. _City of Biddeford_, 92 F.4th 367, 375-76 (1st Cir. 2024) (quoting _Rahim_, 51 F.4th at 410).  "The qualified immunity [the officers] enjoy . . . the Supreme Court of the United States has explained is intended to 'protect[] all but the plainly incompetent or those who knowingly violate the law.'"  _Jakuttis_ v. _Town of Dracut_, 95 F.4th 22, 30 (1st Cir. 2024) (quoting _White_ v. _Pauly_, 580 U.S. 73, 79 (2017)).  "Thus, if an objectively reasonable official in [the officers'] shoes 'might not have known for certain that their conduct was unlawful,' then [the officers] '[are] immune from

---

[24]    "Qualified immunity principles developed under 42 U.S.C. § 1983 apply equally to MCRA claims."  _Krupien_ v. _Ritcey_, 112 N.E.3d 302, 306 & 306 n.7 (Mass. App. Ct. 2018).

liability.'" Id. (third alteration in original) (quoting Ziglar
v. Abbasi, 582 U.S. 120, 152 (2017)).

        "In the Fourth Amendment context, the '[s]pecificity' of
the rule set forth in such precedent 'is especially important,'
because it can be 'difficult for an officer to determine how the
relevant legal doctrine,' such as excessive force, 'will apply to
the factual situation the officer confronts.'" Lachance v. Town
of Charlton, 990 F.3d 14, 21 (1st Cir. 2021) (alteration in
original) (quoting City of Escondido v. Emmons, 586 U.S. 38, 42
(2019)). Thus, outside of obvious cases, "'relevant case law,'
where 'an officer acting under similar circumstances . . . was
held to have violated the Fourth Amendment,' is 'usually necessary'
to overcome officers' qualified immunity." Id. (omission in
original) (quoting District of Columbia v. Wesby, 583 U.S. 48, 64
(2018)). The plaintiff bears the burden of "identify[ing]
controlling authority or a consensus of persuasive authority
sufficient to put the officers on notice that their conduct
violated the law." Rahim, 51 F.4th at 412.

        Bannon has failed to "identif[y] a single precedent
finding a Fourth Amendment violation under similar circumstances."
City of Tahlequah v. Bond, 595 U.S. 9, 14 (2021). We have already
explained why the cases on which Bannon principally relies, such
as Woodcock and Estate of Jones, involve factual scenarios too
dissimilar from those confronted by the officers here to clearly

establish any relevant right.  Bannon cites <u>Franklin</u> v. <u>City of Charlotte</u>, 64 F.4th 519, 532-34 (4th Cir. 2023), a case which was decided over three years after the shooting in February 2020, and so could not have placed the officers on notice of a potential constitutional violation at the time of the incident.  <u>See</u> <u>City of Tahlequah</u>, 595 U.S. at 13 (explaining that a case "decided after the shooting at issue[] is of no use in the clearly established inquiry").  There, the man shot by officers was not aggressive or threatening, did not attempt to resist or flee, and sought to comply with police orders to drop his weapon by "carefully pull[ing] [his] firearm out of his jacket, point[ing] it at no one, and [holding] it with just one hand from the top of the barrel" in a "non-firing grip." <u>Franklin</u>, 64 F.4th at 532-34.

In addition to the clearly established law supporting the officers, we also hold that "objectively reasonable officers . . . would not have understood the[se] actions to violate the law," <u>Rahim</u>, 51 F.4th at 413, for the reasons discussed earlier. The officers thus are entitled to qualified immunity on that independent basis.  <u>Id.</u>

On this issue the dissent begins from the premise, not supported by the record, "that . . . a reasonable factfinder could disbelieve the officers' testimony and find that Root was not and could not act threateningly at the time of the shooting."  We have already explained in detail why, properly considering the totality

of the circumstances, this premise is incorrect under the well-settled precedent of our circuit. From that erroneous premise the dissent, taking language from <u>Stamps</u> v. <u>Town of Framingham</u>, 813 F.3d 27, 39-40 (1st Cir. 2016), argues "'that a reasonable officer in [the officers'] position would have understood that' shooting a person who is bleeding on the ground and unable to make sudden movements 'constituted excessive force in violation of that person's Fourth Amendment rights.'"  (Alteration in original.) <u>Stamps</u> concerned one officer who shot a man who "was fully complying with the orders he was given, was unarmed and flat on his stomach in the hallway, and [who] constituted no threat." <u>Id.</u> at 31. Even on the dissent's own preferred read of the evidence, here Root was understood to be armed, was failing to comply with officer orders, and had, at least until seconds earlier, posed a real threat to officers and the general public by virtue of his erratic driving at high speeds. Unlike <u>Stamps</u>, this is not a case where officers "sho[t] a person who [wa]s bleeding on the ground and unable to make sudden movements," <u>Stamps</u>, 813 F.3d at 39-40, for all the reasons discussed above.

We affirm the entry of summary judgment on the § 1983 and MCRA claims for the several reasons stated based on qualified immunity.

**IV.**

We turn to Bannon's other excessive force claims against only Officer McMenamy under § 1983 and the MCRA. We affirm the district court's grant of summary judgment to Officer McMenamy.

We begin with Bannon's claims concerning Officer McMenamy's use of the PIT maneuver to try to stop Root's car with his cruiser. Without deciding whether Officer McMenamy's conduct violated the Fourth Amendment, we affirm based on qualified immunity.

Bannon has not met her burden of "identify[ing] either controlling authority or a consensus of persuasive authority sufficient to put [Officer McMenamy] on notice that his conduct fell short of the constitutional norm."[25] Rahim, 51 F.4th at 410. Bannon's brief does not identify any precedent on this issue finding a Fourth Amendment violation at all, citing instead two decisions dealing with alleged due process violations, neither of

---

[25] Bannon does not contend an alleged constitutional violation was so "obvious" that "any competent officer would have known that [the maneuver] would violate the Fourth Amendment," Kisela, 584 U.S. at 106, nor could she plausibly do so, cf., e.g., Scott v. Harris, 550 U.S. 372, 374, 386 (2007) (holding that it is at least sometimes reasonable for an officer to intentionally collide with a suspect's vehicle during a pursuit). Nor does the fact that the PIT maneuver violated BPD policy strip Officer McMenamy of immunity. See Davis v. Scherer, 468 U.S. 183, 194-96 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

which involved an intentional police cruiser collision with a
fleeing, armed suspect under circumstances like those presented
here. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 836-38, 854
& 854 n.13 (1998); Checki v. Webb, 785 F.2d 534, 535-36, 538 (5th
Cir. 1986).[26]  That failure ends her appeal on this claim.

Bannon also argues that Officer McMenamy violated the
Fourth Amendment when he kicked Root after arriving at the scene
in Brookline.  Officer McMenamy responds that the use of force was
reasonable under the circumstances, and we agree.[27]

An officer's use of nondeadly force, like the use of
deadly force, is governed by a Fourth Amendment reasonableness
standard, see Graham, 490 U.S. at 396, under which we also must
pay "careful attention to the facts and circumstances," id.  The

---

[26]    In addition to addressing a different constitutional
issue, Lewis found no constitutional violation.  See 523 U.S. at
855.  And Bannon acknowledges that the facts of Checki, in which
two defendant police officers, apparently without any provocation
and without providing any indication that they were officers,
pursued the plaintiff in a high-speed chase involving "speeds in
excess of 100 M.P.H.," occasionally "tailgating to within two to
three feet" of the pursued car, 785 F.2d at 535, "are not similar
to this case," cf. Kisela, 584 U.S. at 106-07 (explaining why
various precedents were insufficiently factually similar to show
that a right was clearly established).

[27]    Contrary to Bannon's assertion that Officer McMenamy
"did not seek summary judgment as to the kick" and has thereby
waived the issue, Officer McMenamy sought summary judgment on all
counts.  His memorandum in support of his summary judgment motion
did not specifically discuss the kick, but he briefed the issue in
responding to Bannon's motion for summary judgment.  Further, the
district court analyzed the kick, see Bannon, 2022 WL 17417615, at
*7, and the parties have fully briefed it on appeal.

facts support the reasonableness of Officer McMenamy's actions, such that no reasonable jury could find a constitutional violation.

At the time of Officer McMenamy's kick, he was aware of multiple severe crimes at issue: Root was armed; had demonstrated intent to harm officers and civilians, including hospital patients; had fled in a vehicle at high speeds and, once that vehicle was no longer functional after the collision, continued to flee on foot; was in close proximity to officers and the public; and continued to disregard lawful orders to show his hands, get on the ground, etc.

Even assuming, favorably to Root and contrary to Officer McMenamy's testimony, that Root was stationary at the time of the kick, a reasonable officer would not assume that Root had ceased his efforts to "evade arrest." Graham, 490 U.S. at 396; cf. Johnson, 576 F.3d at 660 ("No law that we know of required [an officer] to take [a suspect's] apparent surrender at face value, a split second after [the suspect] stopped running.").

Under these circumstances, a reasonable officer would believe that the force employed by Officer McMenamy was appropriate. After ordering Root to show his hands and get on the ground, McMenamy used his foot to "push[] [Root] to the ground." Bannon has produced no evidence that the kick caused any injury or was otherwise unduly forceful. See Dean at 369 (noting that a suspect's "minor physical injuries" were "insufficient to support

- 51 -

an inference that . . . officers used inordinate force" when
"subdu[ing] an armed felon on a busy city street"); see also
Graham, 490 U.S. at 396 ("'Not every push or shove, even if it may
later seem unnecessary in the peace of a judge's chambers,'
violates the Fourth Amendment." (citation omitted) (quoting
Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973))).   Even
assuming Root was lying on the ground, we still conclude that,
under the circumstances, a reasonable officer would be justified
in using his foot to push an unsecured armed suspect toward the
ground to ensure that that suspect did not begin to rise.   The
cases Bannon cites, which involved unwarranted beatings of
already-secured suspects, are obviously distinguishable.   See
Alicea v. Thomas, 815 F.3d 283, 287, 292 (7th Cir. 2016); Boozer
v. Sarria, No. 09-cv-2102, 2010 WL 3937164, at *1, *6 (N.D. Ga.
Oct. 4, 2010).

**V.**

Finally, we affirm the district court's grant of summary
judgment to the City on Bannon's § 1983 claim alleging a failure
by the City to adequately train its officers.[28]

---

[28]   Bannon's complaint styles the count against the City as
sounding in "negligent training and supervision."   The City, in
moving for summary judgment, construed the claim as one based
entirely on failure to train, noting that the claim's "substance
principally concerns the City's purported failure to train its
officers."   While Bannon argues that the City has therefore "waived
any right to argue that it is seeking summary judgment concerning

"[A] municipality 'may be liable under [§ 1983] if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.'" Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011) (internal quotation marks omitted) (quoting Connick v. Thompson, 563 U.S. 51, 60 (2011)). Municipalities "are responsible only for their own unconstitutional acts," and "are not vicariously liable . . . for the actions of their non-policymaking employees," and so "a plaintiff must 'identify a municipal policy or custom that caused the plaintiff's injury.'" Id. (internal quotation marks omitted) (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)).

A municipality's "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," but only where the "failure to train its employees in a relevant respect . . . amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained

---

its failure to supervise," the City's reading of the complaint is a fair one, as the pleading makes only passing references to a failure-to-supervise theory. At minimum, Bannon bore the burden of explaining why her failure-to-supervise theory offers a distinct basis for relief, yet she has never done so in any detail, instead asserting vaguely in footnotes in the district court and on appeal that discovery produced evidence of the City's purported failure to supervise its officers. Bannon has waived any argument based on a failure-to-supervise theory. See, e.g., FinSight I LP v. Seaver, 50 F.4th 226, 235 (1st Cir. 2022); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

employees] come into contact.'" Connick, 563 U.S. at 61 (last alteration in original) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  The deliberate indifference standard is "stringent" and "requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (quoting Brown, 520 U.S. at 410).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," id. at 62 (quoting Brown, 520 U.S. at 409), although liability based on a single incident may be possible in rare cases where "the need for more or different training is . . . obvious, and the inadequacy [is highly] likely to result in the violation of constitutional rights," City of Canton, 489 U.S. at 390; see Connick, 563 U.S. at 63-64.

This theory of municipal liability is viable only where a plaintiff establishes the existence of "underlying, identifiable constitutional violations . . . ." Lachance, 990 F.3d at 31 (omission in original) (quoting Kennedy v. Town of Billerica, 617 F.3d 520, 531 (1st Cir. 2010)).  We have already held that neither the shooting nor the kick violated the Fourth Amendment, and so neither can support the claim against the City.  Any liability on this claim would have to stem from the only other purported constitutional violation identified by Bannon -- the claim of excessive force in Officer McMenamy's attempted PIT maneuver.

Regardless, Bannon cannot show deliberate indifference on the part of the City. BPD policy expressly forbids officers from deliberately colliding with suspects' vehicles. A Department rule provides: "Officers shall not use their police vehicle to deliberately make contact with a pursued vehicle." The undisputed facts show that the City trained BPD recruits, including Officer McMenamy, about this rule. An instructor from the Boston Police Academy deposed on behalf of the City, see Fed. R. Civ. P. 30(b)(6), testified that "[BPD] recruits . . . [are] taught that they are prohibited from using their police vehicle[s] to deliberately strike . . . vehicle[s] that[] [are] being pursued." Officer McMenamy confirmed in his deposition that he was trained not to perform PIT maneuvers and that he was aware on the day of the incident that PIT maneuvers and the use of his vehicle to strike a pursued vehicle were prohibited by BPD policy.

Bannon has not shown that the City had any reason to anticipate that this training would be inadequate. Her brief asserts that "BPD has a long history of excessive force complaints," but does not argue that any of these complaints involved "similar [alleged] constitutional violations," Connick, 563 U.S. at 62, like the PIT maneuver. Nor has Bannon explained why it was "obvious" that the City's training concerning PIT maneuvers would be inadequate. Id. at 64. On this record, no

reasonable factfinder could find deliberate indifference, making summary judgment for the City appropriate.

The entry of summary judgment for defendants is affirmed. No costs are awarded.

**-Dissenting and Concurring Opinion Follows-**

MONTECALVO, <u>Circuit Judge</u>, **dissenting in part and concurring in part**. I respectfully disagree with the majority's characterization of the evidence and its application of the summary judgment standard to the deadly force claims and would find that summary judgment on those claims is inappropriate at this juncture. Plaintiff has put forth sufficient evidence, both regarding the events leading up to the shooting and as to the witnesses' credibility, that a reasonable factfinder could find in her favor. However, because I join in the majority's decision as to Part IV and concur as to Part V, I dissent only in part.

## I. Standard of Review

"A district court may only grant summary judgment when the record, construed in the light most congenial to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." <u>McKenney</u> v. <u>Mangino</u>, 873 F.3d 75, 80 (1st Cir. 2017). All reasonable inferences are also drawn in favor of the nonmovant. <u>Mitchell</u> v. <u>Miller</u>, 790 F.3d 73, 76 (1st Cir. 2015). We review summary judgment rulings de novo, through this same lens employed by the district court. See <u>McKenney</u>, 873 F.3d at 80.

## II. Excessive Force Claims

### A. Violation of Protected Right

"The qualified immunity analysis 'entails a two-step pavane.'" Morse v. Cloutier, 869 F.3d 16, 23 (1st Cir. 2017) (quoting Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017)). Public officials are generally immune from individual liability unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." Punsky v. City of Portland, 54 F.4th 62, 65-66 (1st Cir. 2022) (internal quotation marks omitted) (quoting Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020)). "We have discretion to bypass the first step if we conclude that the right was not clearly established at the time of its alleged violation." Perry v. Spencer, 94 F.4th 136, 146 (1st Cir. 2024).

Under the first step, this court evaluates "whether the plaintiff's version of the facts makes out a violation of a protected right." Morse, 869 F.3d at 23 (quoting Alfano, 847 F.3d at 75). At this juncture, all undisputed facts stand as true; however, all disputed facts are resolved in favor of the plaintiff.

Although we face a fact-intensive inquiry, in my mind, only one question remains: What was Juston Root doing in those few seconds prior to the officers' use of deadly force? If, as the defendants contend, Root reached into his jacket, then the officers likely reasonably responded to a potential imminent threat because

they had reason to believe Root was armed.  However, if, as the
Plaintiff contends, Root was on the ground, severely bleeding, and
merely holding his hand to his chest, the officers' actions appear
to be "patently unreasonable."  Flythe v. District of Columbia,
791 F.3d 13, 19 (D.C. Cir. 2015).  Given we are at the summary
judgment stage, after viewing all of the facts in the light most
favorable to the plaintiff, we can only affirm the district court
if "no rational trier of fact could disbelieve" the officers'
telling.  Id.; see Morelli v. Webster, 552 F.3d 12, 18 (1st Cir.
2009).  As I describe below, the factual record leaves open ample
room for reasonable factfinders to dispute the reasonableness of
the officers' conduct.

### 1. The Relevant Factual Record

Much of the interaction between Root and the officers,
beginning with the initial confrontation at the hospital, is
documented on various video recordings.  However, we do not have
the benefit of any video recording as to the essential time
period -- immediately prior to and during the deadly shooting.
Thus, we must look to the other evidence available in the summary
judgment record.

While reviewing the record, it is important to note that
"history is usually written by those who survive to tell the tale."
Flythe, 791 F.3d at 19.  Under such circumstances, "where 'the
witness most likely to contradict [the officers'] story -- the

person [they] shot dead -- is unable to testify,' courts . . .
'may not simply accept what may be a self-serving account by the
police officer[s].'" Id. (quoting Scott v. Henrich, 39 F.3d 912,
915 (9th Cir. 1994)).  "Instead, courts must 'carefully examine
all the evidence in the record . . . to determine whether the
officer[s'] story is internally consistent and consistent with
other known facts.'" Id. (quoting Scott, 39 F.3d at 915).  "Courts
'must also look at the circumstantial evidence that, if believed,
would tend to discredit the police officer[s'] story, and consider
whether this evidence could convince a rational factfinder that
the officer[s] acted unreasonably.'"[29]  Id. (quoting Scott, 39 F.3d
at 915).  "[W]here the circumstantial evidence supports a dispute
of material fact, we must conclude that summary judgment is

_____

[29]  I agree with the majority that Flythe is "entirely
consistent with [our] circuit law." Op. 41 n.21.  And, under our
caselaw, we must carefully examine the direct and circumstantial
evidence presented by the parties to determine whether a genuine
issue of material fact exists at the summary judgment stage.  See
Giroux v. Somerset Cnty., 178 F.3d 28, 32-34 (1st Cir. 1999)
(reviewing both circumstantial and direct evidence to reverse the
granting of summary judgment); see also In re Neurontin Mktg. &
Sales Pracs. Litig., 712 F.3d 60, 69 (1st Cir. 2013) (holding that
"it is a jury's task to weigh the individual testimony presented
by [the defendant] against the aggregate and circumstantial
evidence presented by the . . . plaintiffs"); Mesnick v. Gen. Elec.
Co., 950 F.2d 816, 828 (1st Cir. 1991) (holding that plaintiff had
not provided "direct or circumstantial" evidence to overcome
summary judgment).  The majority opinion's characterization of my
reliance on Flythe is unfounded, as discussed infra. Op. 41 n.21;
Diss. 87-88 n.42.

inappropriate and allow the case to proceed to trial." <u>Hinson</u> v. <u>Bias</u>, 927 F.3d 1103, 1118 (11th Cir. 2019).

Thus, after a careful examination of the record, I have summarized below the relevant evidence provided, including the testimony of the individual officers.  I also focus on the essential time period, as noted above.  When describing each officer and witness's role and observations in the remainder of this section, I do so based on what those particular witnesses testified to, without drawing any conclusions as to what occurred. As I will lay out, I disagree with the majority's view that the witnesses' testimonies were consistent as to the material facts; accordingly, I think it is important to carefully describe each witness's recollection to evaluate the full scope of the evidence presented.

### i. Officer David Godin

Officer David Godin responded to the initial call at Brigham and Women's hospital ("the hospital") regarding a person with a gun.[30]  After the vehicle pursuit of Root ended in Root crashing his car and exiting his vehicle, Godin next observed Root

---

[30] Although the majority opinion refers to this weapon as a "gun," it is undisputed that what was ultimately recovered was a paintball gun.  However, there is also no dispute that Godin did not know that it was a paintball gun until after the shooting in Brookline was well over.  This paintball gun, as well as another paintball gun, was recovered from Root's vehicle sometime after Root was fatally shot.

seated next to a woman, later identified as Shelly McCarthy, in a mulched area in Brookline. Godin testified that, as he approached, he yelled at McCarthy to get away from Root and yelled at Root to show his hands. Godin never saw Root standing on two feet and did not consider Root to be "fleeing" once Godin observed Root in the mulched area. Godin also said he never saw another officer approach Root or touch Root in any way. Godin testified that although he saw Root reach into his jacket, he did not shoot until he heard another officer yell "gun." Godin fired eight rounds at Root.

In a sworn, written statement, Godin said that his body-worn camera was in his duty bag throughout his interactions with Root and was not attached to his body. Godin also initially stated at his interview with the Massachusetts state police investigators that he was not wearing his body-worn camera on this day, but, after video evidence showed otherwise, he testified that he did not remember whether he was wearing his body-worn camera. Specifically, video from another officer's body-worn camera showed Godin wearing his body-worn camera and then throwing it into a cruiser. Godin also testified that the incident caused him stress, resulting in sleeping problems "for the next couple days."

### ii. Officer Joseph McMenamy

Officer Joseph McMenamy joined the pursuit of Root shortly after Root left the area of the hospital. McMenamy

performed a PIT maneuver during the pursuit, which failed to stop the pursuit. Although the pursuit started with Root driving at about twenty to thirty miles per hour, after McMenamy's PIT maneuver, Root increased his speed to up to ninety miles per hour. McMenamy was later the first officer to arrive at the scene after Root crashed his vehicle. McMenamy testified that he observed Root "running" from his vehicle on the sidewalk.

When McMenamy approached, he saw McCarthy "relatively close" to Root and observed her reaching her hand out and touching him. McMenamy yelled at McCarthy to get away from Root. McMenamy testified that Root was in "a hunched over position," but standing with both feet on the ground. McMenamy testified that he was ordering Root to show his hands and to get on the ground. McMenamy also testified that during this time, Root was moving away from him "little by little."

McMenamy stated that he then approached Root and kicked him with the bottom of his foot, causing Root to fall to the ground. McMenamy testified that Root then "started standing back up" and eventually "got up to both feet." McMenamy also testified that he believed he saw the backside of a handgun[31] on Root, and once he thought he saw Root reach toward it, McMenamy shot at him.

---

[31] Although the majority opinion also refers to this "weapon" as a "gun," it is undisputed that what was ultimately recovered from the scene was a black bb gun.

McMenamy fired ten rounds. McMenamy also stated that although he was wearing his body-worn camera on this day, he did not activate the camera until after the shooting.

### iii. Officer Brenda Figueroa

Officer Brenda Figueroa joined the pursuit of Root near the hospital. Figueroa did not recall ever hearing over her radio that Root had been shot at the hospital. Figueroa turned on her body-worn camera while in pursuit of Root's vehicle.

Figueroa testified that when she exited her vehicle at the scene, there were no civilians near Root, and Root was facing the other officers and kneeling on the ground ten to fifteen feet away from her. She further testified that both of Root's hands were inside of his jacket. Figueroa stated that she and the other officers commanded Root to "[s]how us [his] hands." Figueroa testified that Root began removing his hand from his jacket, and she saw the handle of a firearm in one of his hands. Figueroa fired three rounds at Root. Figueroa's body-worn camera was recording throughout the interaction; however, her camera lens was blocked beginning five seconds before Root was fatally shot.

### iv. Officer Leroy Fernandes

Officer Leroy Fernandes, who joined the pursuit of Root after he left the hospital area, testified that Root was standing in the mulch when Fernandes came within ten to fifteen feet of Root. At his interview with the Massachusetts state police

investigators, Fernandes described Root's position as "seem[ing] like . . . he was trying to stand but he wasn't standing.   He wasn't standing up."   Later, at his deposition for this case, Fernandes described Root's position as "standing.   Well, upright. . . . [M]aybe a little bit of a lean-type standing, not fully standing up."  When asked to clarify what "upright" meant, Fernandes testified that he believed Root was "on his feet" and "standing upright."[32]  Fernandes further testified that as he and the other officers verbally commanded Root to show them his hands, Root "reached into his coat . . . at which point shots were fired." However, Fernandes also stated that "after reaching in, there was a motion that appeared to be a reach out, at which point shots were fired."   Fernandes fired two rounds.   Fernandes testified that part of the reason he fired his weapon was because he heard shots and did not know where they were coming from.   Fernandes did not issue any warnings to Root prior to shooting, other than telling Root to show his hands.   Fernandes also stated that he did

---

[32]   The  majority  opinion  describes  these  accounts  as consistent, Op. 17; however, I do not see the statements "he wasn't standing" and "[h]e was standing" or "standing upright" as being consistent with one another.  Although the majority opinion states that  I  have  taken  out  of  context  Fernandes's  quote  at  his deposition, Op. 17 n.9, the majority opinion restates the same language from the record I have quoted above, without considering Fernandes's later clarifying comments as to what "upright" meant to him.

not wear a body-worn camera on the day of the incident because it was an overtime shift.

### v. Officer Corey Thomas

Officer Corey Thomas, who was in the passenger seat of Fernandes's car during the pursuit, approached the area where the car accident occurred and stood behind or by a tree, approximately fifteen feet from where Root was located. Thomas recalled that another officer was already present when Thomas and Fernandes arrived on the scene. At his initial interview with the Massachusetts state police investigators, Thomas described Root as being "on the ground" in a "half lying, half kneeling type position. . . . [H]e wasn't standing or fully sitting." Later, at his deposition, Thomas testified that Root was "moving in a direction" and "stumbling." When asked about these potentially conflicting statements, Thomas attempted to reconcile them by explaining, "when you're stumbling . . . it's, like, in the way you're trying to get up. You're not fully on the ground. You're kind of, like, working your way up but, again, stumbling and going back -- you're falling back down." Thomas also testified that the officers were shouting commands at Root to show his hands and get on the ground; meanwhile, Root kept his hands close to his body. Thomas testified that Root was moving "abruptly and aggressively," "keeping his hands close to his body," when Thomas heard gunshots and decided to shoot at Root; Thomas shot three times.

### vi. Trooper Paul Conneely

Trooper Paul Conneely, a Massachusetts state trooper, joined the Boston police officers' pursuit of Root just before the final collision occurred.  Conneely testified that he first saw Root on the ground in the mulched area in a kneeling position and that "it looked like he had fallen down."  Conneely also testified that he saw Root attempting to get up while putting both hands on the ground, but that Root was "never able to get up."  Conneely witnessed Root "on either one knee or two."  Conneely recalled seeing the civilian woman run towards Root and then run away after being instructed to do so by officers.  Conneely testified that he commanded Root to stay on the ground and show his hands, while other officers also gave Root directives.

At some point, Conneely saw Root's right hand "c[o]me up" to his chest, and Conneely "lost sight of [Root's] hand" when it "disappeared briefly behind [Root's] [open] jacket."  Conneely remembered Boston police officers yelling that Root had a gun and someone telling Root to drop the gun.  Conneely testified that he then saw Root's hand around a black handle that appeared to be a gun handle.  Conneely also testified that he fired his gun at the time he saw Root with a gun; Conneely fired five rounds.

### vii. Post-Shooting Evidence

In total, the six officers fired thirty-one shots at Root within a three-second time period.  After the officers shot

Root, Conneely and Figueroa turned over Root's body, and Conneely testified that he removed a black bb gun pistol from Root's right hand.[33]  However, Figueroa testified that when they "pulled his hands out from under him" there was nothing in Root's hands "at that moment."  Brookline police officer Christopher Elcock told law enforcement investigators that, after the shooting, he approached Root's body with a medical bag, rolled Root over, and a black firearm (assumedly the bb gun, as no other firearms were recovered from the scene) fell out of Root's chest area.  Brookline police detective David Wagner also told the law enforcement investigators that "he saw the suspect get rolled over" and then "observed [what he believed was] a black semi-automatic firearm fall out of the suspect's chest area."

After the shooting, several of the Boston Police Department officers' body-worn cameras recorded the interactions between the officers.  Conneely told McMenamy to "shut [his] mouth" and asked if he had a "rep" coming to the scene.  In response, McMenamy stated, "Yeah.  I won't -- I won't talk."

Prior to the officers being interviewed by the Massachusetts state police investigators, the officers from the

---

[33] Although the majority describes Conneely's testimony as consistent with the body-worn camera footage, nowhere in the footage do we see from where the bb gun was recovered.  Figueroa's body-worn camera is blocked for much of the time that Figueroa and Conneely are handcuffing Root.

Boston Police Department, other than Thomas, collectively met with their attorney, against police department policy.  The officers remained together for approximately an hour, during which time the officers discussed the incident.

Sergeant Detective Marc Sullivan investigated the shooting in Brookline as part of the Firearm Discharge Investigation Team; as part of that investigation, he, among other things, personally interviewed some of the officers and submitted a final report relating to the incident.  Sullivan was later deposed in relation to this case.  In discussing the investigation during a deposition, Sullivan testified that the police department makes efforts to ensure that officers do not collectively confer prior to their interviews.  Sullivan also testified that the officers meeting together to prepare for their interviews "would taint the interview[s]."

### viii. Shelly McCarthy

McCarthy, a civilian with EMS training who was present at the scene, also testified during a deposition.  McCarthy was parked near where Root crashed his vehicle; she saw Root shortly after he exited his vehicle and observed him slowly moving away from it.  McCarthy testified that from the moment she saw him leaving his car, Root had his right hand on his chest and his left hand was hanging down at his side.  McCarthy watched Root walk away from his car slowly and unsteadily while slumped over, until

he ultimately fell.  She then witnessed Root use his left arm to get himself back on his feet; Root walked forward a couple more feet until he fell again in the mulched area and could not get up.

After McCarthy saw Root fall the first time, she began running over to him but did not reach him until he fell for the second time.  McCarthy testified that after the second fall, Root was lying with his back on the ground -- still holding his chest with his right hand and keeping his left hand by his side.  McCarthy further testified that Root tried to roll onto his shoulder as if to get up, but he could not and so he remained on his back. McCarthy got on her knees next to Root to assist him.  McCarthy described Root's eyes as being open but "bouncing around like ping-pong balls."[34]  McCarthy also observed that Root was "covered in blood" and making "gurgling noises" while breathing slowly. McCarthy stated that, at some point, Root's eyes "stuck in the back of his head" and stopped moving.  McCarthy opined that, after

---

[34] The majority's position that McCarthy's deposition testimony is inconsistent with the statement she gave to state police investigators, Op. 22-23, is not supported by my reading of the record.  The majority opinion has reduced McCarthy's twenty-three-minute interview to one sentence.  Op. 22.  Although McCarthy stated at the interview that she "didn't really get a look at" Root's face to describe his features with particularity, she described the expression on his face several times.  McCarthy stated that Root looked like there were "lights on[,] no one home" and that his eyes looked "pretty vacant."  She also stated that "[i]t could have been shock that was on his face" and that when the cops arrived his expression did not change and "[h]e didn't seem to . . . know what was going on."

observing Root's state, she thought he was unable to stand or speak.

McCarthy testified that after the police officers arrived, they approached with their guns out and began screaming different commands.  McCarthy remembered one of the officers telling her to run, and so she let go of Root's face and ran a few feet before she began hearing gunshots.  McCarthy also testified that she never heard anyone yell, "drop the gun."  McCarthy testified that as she was leaving Root, she saw that his eyes were still in the back of his head and one of his hands was still clutching his chest.

### ix. Doctor Victor Gerbaudo

In addition, a bystander, Doctor Victor Gerbaudo,[35] was interviewed during the Boston Police Department's investigation of the incident.[36]  Gerbaudo was traveling to his work at the hospital, driving in the opposite direction of Root, when Root crashed his vehicle.  In his interview, Garbaudo stated that he observed Root walking with a limp on the sidewalk after the car accident.

_____

[35] Gerbaudo noted to the law enforcement investigators that he was a former reserve police officer.

[36] After observing the incident, Gerbaudo approached a police officer who happened to be at the hospital where he worked and described what he had seen "because . . . [he] kn[e]w that it would have helped [the] officers."  That officer took Gerbaudo's information, and Gerbaudo was later contacted to be interviewed. The subsequent interview lasted approximately ten minutes.

Garbaudo observed officers arrive with their guns drawn and believed that they were telling Root to put his hands up and get on the ground. Garbaudo stated that "everybody was screaming." Garbaudo said he then observed Root turn around[37] and "t[ake] his right hand under his coat" and that the officers then began shooting.

### x. Doctor Jennifer Lipman's Expert Opinion

In addition to the testimony, written statements, and interviews of the officers, McCarthy, and Gerbaudo, Plaintiff also provided the expert report and testimony of Doctor Jennifer Lipman, a forensic medical expert. Lipman was asked to provide her opinion "about the likelihood that a plastic [bb] gun pistol would have no damage and no trace of blood on it if it had been in [Root]'s right hand at the time he was shot in Brookline." Lipman examined the autopsy report, which evidenced that Root suffered thirty-one gunshot wounds. Four of those gunshot wounds were to Root's right hand. The bb gun recovered at the scene near Root's body was not damaged and did not appear to have blood on it.[38]

---

[37] Although the majority opinion states that Garbaudo's recollection "fully substantiates the officers' versions of events," Op. 22, I do not read the record as supporting a finding that any officer described Root as "turn[ing] around" prior to the shooting.

[38] The parties do not dispute that the bb gun was not damaged or that it did not appear to have blood on it.

Lipman opined that if the bb gun was in Root's right hand at any point after exiting his car, as some of the officers suggested, the bb gun would have had blood on it, particularly because McCarthy "witnessed [Root's] hand on his bloody jacket and chest the entire time [after] he left his car," which "would indicate that if he had anything in his hand after that, it would have blood on it." Lipman additionally pointed to the blood on the right side of the steering wheel in Root's car, which also evidenced that there was blood on Root's right hand while he was driving.

Lipman further testified and concluded in her report that if the bb gun was in Root's hand during the shooting -- during which he sustained four gunshot wounds to the hand -- the bb gun would have blood on it from the gunshot wounds to his hand and the bullets that went through Root's hand would have damaged the bb gun. Lipman testified that it is "commonsense" to conclude that if Root was holding the plastic bb gun at the time he sustained four gunshot wounds to that hand, the bb gun would have been damaged. Lipman also concluded in her report that "Mr. Root's right hand must have had blood on it, and he would have transferred that blood to the plastic bb gun if it had been in his hand at any point after he left his car." In summary, "[a] plastic bb gun pistol would have had blood on it if it had been in Mr. Root's hand at any point after leaving his car[] and would have been

damaged if it had been in his right hand when he was shot . . . in Brookline."

Lipman was also asked to address "how blood loss from wounds sustained by Mr. Root at the Brigham and Women's Hospital would have impacted him by the time he exited his car near the Star Market in Brookline."  Lipman opined that "[i]t is not possible to quantify the amount of blood Mr. Root lost inside the car, except to say that it was significant."  Accordingly, Lipman concluded that this loss of blood "rendered Mr. Root physically and mentally impaired."

With the relevant portion of the record summarized, the facts are then examined under our Fourth-Amendment precedent, keeping in mind that all disputed facts are resolved in the favor of the nonmoving party -- here, the Plaintiff.

### 2. Reasonableness of Use of Force

When asserting a Fourth-Amendment violation based on excessive force, a plaintiff must show that there was a seizure and that such a seizure was unreasonable.  Stamps v. City of Framingham, 813 F.3d 27, 35 (1st Cir. 2016).  The parties do not dispute that there was a seizure here.  See McKenney, 873 F.3d at 81 ("A police officer's use of deadly force is deemed a seizure under the Fourth Amendment.").

"Whether a seizure is reasonable depends on 'the facts and circumstances of each particular case.'"  Mlodzinski v. Lewis,

648 F.3d 24, 34 (1st Cir. 2011) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quoting Graham, 490 U.S. at 396).  The "extreme action" of using deadly force "is reasonable (and, therefore, constitutional) only when 'at a minimum, a suspect poses an immediate threat to police officers or civilians.'" McKenney, 873 F.3d at 81 (quoting Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003)).  Context is also important, "and the use of deadly force, even if 'reasonable at one moment,' may 'become unreasonable in the next if the justification for the use of force has been ceased.'"  Id. at 82 (quoting Lytle v. Bexar Cnty., 560 F.3d 404, 413 (1st Cir. 2009)).

There are several fact-intensive considerations the court examines in determining the reasonableness of an officer's use of force, including: (1) "[w]hether a reasonable officer on the scene could believe that the suspect 'posed an immediate threat to police officers or civilians,'" Estate of Rahim v. Doe, 51 F.4th 402, 414 (1st Cir. 2022) (cleaned up) (quoting Fagre v. Parks, 985 F.3d 16, 23-24 (1st Cir. 2021)); (2) whether the officers involved gave "some sort of warning before employing deadly force," McKenney, 873 F.3d at 82; (3) "[w]hether the suspect was armed -- with a gun, knife, or otherwise -- at the time of the encounter or

whether the officers believed the suspect to be armed," Estate of Rahim, 51 F.4th at 414; (4) "[t]he speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force," id.; (5) "[w]hether the suspect was advancing on the officers or otherwise escalating the situation," id. at 415; (6) "[the] suspect's physical proximity and the speed of his movements," McKenney, 873 F.3d at 82; (7) "[w]hether multiple officers simultaneously reached the conclusion that a use of force was required," Estate of Rahim, 51 F.4th at 415; and (8) "the nature of the underlying crime," id. As I will lay out, a number of these considerations here weigh in favor of the reasonableness of the officers' use of force. However, the most important considerations that answer the question as to whether a reasonable officer could believe that Root "pose[d] an immediate threat to police officers or civilians" involve a dispute of material facts and therefore cannot be resolved at this summary judgment stage. McKenney, 873 F.3d at 81 (quoting Jarrett, 331 F.3d at 149).

Several of these considerations unquestionably weigh in favor of concluding that the officers used reasonable force. The officers reasonably believed that Root may have been armed based on Godin's interaction with Root at the hospital and the police radio transmissions that informed the officers that there was an officer-involved shooting. The nature of the underlying crime --

showing a weapon to someone and then later pointing that apparent weapon at an officer -- also supports the officers' reasonable belief regarding the danger Root posed. Lastly, although some of the officers used deadly force in response to hearing other shots, such as Fernandes and Thomas, the remaining officers testified that they made the decision to shoot independently and appear to have done so simultaneously (or nearly simultaneously) within three seconds of each other, a factor that also supports the reasonableness of the officers' use of force.

Whether the officers' warnings were adequate under the circumstances is a closer question. When officers are going to utilize deadly force, "the suspect ordinarily must be warned (at least when a warning is feasible)." Conlogue v. Hamilton, 906 F.3d 150, 156 (1st Cir. 2018). "Although there is no standardized script for such a warning, the key is that the warning must be adequate in light of the circumstances then obtaining." Id. Godin, McMenamy, Figueroa, Thomas, and Conneely testified that they commanded Root to show them his hands. McMenamy, Thomas, and Conneely also testified that they commanded Root to get on the ground. McCarthy testified that the officers were giving Root several different commands at the same time. The audio from Figueroa's body-worn camera also evidences that Figueroa told Root to both "get down" and to "let [her] see [his] hands." In the background of that audio recording, several officers can be heard

also yelling commands, some of which appear to be "stay on the ground," "stay down," and "show me your hands." Although a jury could find that the scene was chaotic and the officers shouted a cacophony of commands, given the nature of the crime and likelihood of a firearm being involved, these warnings, although wanting for some consistency, were sufficient under the circumstances. See Estate of Rahim, 51 F.4th at 414 (finding reasonableness where officers gave at least nine commands to put hands up and/or drop a weapon). Thus, this consideration also weighs in favor of the officers.

The speed in which the officers had to respond to the Brookline incident cuts both ways. Although the scene in Brookline developed very rapidly, and the officers decided within seconds to utilize deadly force, the officers had significant time prior to the incident in Brookline to consider the situation and develop a plan of how to address apprehending Root. After the incident at the hospital, which lasted several minutes, the officers engaged in a slow-speed, and then high-speed, car chase in pursuit of Root.[39] During the pursuit, which lasted approximately six minutes, the officers and dispatch communicated over their radios

---

[39] In analyzing this factor, the majority opinion describes the pursuit only as a "high-speed chase," Op. 44, ignoring both the testimony from the officers (such as McMenamy testifying that the initial pursuit "was noticeably slow" and Godin stating they were traveling "only 35 miles per hour") and video evidence that shows the cars traveling at a slow rate of speed.

regarding the incident at the hospital and the ensuing chase. Thus, although the time in which the officers had to determine whether to use deadly force was short, the overall incident was longer and gave the officers more time to consider how to approach and apprehend Root.  See McKenney, 873 F.3d at 84 (affirming denial of summary judgment in part because the officers had six minutes between when they first saw the plaintiff point a gun and when they decided to employ deadly force).

However, several of the remaining considerations, and perhaps the most important ones, are still subject to genuine factual disputes.  The remaining considerations -- the proximity of Root and speed of his movements, whether a reasonable officer on the scene could believe he posed an immediate threat, and whether he was escalating the situation -- are subject to competing evidence in the record and require making factual conclusions resolving those conflicts as to the essential time period.[40]

_____

[40] The majority opinion points to a number of reasons why the officers "had every reason to believe" Root posed an immediate threat to them and the public, including that at the hospital Godin had witnessed Root pull the trigger on what Godin believed was a gun and that the officers had been involved in a car chase with Root.  Op. 31-32.  However, this overlooks the immediacy requirement and our case law that affirms that "the use of deadly force, even if 'reasonable at one moment,' may 'become unreasonable in the next if the justification for the use of force has ceased.'" McKenney v. Mangino, 873 F.3d 75, 82 (1st Cir. 2017) (quoting Lytle v. Bexar Cnty., 560 F.3d 404, 413 (1st Cir. 2009)).  This does not require the officers to view the situation anew but does reinforce our principle that "a passing risk to a police officer is not an

In holding that the officers' testimony was entirely consistent as to Root's movements immediately prior to the shooting, my view is that the majority has taken an unduly narrow view of the evidence. Op. 35, 36-37. It is readily apparent that the officers' accounts contain many inconsistencies as to Root's movements directly before the shooting. While some officers stated that Root was seated or kneeling, others recalled Root standing on two feet, and one officer first testified that Root was standing but later said that Root was merely attempting to stand. There were also officers who testified that Root's hand was by his chest the entire time, while others said Root moved his hand up to his chest. Some of the officers observed Root reaching into his jacket, others testified that they fired because Root was removing his hand from his jacket, and yet another officer testified that

___

ongoing license to kill an otherwise unthreatening suspect." Id. (quoting Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999)). The majority cites McGrath v. Tavares, 757 F.3d 20, 28 (1st Cir. 2014), in support of its finding that the high-speed car chase rendered Root an immediate threat to the officers. Op. 32. However, in McGrath, the suspect was in the car driving towards the officer-defendant when the officer initially made the decision to shoot. 757 F.3d at 28. Subsequent shots were fired by the officer when he believed that "the same reckless driver who had almost run him over a fraction of a second earlier" was driving towards another officer. Id. Here, Root was clearly no longer in the car or posing a threat with his vehicle, which was abandoned on the side of the road after the collision. Further, unlike the "fraction of a second" between the suspect driving at one officer and then another in McGrath, here the officers lost sight of Root's vehicle for approximately thirty seconds before finding it again on the side of the road after the accident and discovering Root several feet away from the vehicle.

shots were fired because Root was reaching into his jacket but later said shots were fired after Root began pulling his hand out of his jacket.

The majority opinion also heavily relies on the unsworn statements of Gerbaudo as support for the finding that Root was reaching into his jacket just before the fatal shooting. Op. 36. Although I agree that Gerbaudo stated that he saw Root reach into his jacket, Gerbaudo also said that he saw Root "turn[] around" -- a fact that is wholly inconsistent with any of the other testimony in the record. The majority opinion states that "Gerbaudo's statement that Root turned reinforces the officers' testimony that Root was moving just before the shooting," Op. 36; however, the officers who described Root as moving did not describe or even suggest that there was a "turn around" movement. None of the officers stated that Root was faced away from the officers at any point or that Root ever changed the direction he was facing. McCarthy's testimony also indicates that when the officers approached her and Root the officers were within Root's line of sight, further evidencing that Root was initially facing towards the officers.

In and of itself, the inconsistencies in the testimony regarding Root's movements (particularly when paired with McCarthy's testimony discussed below) create genuine issues of material fact as to what Root's movements were just prior to the

shooting. However, the inconsistencies also raise questions as to the credibility of the officers, as does other evidence in the record.

Aside from the inconsistencies regarding Root's movements, the officers provided other testimony that was controverted by other pieces of evidence. For example, Godin repeatedly stated that he was not wearing his body-worn camera on the day Root was killed; however, this was later disproved by video evidence from another officer's body-worn camera. Conneely also testified that he only shot when he saw Root's hand around what appeared to be a firearm handle; however, the physical evidence and testimony of Plaintiff's expert, Lipman, lead to the conclusion that the bb gun Root had in his possession could not have been in his hand at the time the shooting occurred (or at any time during the Brookline incident), not only because the plastic bb gun did not appear to have blood on it but also because it was undamaged.

Other evidence in the record also raises concerns regarding the officers' credibility. While several of the officers were wearing body-worn cameras and were mandated to record interactions under police department policies, only Figueroa had hers on during the shooting and it was covered during the essential time period. See Goodwin v. City of Painesville, 781 F.3d 314, 322-23 (6th Cir. 2015) (finding that a failure to activate a recording device against police department policy could weigh

against an officer's credibility).  When some of the other officers
did have their body-worn cameras on after the shooting, the
officers made other statements that draw their credibility into
question, such as McMenamy telling Conneely that he "wo[uld]n't
talk."  Further, the evidence that the officers met collectively
prior to their interviews (other than Thomas, who notably did not
testify that he saw Root reach into or out of his jacket) raises
further questions regarding the officers' credibility.

Based on these facts, Plaintiff relies on more than mere
conclusory allegations that the officers may lack credibility.
Although this other testimony and evidence does not allow us to
conclusively establish what Root was doing prior to the shooting,
these clear contradictions in the record raise questions critical
to the officers' credibility.[41]  See Flythe, 791 F.3d at 21 (holding
that "the record contains evidence that could lead a reasonable
juror to question [the officer]'s personal credibility and his
ability to observe, perceive, and recall the shooting").    The

---

[41] My conclusion that the officers' credibility was reasonably
put in question does not simply hinge on the fact that the sole
other witness was killed by officers, as the majority suggests.
See Op. 41 n.21.  Rather, my conclusion relies on the fact that
the nonmoving party has put forward affirmative evidence that
raises material issues regarding the officers' credibility.  See
Bazan v. Hidalgo Cnty., 246 F.3d 481, 491 (5th Cir. 2001) (finding
that the district court "found genuine issues of material fact as
to the events in the field, both because the [officer] was the
sole surviving witness for his use of deadly force and also because
of questions arising from the varied testimony as to what occurred
shortly before" the deadly shooting).

Plaintiff also is not "relying on the hope that the jury will not trust the credibility of witnesses"; instead, Plaintiff has provided affirmative evidence that directly casts doubt on the officers' credibility, presenting a question that only the factfinder can resolve. Sears, Roebuck & Co. v. Goldstone & Sudalter, 128 F.3d 10, 18 (1st Cir. 1997); see Goodwin, 781 F.3d at 323 ("Though the prospect of challenging a witness's credibility is not alone enough to avoid summary judgment, summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses." (internal citations and quotation marks omitted)); Lamont v. New Jersey, 637 F.3d 177, 184 (3d Cir. 2011) (finding that the officers' explanation of the circumstantial evidence was "a bit far-fetched" and holding that the issue was to be determined by the factfinder).

Lastly, the majority opinion dismisses McCarthy's testimony that Root was under severe physical distress and unable to pose a threat when she was by his side just seconds before the deadly shooting. McCarthy's opinion is supported by Lipman's expert opinion that Root's injuries would have caused him to be both physically and mentally impaired. In my view, this evidence alone provides a reasonable factfinder with an alternative account as to what Root's behavior and abilities were prior to the shooting. Because of this, Plaintiff's contention that Root was

physically incapable of threatening the officers prior to the shooting is neither "incredible" nor "conclusory." <u>Statchen</u> v. <u>Palmer</u>, 623 F.3d 15, 18 (1st Cir. 2010).

      For these reasons, I cannot conclude that the officers' accounts are internally consistent or wholly compatible with other known facts. <u>See</u> <u>Flythe</u>, 791 F.3d at 19. The evidence, at this summary-judgment stage, presents significant reasons to discount the officers' stories and offers a reasonable alternative -- that Root was unable to act threateningly during the essential time period. <u>See</u> <u>id.</u> Consequently, the evidence could convince a rational factfinder that the officers acted unreasonably. Although it is also true that a reasonable factfinder could conclude that Root did pose a threat, "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge on a motion for summary judgment." <u>Id.</u> at 22 (quoting <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).

      As we have stated before, cases like these are tragic, "tragic for the person who lost his life, for the family left behind, and for the police officer[s] who fired the fatal bullet[s]," but must be evaluated "on [their] own facts." <u>Conlogue</u>, 906 F.3d at 158. Summary judgment is simply not the time to make such an evaluation when a number of vital facts are disputed.

## B. Clearly Established

The second step of the qualified immunity analysis is also divisible into two parts. First, "the plaintiff must point to 'controlling authority or a consensus of cases of persuasive authority' that broadcasts 'a clear signal to a reasonable official that certain conduct falls short of the constitutional norm.'" McKenney, 873 F.3d at 81 (quoting Alfano, 847 F.3d at 76). "Then, the court must evaluate 'whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law.'" Id. (quoting Alfano, 847 F.3d at 76).

The test as to the first part is "whether existing case law has 'placed the statutory or constitutional question beyond debate.'" Id. at 83 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014)).

I have already concluded that on this record a reasonable factfinder could disbelieve the officers' testimony and find that Root was not acting and could not act threateningly at the time of the shooting. The "state of the law was clear such that a

reasonable officer in [the officers'] position would have understood that" shooting a person who is bleeding on the ground and unable to make sudden movements "constituted excessive force in violation of that person's Fourth Amendment rights."[42]  Stamps, 813 F.3d at 39-40; see McKenney, 873 F.3d at 83 (finding that well-settled precedent established that the officer could not use deadly force against plaintiff who was not attempting to use a firearm against officers or others).  Therefore, "the use of deadly force against [Root] by officers who did not think that he was holding a deadly weapon or reaching for one when they fired on him

---

[42] Putting aside the evidentiary disputes between myself and the majority, which are detailed above, I also strongly disagree with the majority's view that by virtue of Root being armed and previously posing a threat to the officers and the public by driving at a high rate of speed, the law was not clearly established that the officers could not use deadly force against such a person.  See Franklin v. City of Charlotte, 64 F.4th 519, 531 (4th Cir. 2023) ("[A]n officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." (quoting Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013)).  Our caselaw has consistently set out the established principle that, in my view, clearly applies to the facts here, that "the use of deadly force, even if 'reasonable at one moment,' may 'become unreasonable in the next if the justification for the use of force has ceased.'"  McKenney, 873 F.3d at 82 (quoting Lytle, 560 F.3d at 413).  There is no question that once a suspect no longer poses a threat to the public or the officers, the officers cannot be justified in using deadly force. Id. at 81 (holding that the "extreme action" of using deadly force "is reasonable (and, therefore, constitutional) only when 'at a minimum, a suspect poses an immediate threat to police officers or civilians'" (quoting Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003))).

would be excessive under clearly established law." <u>Estate of Rahim</u>, 51 F.4th at 421 (Barron, C.J., dissenting).

For these reasons, I would reverse the district court's grant of summary judgment in favor of the individual officers as to the deadly force claims.

### III. The Claims Against the City

As to the matter of municipal liability, I agree with the majority's conclusion that McMenamy's kick did not constitute a constitutional violation and, consequently, the kick could not support a theory of municipal liability. <u>See</u> Op. 51-52. Likewise, the majority's analysis in relation to the PIT maneuver soundly supports its determination that regardless of whether the PIT maneuver constituted a constitutional violation, a reasonable factfinder could not find on this record that the City acted with deliberate indifference. <u>See</u> <u>id.</u> at 56-57. But because my colleagues found that there was not a constitutional violation in the use of deadly force, they accordingly held that such deadly force could not support a theory of municipal liability. <u>See</u> <u>id.</u> at 56.

Because I would conclude that a reasonable factfinder could deem the use of deadly force a violation of Root's constitutional rights, I proceed to examine whether a reasonable factfinder, on this summary judgment record, could find municipal

liability for a failure to adequately train the officers.[43] Ultimately, a reasonable factfinder could not find that the City acted with deliberate indifference in its training of the officers; as such, I concur with the majority's conclusion, affirming the district court's granting of summary judgment in favor of the City on the municipal liability claim.

A municipality can be liable for its agents' and employees' constitutional violations "only when the governmental employees' 'execution of a government's policy or custom . . . inflicts the injury' and is the 'moving force' behind the constitutional violation." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). Thus, "two basic elements" must be proven: (1) "plaintiff's harm was caused by a constitutional violation" and (2) the City is "responsible for

---

[43] Plaintiff argues that if this court determines that there was a constitutional violation, contrary to the district court's conclusion, reversal is mandated solely on that basis as to the municipal liability claims.

This argument ignores our principle that "[w]e may affirm the district court's decision on any grounds supported by the record," Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008) (quoting Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 62 (1st Cir. 2004)); in other words, here we can affirm on other grounds even if we find a constitutional violation. Likely acknowledging this, Plaintiff goes on to argue the other element of municipal liability.

that violation." Id. at 25-26. For the reasons discussed supra, I would find that the first element is satisfied.

As to the second basic element, additional requirements have been put in place. "The alleged municipal action at issue must constitute a 'policy or custom' attributable to the City." Id. at 26. Further, "the municipal policy or custom [must] actually have caused the plaintiff's injury" and "the municipality [must] possess[] the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'" Id. To succeed on a claim alleging that a municipality failed "to train police officers who then violate[d] a plaintiff's constitutional rights," the plaintiff must show that "'the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact' and [that] 'the identified deficiency in a city's training program is closely related to the ultimate injury.'" Id. (cleaned up) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

"[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." Id. at 27. Instead, a finding of deliberate indifference requires a finding that the municipality "disregarded a known or obvious risk of harm" in utilizing a deficient training program or in not developing a

training program.  Id. at 28.  "Such knowledge can be imputed to a municipality through a pattern of prior constitutional violations."  Id.  Indeed, such a pattern is "ordinarily necessary" because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  Connick v. Thompson, 563 U.S. 51, 62 (2011) (quoting Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)).  However, "liability without such a pattern will be appropriate 'in a narrow range of circumstances,' where 'a violation of a federal right' is 'a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'"  Young, 404 F.3d at 28 (cleaned up).

Plaintiff asserts that based on the officers' conduct, "whatever training they received did not stick."  Similarly, Plaintiff argues that the officers' repeated violations of the police department's rules during their encounter with Root evinces that the officers "were not trained to understand that they are required to follow BPD rules."  However, the mere fact that officers acted unconstitutionally cannot be sufficient to establish that they were trained inadequately; indeed, such a conclusion would render the second basic element of municipal liability meaningless.  This is also not a case where there is a

question as to whether any training occurred.  See Young, 404 F.3d at 27-28.  "[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do so says little about the training program or the legal basis for holding the city liable." City of Canton, 489 U.S. at 391.

Plaintiff further argues that the police department's training manuals and testimony from the City's training instructor reveal deficient training on "establishing a perimeter, focusing on containment to create time and distance, engaging in de-escalation techniques, considering the full totality of the circumstances rather than only select circumstances, teaching when using deadly force is justifiable, and less-lethal force options." However, Plaintiff does not point with any particularity to what the deficiencies in these areas were or how those deficiencies should have been remedied.  In fact, the record demonstrates that the police department maintains rules around these exact topics and trains officers on defensive tactics and appropriate use of force.  Nonetheless, pointing to the testimony of the City's training instructor, Plaintiff asserts that "recruits are not specifically trained in how to figure out which officers in a multi-officer scenario will assume the contact and cover roles" or how to handle other facets of multi-officer situations.  The City's training instructor, however, did not testify that no training was

provided, but rather that determining assigned roles "is very fluid" based on the nature of the circumstances.

Plaintiff also asserts that the City knows that the police department has a long history of excessive force claims, and it thus follows that the City knew it needed to improve training on the proper use of force. This is far too broad a view of when repeated violations put a municipality on notice that its training is inadequate. Excessive force claims can involve an infinite number of factual scenarios, including highly varying degrees of force itself -- clearly, a use of force can be reasonable in one circumstance yet unreasonable in another. Without more particularized claims that the City's awareness of repeated excessive force claims involving similar policies (such as conduct during multi-officer arrests) or factual scenarios (such as where officers used deadly force against a physically injured arrestee or claims involving the same officers), I cannot conclude on this record that the City had sufficient notice that their training was insufficient as to rise to the level of deliberate indifference.

Finally, Plaintiff argues that this case falls within the narrow exception for circumstances where the constitutional violation was highly predictable due to the officers' lack of ability to handle recurring situations. The need to train officers on the constitutional limitations on the use of deadly force, see

Tennessee v. Garner, 471 U.S. 1 (1985), can be said to be "so obvious" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights, even without a pattern of violations. City of Canton, 489 U.S. at 390 n.10. However, Plaintiff has not asserted that the City offered no training on the use of deadly force, as discussed above. Rather, Plaintiff argues that the training program was "imperfect" -- imperfection is not sufficient to show deliberate indifference. Young, 404 F.3d at 27. Plaintiff also has not pointed to other areas of training that the officers did not receive to which this exception may apply.

Accordingly, because I find that no reasonable juror could find deliberate indifference on the part of the City on this record, I concur with my colleagues in their conclusion that the district court's granting of summary judgment in favor of the City should be affirmed, albeit for different reasons.

### IV. Conclusion

For the above stated reasons, I respectfully dissent, joining only as to Part IV of the majority opinion and concurring as to Part V.